1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9   United States of America,                  No. CV-17-00140-PHX-DLR

10                  Plaintiff,                  (Related Case No. CV-17-08007-PCT-DLR)

11  v.                                          **ORDER**

12  Cyprus Amax Minerals Company; and
    Western Nuclear, Inc.,
13
14                  Defendants.

15

16          The United States, on behalf of the Environmental Protection Agency, filed an

17  unopposed motion to enter the parties' proposed consent decree. (Docs. 18, 18-6.)  The

18  Navajo Nation filed a similar motion in its related suit against Defendants.  (Doc. 23, No.

19  CV-17-08007-PCT-DLR.)  The Court granted the motions, finding the consent decree to

20  be fair, reasonable, and consistent with the objectives of CERCLA.

21          **IT IS ORDERED** that the consent decree is hereby entered:

22

23                            **CONSENT DECREE**

24

25

26

27

28

# TABLE OF CONTENTS

I.      BACKGROUND .................................................................................................. 1

II.      JURISDICTION ................................................................................................. 3

III.      PARTIES BOUND ............................................................................................. 4

IV.      DEFINITIONS ................................................................................................... 4

V.      GENERAL PROVISIONS .............................................................................. 11

VI.      PERFORMANCE OF THE WORK ............................................................... 13

VII.      REMEDY REVIEW ........................................................................................ 19

VIII.      PROPERTY REQUIREMENTS ..................................................................... 20

IX.      FINANCIAL ASSURANCE ........................................................................... 22

X.      PAYMENTS FOR RESPONSE COSTS ....................................................... 29

XI.      INDEMNIFICATION AND INSURANCE ................................................... 41

XII.      FORCE MAJEURE ......................................................................................... 43

XIII.      DISPUTE RESOLUTION .............................................................................. 45

XIV.      STIPULATED PENALTIES .......................................................................... 49

XV.      COVENANTS BY THE UNITED STATES ................................................. 54

XVI.      COVENANTS BY THE NAVAJO NATION ............................................... 58

XVII.      COVENANTS BY SETTLING DEFENDANTS AND SFAS .................... 61

XVIII.      EFFECT OF SETTLEMENT; CONTRIBUTION ......................................... 65

XIX.      ACCESS TO INFORMATION ....................................................................... 67

XX.      RETENTION OF RECORDS ......................................................................... 69

XXI.      NOTICES AND SUBMISSIONS .................................................................. 71

XXII.      RETENTION OF JURISDICTION ............................................................... 75

XXIII.      APPENDICES ................................................................................................. 75

XXIV.      MODIFICATION ............................................................................................ 76

XXV.      NOTICE OF COMPLETION OF WORK ..................................................... 76

XXVI.      LODGING AND OPPORTUNITY FOR PUBLIC COMMENT .............. 77

XXVII.      SIGNATORIES/SERVICE ............................................................................ 77

XXVIII.      FINAL JUDGMENT ...................................................................................... 78

# I.    BACKGROUND

A.    The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607, against Cyprus Amax Minerals Company ("Cyprus Amax") and Western Nuclear, Inc. ("Western Nuclear") (collectively, "Settling Defendants").

B.    The Navajo Nation filed a complaint in this matter pursuant to Section 107 of CERCLA and Sections 2403, 2501 and 2503 of the Navajo Nation CERCLA ("NNCERCLA"), 4 N.N.C. §§ 2403, 2501 and 2503, against Settling Defendants.

C.    The United States and the Navajo Nation (collectively, "Plaintiffs"), in their complaint against the Settling Defendants, each seek, *inter alia*: (1) reimbursement of Past and Future Response Costs incurred, in the case of the United States, by EPA and other federal agencies, and in the case of the Navajo Nation, by the Navajo Nation, including the Navajo Nation EPA ("NNEPA") and the Navajo Nation DOJ ("NNDOJ"), for response actions at the abandoned uranium mine sites and one transfer station in Arizona, New Mexico, and Utah, located on Navajo Nation lands, and listed in Appendix A ("Mine Sites"), together with accrued interest; and (2) performance of response actions by Settling Defendants at the Mine Sites consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

D.    Cyprus Amax acknowledges that it is the successor in interest to Climax Uranium Company and has a contractual obligation to indemnify Chemetall Foote Corporation, the corporate successor to Vanadium Corporation of America and its affiliates. Cyprus Amax further acknowledges that Climax Uranium Company, Vanadium Corporation of America, or another corporate affiliate of Cyprus Amax was historically involved in uranium mining at each of the abandoned uranium mines listed in Appendix A except for the Ruby Mines Site and the Proximate Mine Sites.  Western

Nuclear acknowledges that it was historically involved in uranium mining at the Ruby Mines Site identified in Appendix A.

E.     Western Nuclear recently entered into an Administrative Settlement Agreement and Order on Consent for Engineering Evaluation and Cost Analysis in *In the Matter of: Ruby Mines Site*, U.S. EPA Region 9, CERCLA Docket No. 2016-10 and will perform that work separately from this Consent Decree ("CD").  The Parties agree that all future work at the Ruby Mines Site after the Engineering Evaluation/Cost Analysis ("EE/CA") is completed will be performed pursuant to the terms of this Consent Decree.

F.     Pursuant to the settlement of the Tronox Incorporated bankruptcy proceeding, *In re Tronox Inc.*, No. 09-10156 (ALG) (Bkr. S.D.N.Y.), the United States and the Navajo Nation settled, resolved, and recovered funds from Tronox Incorporated, Kerr-McGee Corporation, and related subsidiaries of Anadarko Petroleum Corporation to address certain abandoned uranium mines located on Navajo Nation lands, including the 23 abandoned uranium mines listed and identified in Appendix B.  Settling Defendants acknowledge that Vanadium Corporation of America was historically involved in uranium mining at each of the abandoned uranium mines identified in Appendix B.  This CD does not require Settling Defendants to perform any work at any of the abandoned uranium mines identified in Appendix B.

G.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the Navajo Nation Division of Natural Resources, Navajo Nation Department of Justice, U.S. Department of the Interior, New Mexico Office of Natural Resources Trustee, Arizona Natural Resources Trustee, State of Utah Lead Trustee, and State of Utah Co-Trustee on December 13, 2016, of negotiations with the Settling Defendants regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustee(s) to participate in the negotiation of this CD.

H.     Settling Defendants do not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaints, do not admit that any release or

threatened release of hazardous substances occurred while they operated any Mine Site, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from any of the Mine Sites constitutes an imminent and substantial endangerment to the public health or welfare or the environment. Settling Federal Agencies do not admit any liability arising out of the transactions or occurrences as may be alleged in any claims by the Navajo Nation or counterclaims by Settling Defendants.

I. Based on the information presently available to EPA and the Navajo Nation, EPA and the Navajo Nation believe that the Work at the Mine Sites will be promptly conducted by Settling Defendants if conducted in accordance with this CD and its appendices.

J. Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the Work to be performed by Settling Defendants shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

K. The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Mine Sites and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II. JURISDICTION

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1367, and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over the Parties. Solely for the purposes of this CD and the underlying complaints, the Parties waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. The Parties shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

### III.   PARTIES BOUND

2.          This CD is binding upon the United States and the Navajo Nation and upon Settling Defendants and their successors and assigns. Any change in ownership or corporate or other legal status of Settling Defendants including, but not limited to, any transfer of assets or real or personal property shall in no way alter Settling Defendants' responsibilities under this CD.

3.          Settling Defendants shall provide a copy of this CD to each contractor hired to perform the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. Settling Defendants or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. Settling Defendants shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with Settling Defendants within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

### IV.   DEFINITIONS

4.          Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at the Mine Sites and any other real property where EPA determines, at any time, after providing a reasonable opportunity for review and comment by NNEPA, that access, land, water, or other resource use restrictions are needed to implement the Work.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation,

and Liability Act, 42 U.S.C. §§ 9601-9675, and as subsequently amended.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXIII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or Navajo Nation holiday, the period shall run until the close of business of the next working day.

"Decision Document" shall mean any action memorandum or record of decision signed by EPA for one or more of the Mine Sites.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Financial Assurance Amount" shall mean the amount calculated pursuant to Paragraph 27.

"First Component of the Work" shall mean removal site evaluations for all of the Mine Sites and EE/CAs for those Mine Sites or groups of Mine Sites where EPA determines that an EE/CA shall be conducted.

"Cyprus Amax/Western Nuclear Sites Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Mine Sites by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3).

"Future Settling Defendants Response Costs" shall mean (i) those necessary costs of response incurred by Settling Defendants after the Effective Date that are consistent with the National Contingency Plan, as defined in 42 U.S.C. § 9601(25), and that arise

5

out of or in connection with the Work, and (ii) any Future Response Costs paid by Settling Defendants.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States or the Navajo Nation incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 12 (Emergencies and Releases), ¶ 13 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 26 (Access to Financial Assurance), ¶ 70 (Work Takeover), Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions, including, but not limited to, the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include all Interim Response Costs, and all Interest on those Past Response Costs and Navajo Nation Past Response Costs that Settling Defendants have agreed to pay under this CD that has accrued pursuant to 42 U.S.C. § 9607(a) during the period from June 15, 2016 to the Effective Date, in the case of the United States, and from June 30, 2016 to the Effective Date, in the case of the Navajo Nation.

"Inflation Start Date" shall mean the earlier of either (1) the date EPA selects at least one response action for one or more of the mines included in Attachment A of the Statement of Work, after completion of an EE/CA or Remedial Investigation pursuant to the Statement of Work, or (2) January 1, 2023. For purposes of determining the Inflation Start Date, Interim Actions required pursuant to Section 7 of the Statement of Work do not constitute a "response action" that triggers the Inflation Start Date.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and applicable Navajo, state, or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to

minimize the potential for human exposure to Waste Material at or in connection with the Mine Sites; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the response action(s); and/or (c) provide information intended to modify or guide human behavior at or in connection with the Mine Sites.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States or the Navajo Nation in connection with the Mine Sites between June 15, 2016 or June 30, 2016, respectively, and the Effective Date, or (b) incurred prior to the Effective Date but paid after that date.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www2.epa.gov/superfund/superfund-interest-rates.

"Mine Site" shall mean one of, and "Mine Sites" shall mean some or all of, the abandoned uranium mine sites and one transfer station in Arizona, New Mexico, and Utah, located on Navajo Nation lands, that are enumerated and described in Appendix A, and other areas where contamination associated with those abandoned uranium mine sites and one transfer station has been deposited, stored, disposed of, placed, or otherwise come to be located. The Parties agree that they may amend Appendix A to add or delete Mine Sites by mutual consent.

"Mining" shall include reconnaissance, drilling, exploring, investigating, surveying, or other activity related to locating, extracting, transporting, or processing ore or minerals from the ground as well as the sale of ores or minerals.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105

7

of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Navajo Nation" shall mean the Navajo Nation and each department, agency, and instrumentality of the Navajo Nation. The term shall not include Navajo Nation enterprises.

"Navajo Nation lands" shall mean all lands of the Navajo Nation as described in 7 N.N.C. § 254(A).

"Navajo Nation Past Response Costs" or "NN Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the Navajo Nation paid at or in connection with the Mine Sites through June 30, 2016, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"NNCERCLA" shall mean the Navajo Nation Comprehensive Environmental Response, Compensation, and Liability Act, 4 N.N.C. §§ 2102-2805, and as subsequently amended.

"NNCERCLA Cyprus Amax/Western Nuclear Sites Special Account" shall mean the special account that is established for the Mine Sites by NNEPA pursuant to the NNCERCLA, 4 N.N.C. § 2504(A)(5), and that is within the existing Hazardous Substance Fund established under the NNCERCLA, 4 N.N.C. § 2701.

"NNDOJ" shall mean the Navajo Nation Department of Justice and its successor departments, agencies, or instrumentalities.

"NNEPA" shall mean the Navajo Nation Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"Notice of Completion of Work" shall mean the notice issued by EPA pursuant to Section XXV after EPA determines that Settling Defendants have completed all Work required by this CD and SOW, except for Payment of Future Response Costs and Record Retention.

"Operation and Maintenance" or "O&M" shall mean all activities required to

operate, maintain, and monitor the effectiveness of the response actions undertaken pursuant to the Statement of Work ("SOW"), as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the Navajo Nation, and Settling Defendants. "Party" shall mean any one of these Parties, as the context requires.

"Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States paid at or in connection with the Mine Sites through June 15, 2016, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Past Settling Defendants Response Costs" shall mean all response costs incurred by Settling Defendants before the Effective Date of this CD.

"Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of response action objectives, as set forth by EPA in one or more action memoranda or one or more records of decision issued in accordance with the SOW, the NCP, and CERCLA.

"Plaintiffs" shall mean the United States and the Navajo Nation.

"Post-Removal Site Control" shall mean actions necessary to ensure the effectiveness and integrity of any removal action to be performed at a Mine Site or Mine Sites pursuant to this CD and the SOW, consistent with Sections 300.415(l) and 300.5 of the NCP and "Policy on Management of Post-Removal Site Control" (OSWER Directive No. 9360.2-02, Dec. 3, 1990).

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"Proximate Mine Site" shall mean one of, and "Proximate Mine Sites" shall mean some or all of, the seventeen abandoned uranium mine sites in Arizona, and New Mexico, and located on Navajo Nation lands, that are enumerated and described in Appendix A, and other areas where contamination associated with those abandoned uranium mine sites has been deposited, stored, disposed of, placed, or otherwise come to be located. The Proximate Mine Sites are in close physical proximity to one or more of the other Mine Sites. The Parties agree that they may amend Appendix A to add or delete Proximate Mine Sites by mutual consent.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992, and as subsequently amended (also known as the Resource Conservation and Recovery Act).

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Federal Agencies" or "SFAs" shall mean any federal agency, department, or instrumentality involved in or responsible in any way for (a) any disposal or release of Waste Material at the Mine Sites or (b) Mining activities at the Mine Sites, or otherwise alleged to be liable for contamination at the Mine Sites, including but not limited to the Atomic Energy Commission, the United States Department of Energy, the United States Nuclear Regulatory Commission, the United States Department of the Interior and all subcomponents thereof, including but not limited to the United States Geological Survey and the Bureau of Indian Affairs, and any predecessor or successor departments, agencies, or instrumentalities.

"Statement of Work" or "SOW" shall mean the document, attached as Appendix C, describing the activities Settling Defendants must perform to implement the response actions required by EPA under CERCLA at the Mine Sites, pursuant to the terms of this CD.

"Supervising Contractor" shall mean the principal contractor retained by Settling Defendants to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition

of any interest by operation of law or otherwise.

"Trust Account" shall mean the U.S. Four Corners Uranium Mine Sites Trust Account established pursuant to the Trust Agreement attached to this CD as Appendix F, or any successor or substitute trust accounts.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA and the SFAs.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27).

"Work" shall mean all activities and obligations Settling Defendants are required to perform under this CD, except the activities required under Section XX (Retention of Records).

## V.      GENERAL PROVISIONS

5.          **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health, welfare, and the environment by the investigation of and design and implementation of response actions at the Mine Sites by Settling Defendants, to pay response costs of Plaintiffs, to resolve the claims of Plaintiffs against Settling Defendants, as provided in Sections XV (Covenants by the United States) and XVI (Covenants by the Navajo Nation), and to resolve the claims of Settling Defendants and the Navajo Nation that have been or could have been asserted against the United States with regard to the Work at the Mine Sites, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, and Future Settling Defendants Response Costs, as provided in Sections XVI (Covenants of the Navajo Nation) and XVII (Covenants of Settling Defendants and SFAs).

6.          **Commitments by Settling Defendants and the SFAs**. Settling Defendants shall finance and perform the Work in accordance with this CD, the SOW, and all deliverables developed by Settling Defendants and approved or modified by EPA,

after reasonable opportunity for review and comment by NNEPA, pursuant to this CD. Settling Defendants shall pay the United States for its Past and Future Response Costs and the Navajo Nation for its Past and Future Response Costs as provided in this CD. SFAs shall reimburse Settling Defendants Future Response Costs, a portion of Past Response Costs and a portion of Navajo Nation Past Response Costs, as provided in this CD, and in the event of a Work Takeover shall act in accordance with Paragraph 70.d.

7. **Compliance with Applicable Law**. Nothing in this CD limits Settling Defendants' obligations to comply with the requirements of all applicable Navajo, state, and federal laws and regulations, except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). Settling Defendants must also comply with all applicable or relevant and appropriate requirements of all federal, Navajo, and state environmental laws as set forth in any records of decision or action memoranda for the Mine Sites, or otherwise identified pursuant to the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8. **Permits**.

a. As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (*i.e.*, within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal, Navajo, or state permit or approval, Settling Defendants shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b. Settling Defendants may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and

required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.      This CD is not, and shall not be construed to be, a permit issued pursuant to any federal, Navajo, or state statute or regulation.

## VI.      PERFORMANCE OF THE WORK

9.      **Coordination and Supervision**.

a.      **Project Coordinators.**

(1)      Settling Defendants' Project Coordinator must have sufficient technical expertise to coordinate the Work. Settling Defendants' Project Coordinator may not be an attorney representing Settling Defendants in this matter and may not act as the Supervising Contractor. Settling Defendants' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2)      EPA has designated Linda Reeves as EPA's Project Coordinator and Mark Ripperda as EPA's Alternate Project Coordinator. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator and Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at a Mine Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3)      NNEPA shall designate and notify EPA and Settling Defendants of their Project Coordinator and Alternate Project Coordinator. NNEPA may designate other representatives, including its employees, contractors and/or consultants, to assist its Project Coordinators. For any meetings and inspections in which EPA's Project Coordinators participate, NNEPA's Project

13

Coordinator[s] also may participate. Settling Defendants shall notify NNEPA reasonably in advance of any such meetings or inspections.

(4)     Settling Defendants' Project Coordinator shall meet, in person or by phone, with EPA's Project Coordinator and NNEPA's Project Coordinator, if he or she chooses to participate, in accordance with the schedules set forth in applicable work plans approved pursuant to the SOW.

b.     **Supervising Contractor**. Settling Defendants' proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2014, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

c.     **Procedures for Disapproval/Notice to Proceed.**

(1)     Settling Defendants shall designate, and notify EPA and NNEPA, within 10 days after the Effective Date, of the names, contact information, and qualifications of Settling Defendants' proposed Project Coordinator and Supervising Contractor.

(2)     EPA, after a reasonable opportunity for review and comment by NNEPA, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, Settling Defendants shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall, after a reasonable opportunity for review and comment by NNEPA, issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. Settling Defendants may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA and NNEPA of Settling Defendants' selection.

(3)　　Settling Defendants may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

(4)　　Notwithstanding the procedures of ¶¶ 9.c(1) through 9.c(3), Settling Defendants have proposed, and EPA, after having provided a reasonable opportunity for review and comment by NNEPA, has authorized Settling Defendants to proceed, regarding the following Project Coordinator, Stuart Brown, 333 N. Central Avenue, Phoenix, Arizona 85004; (602) 366-8303; sbrown@fmi.com, and Supervising Contractor, CH2M Hill, 9191 South Jamaica Street, Englewood, Colorado 80112; (303) 771-0900.

10.　　**Performance of Work in Accordance with the SOW**. Settling Defendants shall conduct all activities required pursuant to the SOW in accordance with the SOW and all EPA-approved, conditionally approved, or modified deliverables. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA, after a reasonable opportunity for review and comment by NNEPA, in accordance with Sections 13 (Approval of Deliverables) and 16 (NNEPA Participation) of the SOW.

11.　　**Annual Spending Cap.**　Settling Defendants' obligation to perform the activities required by the SOW shall be limited by the following terms:

a.　　Settling Defendants shall not be required to spend more than $25 million per calendar year ("Annual Spending Cap") until the Inflation Start Date.

b.　　After the Inflation Start Date, and until all funds from the Trust Account have been fully expended, the Annual Spending Cap shall be $30 million, as adjusted for inflation as provided in Paragraph 11.e.

c.　　After all funds from the Trust Account have been fully expended, the Annual Spending Cap shall be $25 million, as adjusted for inflation as provided in Paragraph 11.e.

15

d.        The Parties shall undertake an annual planning process, according to the work plans required by the SOW.  Through this process EPA, after a reasonable opportunity for review and comment by NNEPA, will determine which activities under the SOW must be performed in the following year, subject to the Annual Spending Cap.  Settling Defendants shall perform those activities as directed by EPA, subject to the Annual Spending Cap.  With EPA's approval and without waiver of Settling Defendants' rights, after a reasonable opportunity for review and comment by NNEPA, Settling Defendants may perform additional response actions that cause their spending to exceed the Annual Spending Cap in a calendar year.

e.        Inflation is adjusted annually beginning on the Inflation Start Date, based on the Producer Price Index, excluding food and energy ("PPI").  The annual inflation adjustment, however, shall be no less than 1% and no greater than 3%, notwithstanding any lesser or greater change in the PPI.

f.        **Emergency Response Cost Exception**.  Any costs incurred by Settling Defendants in responding to an event that causes or threatens to cause a release of Waste Material on, at, or from any of the Mine Sites and that constitutes an emergency situation shall not count toward the Annual Spending Cap that year.  This exception shall apply only when the emergency situation could not have been anticipated and incorporated into the annual planning process.  If the response to the emergency situation continues for more than 90 days, the costs of response activities performed after 90 days shall be incorporated into the next year's annual planning process and be subject to the Annual Spending Cap.  Notwithstanding any other provisions of this Consent Decree, Settling Defendants shall not cease actions to address an emergency situation unless EPA directs Settling Defendants to do so.  An "emergency situation" shall be defined as a situation in which there is an immediate threat to human health or the environment for which EPA requires response activities to begin on-site within 24 hours of EPA's determination that a removal action is appropriate.

12.        **Emergencies and Releases**.

a.        **Emergency Response and Reporting.** If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from a Mine Site that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Defendants shall immediately take all appropriate action to prevent, abate, or minimize such release or threat of release. Settling Defendants shall take such action in accordance with all applicable provisions of this CD and the SOW, including, but not limited to, the Health and Safety Plan. Settling Defendants shall also immediately notify (1) EPA's Project Coordinator, EPA's Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or the Regional Duty Officer at (800) 300-2193 (if neither EPA Project Coordinator is available); and (2) NNEPA's Project Coordinator or NNEPA's Alternate Project Coordinator (if NNEPA's Project Coordinator is unavailable) of the incident or site conditions.

b.        **Release Reporting**. Upon the occurrence of any event during performance of the Work that Settling Defendants are required to report pursuant to Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA), 42 U.S.C. § 11004, Settling Defendants shall immediately orally notify: (1) EPA's Project Coordinator, EPA's Alternate Project Coordinator (if the EPA Project Coordinator is unavailable), or the Regional Duty Officer at (800) 300-2193 (if neither EPA Project Coordinator is available); (2) NNEPA's Project Coordinator or NNEPA's Alternate Project Coordinator (if NNEPA's Project Coordinator is unavailable); and (3) the National Response Center at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of EPCRA, 42 U.S.C. § 11004.

c.        For any event covered by ¶¶ 12.a or 12.b, Settling Defendants shall submit a written report to EPA, with a copy to NNEPA, within 10 days after the onset of such event, setting forth the action or event that occurred and measures taken,

and to be taken, to mitigate any release or threat of release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release or threat of release.

d.      Subject to Sections XV (Covenants by United States) and XVI (Covenants by Navajo Nation), nothing in this CD, including ¶¶ 12.a and 12.b, limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Mine Sites, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Mine Sites. If, due to Settling Defendants' failure to take appropriate response action under ¶¶ 12.a or 12.b, EPA or, as appropriate, NNEPA takes such action instead, Settling Defendants shall reimburse EPA or NNEPA, as appropriate, under Section X (Payments for Future Response Costs) for all costs of the response action.

13.      **Community Involvement**. If requested by EPA, after conferring with NNEPA, Settling Defendants shall participate in community involvement activities. Settling Defendants shall conduct community involvement activities under EPA's and NNEPA's oversight as provided for in, and in accordance with, Section 3 (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States or the Navajo Nation under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

14.      **Modification of SOW or Related Deliverables**.

a.      If EPA determines, after a reasonable opportunity for review and comment by NNEPA, that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Performance Standards or to carry out and maintain the effectiveness of the selected

response actions, then EPA may notify Settling Defendants of such modification. If Settling Defendants object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIII. Notwithstanding this paragraph, EPA may not modify the SOW to require Settling Defendants to characterize or implement response actions for groundwater or surface water at the Proximate Mine Sites.

b. The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if Settling Defendants invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and Settling Defendants shall implement all work required by such modification. Settling Defendants shall incorporate the modification into the deliverable required under the SOW, as appropriate.

c. Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

15. **Modification of Appendices A and B**. The Parties agree that they may add or remove abandoned uranium mine sites or the transfer station from the lists in Appendices A and B by mutual agreement and written consent of each Party.

16. Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

17. **Periodic Review**. If any remedial actions are taken at any Mine Site or Mine Sites pursuant to this CD, Settling Defendants shall conduct studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. §

9621(c), and applicable regulations of whether the remedial actions implemented are protective of human health and the environment.

## VIII.  PROPERTY REQUIREMENTS

18.        **Agreements Regarding Access and Non-Interference.** Settling Defendants shall, with respect to any Affected Property, use best efforts to secure all necessary access agreements, which shall be enforceable by Settling Defendants, EPA, and NNEPA, and which shall provide that the lease and/or permit holders at the Affected Property, and the Affected Property owner, if the Affected Property is owned by another entity that is not a Party, shall: (i) provide Settling Defendants, EPA, and NNEPA, and their representatives, contractors, and subcontractors, with access at all reasonable times to such Affected Property to conduct any activity regarding this CD, including those listed in ¶ 18.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines, after providing NNEPA with a reasonable opportunity to review and comment on the determination, will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation of the Work.

a.        **Access Requirements**. The following list provides examples of activities for which access to an Affected Property is required:

(1)      Monitoring the Work;

(2)      Verifying any data or information submitted to the United States or the Navajo Nation;

(3)      Conducting investigations regarding contamination at or near the Mine Sites;

(4)      Obtaining samples;

(5)      Assessing the need for, planning, implementing, or monitoring response actions at or near the Mine Sites;

(6)      Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan, as provided in the SOW;

(7)      Implementing the Work pursuant to this CD, including pursuant to the conditions set forth in ¶ 70 (Work Takeover);

(8)      Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Settling Defendants or their agents, consistent with Section XIX (Access to Information);

(9)      Assessing Settling Defendants' compliance with the CD;

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions.

19.      **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Settling Defendants would use so as to obtain access or use restrictions in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements. If Settling Defendants are unable to accomplish what is required through "best efforts" in a timely manner, Settling Defendants shall notify the United States and the Navajo Nation and include a description of the steps taken to comply with the requirements in this Section. If the United States deems it appropriate, EPA may assist Settling Defendants, or take independent action, in obtaining such access and/or use restrictions. If the Navajo Nation deems it appropriate, NNEPA may assist Settling Defendants, or take independent action, in obtaining such access and/or use restrictions. All costs incurred by the United States and the Navajo Nation in providing such assistance or taking such action, including the cost of attorney time and the amount

of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

20.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, Settling Defendants shall continue to comply with their obligations under the CD, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions regarding the Affected Property.

21.     Notwithstanding any provision of the CD, Plaintiffs retain all of their access authorities and rights, as well as all of their rights to require land, water, or other resource use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA, NNCERCLA, and any other applicable statute or regulations.

## IX.     FINANCIAL ASSURANCE

22.     In order to ensure completion of the Work, Settling Defendants shall secure financial assurance, in an amount determined in accordance with paragraph 27, for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA, after a reasonable opportunity for review and comment by NNEPA. Settling Defendants may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.     A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.     An irrevocable letter of credit, payable to or at the direction of EPA, after a reasonable opportunity for review and comment by NNEPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c. A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d. A policy of insurance that provides EPA with acceptable rights as beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e. A demonstration by Settling Defendants that Settling Defendants meet the relevant financial test criteria of 40 C.F.R. § 264.143(f) and the reporting requirements of this Section for the sum of the Financial Assurance Amount and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee, accompanied by a standby funding commitment, which obligates Settling Defendants to pay funds to or at the direction of EPA, after a reasonable opportunity for review and comment by NNEPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f. A guarantee to fund or perform the Work executed in favor of EPA by one of the following: (1) a direct or indirect parent company of Settling Defendants; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Settling Defendants; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction, after a reasonable opportunity for review and comment by NNEPA, that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Financial Assurance Amount and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

23. Settling Defendants have selected, and EPA has found satisfactory, after a reasonable opportunity for review and comment by NNEPA, as an initial financial

assurance a surety bond in the form attached as Appendix D. Within 30 days after the Effective Date, Settling Defendants shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the form of financial assurance attached as Appendix D and shall submit such mechanisms and documents to the Regional Financial Management Officer, to the United States and the Navajo Nation, and to EPA and NNEPA as specified in Section XXI (Notices and Submissions).

24.      If Settling Defendants provide financial assurance by means of a demonstration or guarantee under ¶ 22.e or 22.f, Settling Defendants shall also comply and shall ensure that their guarantors comply with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including, but not limited to: (a) the initial submission to EPA and NNEPA of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA and NNEPA no later than 30 days, in accordance with ¶ 25, after any such entity determines that it no longer satisfies the relevant financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). Settling Defendants agree that EPA may also, based on a belief that an affected entity may no longer meet the financial test requirements of ¶ 22.e or 22.f, and after a reasonable opportunity for review and comment by NNEPA, require reports of financial condition at any time from such entity in addition to those specified in this Paragraph. For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Financial Assurance Amount; (2) the phrase "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" includes the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially

obligated in addition to the Financial Assurance Amount under this CD; (3) the terms "owner" and "operator" include Settling Defendants, if they are making a demonstration or obtaining a guarantee under ¶ 22.e or 22.f; and (4) the terms "facility" and "hazardous waste management facility" include the Mine Sites.

25. Settling Defendants shall diligently monitor the adequacy of the financial assurance. If Settling Defendants become aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Settling Defendants shall notify EPA and NNEPA of such information within 7 days. If EPA determines, after a reasonable opportunity for review and comment by NNEPA, that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify Settling Defendants of such determination. Settling Defendants shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section, and shall submit a copy of the proposal to NNEPA. EPA may extend this deadline for such time as is reasonably necessary for Settling Defendants, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. Settling Defendants shall follow the procedures of ¶ 27 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Settling Defendants' inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this CD, including, without limitation, the obligation of Settling Defendants to complete the Work in accordance with the terms of this CD.

26. **Access to Financial Assurance.**

a. If EPA issues a notice of implementation of a Work Takeover under ¶ 70.b, then, in accordance with any applicable financial assurance mechanism

and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) payment of any guaranteed funds, in accordance with ¶ 26.d.

b.  If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and Settling Defendants fail to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 26.d.

c.  If, upon issuance of a notice of implementation of a Work Takeover under ¶ 70.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is provided under ¶ 22.e or 22.f, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. Settling Defendants shall, immediately upon written demand from EPA, pay the amount demanded as directed by EPA.

d.  Any amounts required to be paid under this ¶ 26 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Cyprus Amax/Western Nuclear Mine Sites Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Mine Sites, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

e.  All EPA Work Takeover costs not paid under this ¶ 26 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

27.     **Determining the amount of Settling Defendants' financial assurance**

a.      The Financial Assurance Amount shall be the sum of estimated costs for Work under all Decision Documents for which EPA has not yet issued a Notice of Completion, pursuant to Section 10.8 of the SOW.  The Financial Assurance Amount shall also include an additional amount of $29.4 million until EPA issues a Notice of Completion for the First Component of Work.

b.      Settling Defendants shall be required to secure financial assurance in an amount equal to one-half of the Financial Assurance Amount until the Trigger (defined in     ¶ 34.b(6)).  Upon the occurrence of the Trigger, Settling Defendants shall have no further obligation to provide financial assurance until the amount of funds remaining in the Trust Account is less than the Financial Assurance Amount.  When the amount of funds remaining in the Trust Account becomes less than the Financial Assurance Amount, Setting Defendants shall secure financial assurance in an amount equal to the difference between the Financial Assurance Amount and the Trust Account balance, but not more than one-half of the Financial Assurance Amount, until the Trust Account is exhausted. Settling Defendants shall increase their financial assurance semi-annually, if such an increase is necessary.  Upon exhaustion of the Trust Account, Settling Defendants shall be required to continue to secure financial assurance in an amount equal to one-half of the Financial Assurance Amount.

c.      Upon EPA's signature of a Decision Document, the estimated costs for the Work under that Decision Document shall be included in the calculation of the Financial Assurance Amount pursuant to paragraph 27.a.  Settling Defendants shall secure any necessary additional financial assurance, within 30 days of EPA's signature of that Decision Document.

d.      The Financial Assurance Amount may be reduced only in accordance with the procedures set forth in paragraph 27.e.

e.        **Modification of Amount, Form, or Terms of Financial Assurance**. Settling Defendants may at any time submit a request to reduce the Financial Assurance Amount or change the form or terms of the financial assurance mechanism. Any such request must be submitted to EPA and NNEPA in accordance with ¶ 23, and must include an estimate of the cost of the remaining Work under all Decision Documents and in the First Component of the Work, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify Settling Defendants, after EPA provides a reasonable opportunity for review and comment by NNEPA, of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. Settling Defendants may reduce the Financial Assurance Amount only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). Within 30 days after EPA's approval of or the agreement or decision resolving a dispute relating to the requested modification to the amount, Settling Defendants shall submit to EPA, with a copy to NNEPA, documentation of the reduced financial assurance mechanism in accordance with ¶ 23.  Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by Settling Defendants pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of any requested modifications of the form or terms of financial assurance pursuant to this Paragraph, Settling Defendants shall submit to EPA, with a copy to NNEPA, documentation of the revised or alternative financial assurance mechanism in accordance with ¶ 23.

28.        **Release, Cancellation, or Discontinuation of Financial Assurance**. Settling Defendants may release, cancel, or discontinue any financial assurance provided under this Section only: (a) after EPA issues a Notification of Work

Completion under ¶ 11.4 (Certification of Work Completion) of the SOW for every Mine Site; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution).

## X.    PAYMENTS FOR RESPONSE COSTS

29.        **Payment by Settling Defendants for United States Past Response Costs.** Within 30 days after the Effective Date, Settling Defendants shall pay to EPA $1,506,915.01 for Past Response Costs. Payment shall be made in accordance with ¶ 35.a (instructions for past response cost payments).

30.        **Payment by Settling Defendants for NN Past Response Costs.** Within 30 days after the Effective Date, Settling Defendants shall pay NNEPA $8,099.60 for Navajo Nation Past Response Costs.  Payment shall be made in accordance with ¶ 35.c.

31.        **Payment by Settling Federal Agencies for Past Response Costs.**

a.        As soon as reasonably practicable after the Effective Date, the United States on behalf of the SFAs shall pay to EPA $1,506,915.01 for Past Response Costs. Payment shall be made in accordance with Paragraph 35.a (instructions for past response cost payments).  The total amount to be paid by the United States on behalf of the SFAs shall be deposited by EPA in the Cyprus Amax/Western Nuclear Mines Sites Special Account to be retained and used to conduct or finance response actions at or in connection with the Mine Sites.

b.        As soon as reasonably practicable after the Effective Date, the United States on behalf of the SFAs shall pay NNEPA $8,099.59 for Navajo Nation Past Response Costs.  Payment shall be made in accordance with Paragraph 35.c.

32.        **Deposit of Past Response Costs Payment**. The total amount to be paid by Settling Defendants pursuant to ¶ 29 shall be deposited by EPA in the Cyprus

Amax/Western Nuclear Mine Sites Special Account to be retained and used to conduct or finance response actions at or in connection with the Mine Sites.

33. **Payments by Settling Defendants for Future Response Costs**. Settling Defendants shall pay to EPA and NNEPA all Future Response Costs not inconsistent with the NCP.

a. **Prepayment of Future Response Costs.** Within 30 days after the Effective Date, Settling Defendants shall pay NNEPA $100,000 as an initial payment toward Future Response Costs. This payment shall be made in accordance with ¶ 35.c (instructions for future response cost prepayments). The total amount paid to NNEPA shall be deposited in the NNCERCLA Cyprus Amax/Western Nuclear Sites Special Account . These funds shall be retained and used by NNEPA to conduct or finance future response actions at or in connection with the Mine Sites.

b. **Periodic Bills**. On a periodic basis, EPA will send Settling Defendants a bill requiring payment that includes a cost summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. EPA may periodically provide to Settling Defendants estimates of Future Response Costs incurred by EPA since the date of the last bill and projections of costs to be incurred by EPA in the upcoming year.  On a periodic basis, NNEPA will send Settling Defendants a bill requiring payment that includes a cost summary, which includes direct and indirect costs incurred by NNEPA, NNDOJ, contractors, and subcontractors. Settling Defendants shall make all payments within 30 days after Settling Defendants' receipt of each bill requiring payment, except as otherwise provided in ¶ 36, in accordance with ¶¶ 35.b and 35.c (instructions for future response cost payments).

c. **Deposit of Future Response Costs Payments**. The total amount to be paid by Settling Defendants to EPA pursuant to ¶ 33.b (Periodic Bills) shall be deposited by EPA in the Cyprus Amax/Western Nuclear Mine Sites Special Account to be retained and used to conduct or finance response actions at or in connection with the Mine Sites, or to be transferred by EPA to the EPA Hazardous Substance Superfund,

provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Cyprus Amax/Western Nuclear Mine Sites Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Mine Sites. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by Settling Defendants pursuant to the dispute resolution provisions of this CD or in any other forum. The total amount to be paid to NNEPA by Settling Defendants pursuant to ¶ 33.b (Periodic Bills) shall be deposited by NNEPA into the NNCERCLA Cyprus Amax/Western Nuclear Mine Sites Special Account.

d.     **Unused Amount**. After EPA issues the Notice of Completion of Work pursuant to Section XXV and NNEPA issues a final accounting of the NNCERCLA Cyprus Amax/Western Nuclear Mine Sites Special Account (including crediting Settling Defendants for any amounts received under ¶¶ 33.a (Prepayment of Future Response Costs) or 33.b (Periodic Bills), NNEPA will offset the next Future Response Costs bill by the unused amount paid by Settling Defendants pursuant to ¶¶ 33.a (Prepayment of Future Response Costs) or 33.b (Periodic Bills); apply any unused amount paid by Settling Defendants pursuant to ¶¶ 33.a (Prepayment of Future Response Costs) or 33.b (Periodic Bills) to any other unreimbursed response costs or response actions remaining at the Mine Sites; or remit and return to Settling Defendants any unused amount of the funds paid by Settling Defendants pursuant to ¶¶ 33.a (Prepayment of Future Response Costs) or 33.b (Periodic Bills). Any decision by NNEPA to apply unused amounts to unreimbursed response costs or response actions remaining at the Mine Sites shall not be subject to challenge by Settling Defendants pursuant to the dispute resolution provisions of this CD or in any other forum.

34. **Payments by SFAs.**

a.   **Cash-out Payment for Future Settling Defendants Response Costs.** Following the Effective Date, and as soon as reasonably practicable following receipt of payment instructions from the Trustee, the United States shall deposit $335 million into the Trust Account created pursuant to the Trust Agreement that the United States and Settling Defendants shall execute, attached hereto as Appendix F.

b.   **Reimbursement of Future Settling Defendants Response Costs by the Trust.**

   (1)  To obtain reimbursement from the Trust Account, Settling Defendants must submit claims for reimbursement pursuant to Section 4 of the Trust Agreement. In no case may Settling Defendants submit claims for reimbursement more frequently than once every 30 calendar days. Nothing herein shall be interpreted to preclude Settling Defendants from submitting claims for reimbursement at less frequent intervals.

   (2)  The $25 Million Cap is equal to $25 million, as adjusted for inflation pursuant to Paragraph 11.e.

   (3)  Before the Inflation Start Date, Settling Defendants may submit claims for reimbursement from the Trust Account for up to 50 percent of Future Settling Defendants Response Costs.

   (4)  Annual Review by the United States. No later than March 1 of each year, beginning in 2018, Settling Defendants shall submit to the United States a statement of Future Settling Defendants Response Costs incurred in the prior calendar year. Settling Defendants shall include a statement of all reimbursements obtained from the Trust Account for costs incurred during that calendar year, as well as sufficient documentation to allow verification of the accuracy of the costs claimed, proof of payment of all of the Future Settling Defendants Response Costs included in the statement, and a signed certification under penalty of law that such costs were properly incurred and consistent with the National Contingency Plan, this Consent Decree, and any Decision Documents.

The information required under this subparagraph shall constitute a "Settling Defendants Costs Statement."

        (5)     From the Inflation Start Date until the Trigger under Paragraph 34.b(6), each calendar year Settling Defendants may submit claims for reimbursement from the Trust Account for Future Settling Defendants Response Costs up to 50 percent of the $25 Million Cap. For any Future Settling Defendants Response Costs above the $25 Million Cap and up to the Annual Spending Cap, Settling Defendants may submit claims for reimbursement for 100 percent of such costs from the Trust Account. If Settling Defendants elect under Paragraph 11.d to perform Work that causes Future Settling Defendants Response Costs to exceed the Annual Spending Cap in any calendar year, Settling Defendants may submit claims for reimbursement from the Trust Account for 50 percent of such excess amount.

        (6)     If and when the net total Future Settling Defendants Response Costs exceed $265 million (the "Trigger"), Settling Defendants may thereafter submit claims for reimbursement from the Trust Account for 100 percent of Settling Defendants Future Response Costs, up to the Annual Spending Cap. For the avoidance of doubt, the Trigger shall <u>not</u> be adjusted for inflation pursuant to Paragraph 11.e.  If Settling Defendants elect under Paragraph 11.d to perform Work that causes Future Settling Defendants Response Costs to exceed the Annual Spending Cap, Settling Defendants may submit claims for reimbursement from the Trust Account for up to 50 percent of such excess amount. Settling Defendants' total net spending does not include any spending for which Settling Defendants obtained, or are in the process of obtaining, reimbursement from the Trust Account.  Settling Defendants must notify the United States within 15 days after its accounting indicates that total net spending reached $265 million. Settling Defendants shall include in this notification a Settling Defendants Costs Statement

covering the period of time from the last such annual statement provided pursuant to Paragraph 34.b(4) through the Trigger.

(7)     Notwithstanding anything to the contrary contained herein, but subject to the provisions of Paragraph 34.b(8) regarding the Proximate Mines, for any Future Settling Defendants Response Costs incurred in response to an emergency as described in Paragraph 11.f, Settling Defendants may submit claims for reimbursement from the Trust Account for only 50 percent of any such costs.

(8)     Notwithstanding anything to the contrary contained herein, for any Future Settling Defendants Response Costs incurred pursuant to Paragraph 11.f, to the extent (a) such costs are incurred at a Proximate Mine and (b) the emergency was not caused by any action taken by Settling Defendants, Settling Defendants may submit claims for reimbursement from the Trust Account (or the United States, in the event of the Re-Opener Event) for 100 percent of any such costs.

(9)     In the event EPA implements a Work Takeover pursuant to Paragraph 70, the Trust Account may be used to reimburse or incur response costs for the Work other than Future Settling Defendants Response Costs. If EPA subsequently terminates the Work Takeover and Settling Defendants resume performance of the Work, disbursements from the Trust Account to the Settling Defendants shall be reduced (or the United States shall reduce its reimbursements, if after the Re-Opener Event) by an amount equal to the costs incurred by the Trust Account in excess of what the Trust Account would have otherwise paid as reimbursement for Future Settling Defendants Response Costs. Such reduction, however, shall exclude any costs that (1) in the absence of a Work Takeover, would not be paid by the Trust Account as reimbursement for Future Settling Defendants Response Costs pursuant to Paragraph 34.b, and (2) are or could have been paid through EPA's access to financial assurance pursuant to Paragraph 26.

c.          **Re-Opener Event**. In the event the funds in the Trust Account are exhausted, the United States on behalf of the SFAs agrees to thereafter reimburse Settling Defendants for 50 percent of Future Settling Defendants Response Costs ("the Re-Opener Event"). Settling Defendants may submit claims for reimbursement of up to 50 percent of Future Settling Defendants Response Costs (including any spending to respond to an emergency as described in Paragraph 11.f, or up to 100 percent of such Future Settling Defendants Response Costs to the extent that they were incurred to address an emergency situation at a Proximate Mine pursuant to Paragraph 34.b(8)), to the Chief of the Environmental Defense Section of DOJ's Environmental and Natural Resources Division no more often than once every six months. Settling Defendants shall include with each claim for reimbursement a Settling Defendants Costs Statement for the period of time for which it seeks reimbursement.

d.          **Dispute Resolution for Future Settling Defendants Response Costs**.

(1)          Upon the receipt of any Settling Defendants Costs Statement, the United States shall have 60 days to review and approve the Settling Defendants Costs Statement. Within 60 days of receipt of the Settling Defendants Costs Statement, the United States may object, in writing, and that objection shall be sent to Settling Defendants pursuant to Paragraph 99. Any objection shall identify the contested costs and the basis for objection. As soon as reasonably practicable following the close of the 60 day review period, the United States shall reimburse Settling Defendants for the United States' share of any uncontested Settling Defendants Future Response Costs contained in a Settling Defendants Costs Statement.

(2)          If the United States objects to any Settling Defendants Costs Statement in whole or in part, Settling Defendants and the United States agree to participate in informal negotiations to resolve the dispute. The period of informal negotiations shall last 60 days from the date the United States transmits its

objection pursuant to Paragraph 99, and may be extended upon mutual consent by the United States and Settling Defendants.

(3)     If informal negotiations are unsuccessful, the United States and Settling Defendants reserve their right to submit the dispute to non-binding mediation or to the Court to resolve the matter.  The reasonable costs and expenses of mediation shall be borne equally by the parties, and each party shall bear its own attorney fees, expert fees, and other costs of mediation.

e.     If the United States prevails in whole or in part upon any objection to any Future Settling Defendants Response Costs described in any Settling Defendants Costs Statement, the next disbursement from the Trust Account (or the next reimbursement from the United States, if after the Re-Opener Event) to the Settling Defendants shall by reduced by a corresponding amount.

f.     Section XIII (Dispute Resolution) of this Consent Decree does not apply to disputes raised pursuant to this Paragraph.  Any dispute raised pursuant to this Paragraph shall not excuse performance by the SFAs and Settling Defendants of their obligations under this Consent Decree.

g.     **Interest**. The United States shall pay Interest on any unpaid balance on a Settling Defendants Costs Statement submitted pursuant to Paragraph 34.b(4); Interest shall begin to accrue starting on the 61st day after the receipt of a Settling Defendants Costs Statement and shall continue through the date of the payment. In the event the United States objects to a Settling Defendants Costs Statement in whole or in part and prevails on any disputed costs, the United States shall not be required to pay those costs or any Interest on those costs.

h.     The Parties to this CD recognize and acknowledge that the payment obligations of the United States under this CD can only be paid from appropriated funds legally available for such purpose. Nothing in this CD shall be interpreted or construed as a commitment or requirement that the United States or any

Settling Federal Agency obligate or pay funds in contravention of the Anti-Deficiency Act, 31 U.S.C. § 1341, or any other applicable provision of law.

35. **Payment Instructions for Settling Defendants**.

a. **Past Response Costs Payments to the United States.**

(1) The Financial Litigation Unit (FLU) of the United States Attorney's Office for the District of Arizona shall provide Settling Defendants, in accordance with ¶ 99, with instructions regarding making payments to DOJ on behalf of EPA. The instructions must include a Consolidated Debt Collection System (CDCS) number to identify payments made under this CD.

(2) For all payments subject to this ¶ 35.a, Settling Defendants shall make such payment by Fedwire Electronic Funds Transfer (EFT) / at https://www.pay.gov to the U.S. DOJ account, in accordance with the instructions provided under and including references to the CDCS Number, Site/Spill ID Number A976, and DJ Number 90-11-2-10823/1.

(3) For each payment made under this ¶ 35.a, Settling Defendants shall send notices, including references to the CDCS, Site/Spill ID, and DJ numbers, to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 99.

b. **Future Response Costs Payments to the United States and Stipulated Penalties**.

(1) For all payments subject to this ¶ 35.b, Settling Defendants shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

37

Federal Reserve Bank of New York

ABA = 021030004

Account = 68010727

SWIFT address = FRNYUS33

33 Liberty Street

New York NY 10045

Field Tag 4200 of the Fedwire message should read

"D 68010727 Environmental Protection Agency"

(2)     For all payments made under this ¶ 35.b, Settling Defendants must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 35.b, Settling Defendants shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 99. All notices must include references to the Site/Spill ID and DJ numbers.

c.          **Past and Future Response Costs Payments to the Navajo Nation.** All payments to the Navajo Nation required by this CD shall be made in accordance with instructions to be provided by NNEPA.

36.          **Contesting Future Response Costs**. Settling Defendants may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 33 (Payments by Settling Defendants for Future Response Costs) if they determine that EPA or the Navajo Nation has made a mathematical error or included a cost item that is not within the definition of Future Response Costs, or if they believe EPA or the Navajo Nation incurred excess costs as a direct result of an EPA or NNEPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States (if the United States' accounting is being disputed) or the Navajo Nation (if the Navajo Nation's accounting is being disputed) pursuant to Section XXI (Notices and

Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If Settling Defendants submit a Notice of Dispute, Settling Defendants shall within the 30-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Response Costs to the United States and the Navajo Nation, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Settling Defendants shall send to the United States or the Navajo Nation, as appropriate, as provided in Section XXI (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States or the Navajo Nation prevails in the dispute, Settling Defendants shall pay the sums due (with accrued interest) to the United States or the Navajo Nation, if Navajo Nation costs are disputed, within 10 days after the resolution of the dispute. If Settling Defendants prevail concerning any aspect of the contested costs, Settling Defendants shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States or the Navajo Nation, if Navajo Nation costs are disputed, within 10 days after the resolution of the dispute. Settling Defendants shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶ 35.b. All payments to the Navajo Nation under this Paragraph shall be made in accordance with ¶ 35.c. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Settling Defendants' obligation to reimburse the United States and the Navajo Nation for their Future Response Costs.

37.          Settling Defendants may contest the final accounting of the NNCERCLA Cyprus Amax/Western Nuclear Special Account issued under ¶ 33.d (Unused Amount) if they determine that the Navajo Nation has made a mathematical error. Such objection shall be made in writing within 30 days after receipt of the final accounting and must be sent to the Navajo Nation pursuant to Section XXI (Notices and Submissions). Any such objection shall specifically identify the alleged final mathematical error and the basis for objection. NNEPA will review the alleged mathematical error and either affirm the initial accounting or issue a corrected final accounting within 60 days. If a corrected final accounting is issued, NNEPA will take such action as may be necessary to correct the final disposition of unused amounts paid in accordance with ¶ 33.d (Unused Amount). If Settling Defendants disagree with NNEPA's decision, Settling Defendants may, within 10 days after receipt of the decision, appeal the decision to the Manager of the Waste Regulatory and Compliance Department for NNEPA. The Manager of the Waste Regulatory and Compliance Department will issue a final administrative decision resolving the dispute, which shall be binding upon Settling Defendants and shall not be subject to challenge by Settling Defendants pursuant to the dispute resolution provisions of this CD or in any other forum.

38.          **Interest**. In the event that any payment for Future Response Costs required under this Section is not made by the date required, Settling Defendants shall pay Interest on the unpaid balance. The Interest on Past Response Costs, NN Past Response Costs, and prepaid Future Response Costs shall begin to accrue on the Effective Date. The Interest on all subsequent Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of Settling Defendants' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of Settling Defendants' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 55 (Stipulated Penalty Amounts – Work).

# XI.    INDEMNIFICATION AND INSURANCE

39.    **Settling Defendants' Indemnification of the United States and the Navajo Nation**.

a.    The United States and the Navajo Nation do not assume any liability by entering into this CD or by virtue of any designation of Settling Defendants as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). Settling Defendants shall indemnify, save, and hold harmless the United States and the Navajo Nation and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on Settling Defendants' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of Settling Defendants as EPA's authorized representatives under Section 104(e) of CERCLA. Further, Settling Defendants agree to pay the United States and the Navajo Nation all costs incurred by the United States and the Navajo Nation, including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the Navajo Nation based on negligent or other wrongful acts or omissions of Settling Defendants, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. Neither the United States nor the Navajo Nation shall be held out as a party to any contract entered into by or on behalf of Settling Defendants in carrying out activities pursuant to this CD. Neither Settling Defendants nor any such contractor shall be considered an agent of the United States or the Navajo Nation.

b.    The United States and the Navajo Nation, respectively, shall give Settling Defendants notice of any claim for which the United States or the Navajo

Nation plans to seek indemnification pursuant to this ¶ 39, and shall consult with Settling Defendants prior to settling such claim.

40.        Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States and the Navajo Nation, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the Navajo Nation, arising from or on account of any contract, agreement, or arrangement between Settling Defendants and any person for performance of the Work, including, but not limited to, claims on account of construction delays. In addition, Settling Defendants shall indemnify, save and hold harmless the United States and the Navajo Nation with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Defendants and any person for performance of the Work, including, but not limited to, claims on account of construction delays.

41.        **Insurance**. No later than 15 days before commencing any on-site Work, Settling Defendants shall secure, and shall maintain until the first anniversary after issuance of Notice of Completion of Work pursuant to Section XXV, commercial general liability insurance with limits of $1 million, for any one occurrence, and automobile liability insurance with limits of $1 million, combined single limit, naming the United States and the Navajo Nation as additional insureds with respect to all liability arising out of the activities performed by or on behalf of Settling Defendants pursuant to this CD. In addition, for the duration of this CD, Settling Defendants shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendants in furtherance of this CD. Prior to commencement of the Work, Settling Defendants shall provide to EPA and the Navajo Nation certificates of such insurance and a copy of each insurance policy. Settling Defendants shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If Settling Defendants demonstrate by evidence satisfactory to EPA and the Navajo

Nation that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendants need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XII.   FORCE MAJEURE

42.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of Settling Defendants, of any entity controlled by Settling Defendants, or of Settling Defendants' contractors that delays or prevents the performance of any obligation under this CD despite Settling Defendants' best efforts to fulfill the obligation. The requirement that Settling Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or failure to achieve the Performance Standards.

43.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which Settling Defendants intend or may intend to assert a claim of force majeure, Settling Defendants shall notify EPA's Project Coordinator orally or, in her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region IX, within 48 hours of when Settling Defendants first knew that the event might cause a delay. In addition, Settling Defendants shall notify NNEPA's Project Coordinator orally or, in his or her absence, NNEPA's Alternate Project Coordinator or, in the event both NNEPA's designated representatives are unavailable, the Manager of the Waste Regulatory and Compliance Department for NNEPA. Within 5 days thereafter, Settling Defendants shall provide in writing to EPA

and NNEPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Settling Defendants' rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of Settling Defendants, such event may cause or contribute to an endangerment to public health or welfare, or the environment. Settling Defendants shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. Settling Defendants shall be deemed to know of any circumstance of which Settling Defendants, any entity controlled by Settling Defendants, or Settling Defendants' contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude Settling Defendants from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 42 and whether Settling Defendants have exercised their best efforts under ¶ 42, EPA may, in its unreviewable discretion, excuse in writing Settling Defendants' failure to submit timely or complete notices under this Paragraph.

44.     If EPA, after a reasonable opportunity for review and comment by NNEPA, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by NNEPA, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by NNEPA, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify Settling Defendants in writing of its decision. If EPA, after a reasonable opportunity for review and comment by NNEPA, agrees that the delay is attributable to a force majeure, EPA

will notify Settling Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

45. If Settling Defendants elect to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, Settling Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Settling Defendants complied with the requirements of ¶¶ 42 and 43. If Settling Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Settling Defendants of the affected obligation of this CD identified to EPA and the Court.

46. The failure by EPA or NNEPA to timely complete any obligation under this CD or under the SOW is not a violation of this CD, provided, however, that if such failure prevents Settling Defendants from meeting one or more deadlines in the SOW, Settling Defendants may seek relief under this Section.

## XIII. DISPUTE RESOLUTION

47. Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States or the Navajo Nation to enforce obligations of Settling Defendants that have not been disputed in accordance with this Section.

48. A dispute shall be considered to have arisen when one Party sends the other Parties a written Notice of Dispute under this CD. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the Parties. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

49.	**Statements of Position**.

a.	In the event that the Parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 14 days after the conclusion of the informal negotiation period, Settling Defendants invoke the formal dispute resolution procedures of this Section by serving on the United States and the Navajo Nation a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by Settling Defendants. The Statement of Position shall specify Settling Defendants' position as to whether formal dispute resolution should proceed under ¶ 50 or 51.

b.	Within 30 days after receipt of Settling Defendants' Statement of Position, EPA will serve on Settling Defendants its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 50 (Record Review) or 51. Within 30 days after receipt of EPA's Statement of Position, Settling Defendants may submit a Reply.

c.	If there is disagreement between EPA and Settling Defendants as to whether dispute resolution should proceed under ¶ 50 (Record Review) or 51, the parties to the dispute shall follow the procedures set forth in the paragraph determined by EPA to be applicable. However, if Settling Defendants ultimately appeal to the Court to resolve the dispute, the Court shall determine which paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 50 and 51.

50.	**Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of

this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD.

a.        An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. When appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.        The Director of the Superfund Division, EPA Region IX, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 50.a. This decision shall be binding upon Settling Defendants, subject only to the right to seek judicial review pursuant to ¶¶ 50.c and 50.d.

c.        Any administrative decision made by EPA pursuant to ¶ 50.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by Settling Defendants with the Court and served on all Parties within 30 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to Settling Defendants' motion within 30 days.

d.        In proceedings on any dispute governed by this Paragraph, Settling Defendants shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 50.a.

51.        Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the

administrative record under applicable principles of administrative law shall be governed by this Paragraph.

a.        The Director of the Superfund Division, EPA Region IX, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 49. The Superfund Division Director's decision shall be binding on Settling Defendants unless, within 30 days after receipt of the decision, Settling Defendants file with this Court and serve on the Parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to Settling Defendants' motion within 30 days.

b.        Notwithstanding ¶ J (CERCLA § 113(j) record review of Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

52.        The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of Settling Defendants under this CD, except as provided in ¶ 36 (Contesting Future Response Costs), as agreed by EPA, after a reasonable opportunity for review and comment by NNEPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 62. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that Settling Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties).

53.        **Disputes Regarding Future Response Costs Owed to the Navajo Nation**. Disputes arising under this CD between the Navajo Nation and Settling Defendants that relate to Future Response Costs owed to the Navajo Nation, including assessment of stipulated penalties by the Navajo Nation regarding such Future Response

Costs, shall not be considered disputes on the record pursuant to ¶ 50 and shall be governed in the following manner. The procedures for resolving the disputes mentioned in this Paragraph shall be the same as provided for in ¶¶ 48 to 49 and ¶¶ 51 to 52, except that ¶ 49.c (provision regarding whether to proceed under ¶ 50 or 51) shall not apply; each reference to EPA shall read as a reference to NNEPA; each reference to NNEPA or the Navajo Nation shall be ignored; each reference to the Director of the Superfund Division, EPA Region IX, shall read as a reference to the Director of NNEPA; and each reference to the United States shall be read as a reference to the Navajo Nation. In addition, for purposes of this Paragraph only, references to "informal negotiations" in ¶ 48 shall mean the Navajo informal dispute resolution procedure, known as the "talking things out" approach, attached to this CD as Appendix E.

## XIV. STIPULATED PENALTIES

54.     Settling Defendants shall be liable for stipulated penalties in the amounts set forth in ¶¶ 55 and 56 to both the United States and the Navajo Nation for failure to comply with the requirements of this CD specified below, unless excused under Section XII (Force Majeure). "Compliance" by Settling Defendants shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

55.     **Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables)**.

a.     The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 55.b:

| Period of Noncompliance | Penalty Per Violation Per Day Due to the United States | Penalty Per Violation Per Day Due to the Navajo Nation |
|---|---|---|
| 1st through 14th day | $ 1,250 | $ 1,250 |
| 15th through 30th day | $ 2,500 | $ 2,500 |
| 31st day and beyond | $ 3,750 | $ 3,750 |

b.        **Compliance Milestones**.

(1)    Payment of Past and Future Response Costs to the United States and/or the Navajo Nation in compliance with the timelines and other requirements of Section X (Payment for Response Costs);

(2)    Performance of each component of Work required by the SOW, with the exception of submission of deliverables, in compliance with the timelines and other substantive and procedural requirements of Section VI (Performance of the Work) and the SOW; and

(3)    Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section IX (Financial Assurance).

56.        **Stipulated Penalty Amounts - Deliverables**.

a.        **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under Sections 13 (Approval of Deliverables) and 16 (Navajo Nation Participation) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 54. The provisions of Section XIII (Dispute Resolution) and Section XIV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding Settling Defendants' submissions under this CD.

b.        The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day Due to the United States | Penalty Per Violation Per Day Due to the Navajo Nation |
|---|---|---|
| 1st through 14th day | $ 500 | $ 500 |
| 15th through 30th day | $ 1,250 | $ 1,250 |
| 31st day and beyond | $ 2,500 | $ 2,500 |

57.　　　　In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 70 (Work Takeover), Settling Defendants shall be liable for a stipulated penalty in the amount of $ 6 million, payable in equal share to the United States and the Navajo Nation. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 26 (Access to Financial Assurance) and 70 (Work Takeover).

58.　　　　All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under Section 13 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies Settling Defendants of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region IX, or the Director of NNEPA, as the case may be, under ¶¶ 50.b or 51.a of Section XIII (Dispute Resolution), as made applicable to the Navajo Nation by ¶ 53, during the period, if any, beginning on the 21st day after the date that Settling Defendants' reply to EPA's or NNEPA's Statement of Position is received until the date that the applicable Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court

issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

59.     Following EPA's determination that Settling Defendants have failed to comply with a requirement of this CD, EPA may give Settling Defendants written notification of the same and describe the noncompliance. EPA may send Settling Defendants a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified Settling Defendants of a violation.

60.     Following NNEPA's determination that Settling Defendants have failed to comply with a requirement of this CD that pertains to Future Response Costs owed to the Navajo Nation, NNEPA may give Settling Defendants written notification of the same and describe the noncompliance. NNEPA may send Settling Defendants a written demand for payment of the penalties. However, penalties shall accrue as provided in ¶ 58 regardless of whether NNEPPA has notified Settling Defendants of a violation.

61.     All penalties accruing under this Section shall be due and payable to the United States and the Navajo Nation within 30 days after Settling Defendants' receipt from EPA or NNEPA, as applicable, of a demand for payment of the penalties, unless Settling Defendants invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 35.b. All payments to the Navajo Nation under this Section shall indicate that payment is for stipulated penalties and shall be made in accordance with ¶ 35.c.

62.     Penalties shall continue to accrue as provided in ¶ 58 during any dispute resolution period, but need not be paid until the following:

     a.     If the dispute is resolved by agreement of the parties or by a decision of EPA or NNEPA, as applicable, that is not appealed to this Court, accrued

penalties determined to be owed shall be paid to EPA and/or NNEPA within 15 days after the date of the agreement or the receipt of EPA's or NNEPA's decision or order;

       b.      If the dispute is appealed to this Court and the United States and/or the Navajo Nation prevails in whole or in part, Settling Defendants shall pay all accrued penalties determined by the Court to be owed to EPA and/or NNEPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 62.c;

       c.      If the District Court's decision is appealed by any Party, Settling Defendants shall pay all accrued penalties determined by the District Court to be owed to the United States and/or the Navajo Nation into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to the prevailing party or parties.

       63.      If Settling Defendants fail to pay stipulated penalties when due, Settling Defendants shall pay Interest on the unpaid stipulated penalties as follows: (a) if Settling Defendants have timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 62 until the date of payment; and (b) if Settling Defendants fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 61 until the date of payment. If Settling Defendants fail to pay stipulated penalties and Interest when due, the United States or the Navajo Nation may institute proceedings to collect the penalties and Interest.

       64.      The payment of penalties and Interest, if any, shall not alter in any way Settling Defendants' obligation to complete the performance of the Work required under this CD.

       65.      Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the Navajo Nation to seek any other

remedies or sanctions available by virtue of Settling Defendants' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

66.     Notwithstanding any other provision of this Section, the United States and Navajo Nation may, in either Party's unreviewable discretion, waive any portion of stipulated penalties that have accrued to that Party pursuant to this CD.

## XV.   COVENANTS BY THE UNITED STATES

67.     **Covenants for Settling Defendants by United States**. Except as provided in ¶69 (United States Reservations of Rights), the United States covenants not to sue or to take administrative action against Settling Defendants pursuant to Sections 106 and 107(a) of CERCLA for the Work, Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, and Future Settling Defendants Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by Settling Defendants of their obligations under this CD. These covenants extend only to Settling Defendants and do not extend to any other person.

68.     **Covenant for SFAs by United States**. Except as provided in ¶ 69 (United States Reservations of Rights), EPA covenants not to take administrative action against SFAs pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), and Section 7003 of RCRA, 42 U.S.C. § 6973, for the Work, Past Response Costs, and Future Response Costs. EPA's covenant shall take effect upon the Effective Date. EPA's covenant is conditioned upon the satisfactory performance by SFAs of their obligations under this CD. EPA's covenant extends only to SFAs and does not extend to any other person.

54

69.        **United States Reservation of Rights**. The United States reserves, and this CD is without prejudice to, all rights against Settling Defendants, and EPA reserves, and this CD is without prejudice to, all rights against SFAs, with respect to all matters not expressly included within the United States' covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against Settling Defendants, and EPA reserves, and this CD is without prejudice to, all rights against SFAs, with respect to:

a.        liability for failure by Settling Defendants or SFAs to meet a requirement of this CD;

b.        liability based on the ownership of any of the Mine Sites by Settling Defendants or SFAs when such ownership commences after signature of this CD by Settling Defendants or SFAs;

c.        liability based on the operation of any of the Mine Sites by Settling Defendants when such operation commences after signature of this CD by Settling Defendants and does not arise solely from Settling Defendants' performance of the Work and liability based on the operation of any of the Mine Sites by SFAs when such operation commences after signature of this CD by SFAs;

d.        liability based on Settling Defendants' or SFAs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with any of the Mine Sites, other than as provided in an action memorandum or record of decision issued for a Mine Site or Mine Sites, the Work, or otherwise ordered by EPA, after signature of this CD by Settling Defendants or SFAs;

e.        liability for costs not included within the definition of Future Response Costs;

f.        liability for performance of response actions other than the Work;

g.        criminal liability;

h. liability for violations of federal, tribal, or state law that occur during or after implementation of the Work;

i. liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of any remedy set forth in an action memorandum or a record of decision issued for a Mine Site or Mine Sites, but that cannot be required pursuant to ¶ 14 (Modification of SOW or Related Deliverables);

j. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

k. liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Mine Sites; and

l. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Mine Sites.

70. **Work Takeover**.

a. In the event EPA determines, after EPA provides a reasonable opportunity for review and comment by NNEPA, that Settling Defendants: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to Settling Defendants. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide Settling Defendants a period of 21 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b. If, after expiration of the 21-day notice period specified in ¶ 70.a, Settling Defendants have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA

deems necessary ("Work Takeover"). EPA will notify Settling Defendants in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 70.b. Funding of Work Takeover costs is addressed under ¶ 26 (Access to Financial Assurance).

c.        If EPA implements a Work Takeover pursuant to Paragraph 70, DOJ, on behalf of the SFAs, shall take steps, as described in this Paragraph, to cause the remaining Trust Assets to be paid towards the Work. Following discussion with EPA, DOJ may, at an appropriate time, either: (1) direct the trustee for the U.S. Four Corners Uranium Mines Trust Account ("Trustee") to, pursuant to a schedule to be agreed upon with EPA, but not more often than monthly, transfer funds to the Cyprus Amax/Western Nuclear Mine Sites Special Account to reimburse EPA for its costs incurred in conducting or financing response actions at or in connection with the Mine Sites, until either EPA terminates the Work Takeover or the Trust Account is exhausted; or (2) direct the Trustee (or successor) to perform the Work under the CD, in accordance with the SOW, until either EPA terminates the Work Takeover or the Trust Account is exhausted.

d.        If DOJ, on behalf of the SFAs, directs the Trustee to perform the Work, DOJ shall take the necessary steps to convert the Trust into an environmental response trust capable of performing the Work. The provisions of Paragraphs 70.c and 70.d to so convert the Trust (which may include modification of the Trust Agreement or termination of the Trust and Trust Agreement and creation of a successor Trust) shall supersede any contrary provisions in the Trust Agreement regarding modification or termination. Further, any modifications to the Trust Agreement or any new trust agreement created pursuant to Paragraphs 70.c and 70.d shall not require the agreement or signature of the Trustee or Settling Defendants. The Navajo Nation shall be designated a beneficiary of the environmental response trust. DOJ, however, shall have the authority to determine what powers and rights the environmental response trust will accord each beneficiary and such powers and rights need not be the same for each beneficiary, provided that such authority shall not affect the trustee's fiduciary duties to the Navajo

57

Nation as a beneficiary of the environmental response trust. Finally, with the exceptions of Section XI (indemnification and insurance) and Section XIV (stipulated penalties), the provisions of this Consent Decree and the SOW governing performance of the Work shall apply to the environmental response trust.

e.        Notwithstanding anything to the contrary in this Paragraph, only DOJ, consistent with Paragraph 4.2.2 of the Trust Agreement, shall have the authority to act pursuant to Paragraphs 70.c and 70.d.

f.        Settling Defendants may invoke the procedures set forth in ¶ 50 (Record Review) to dispute EPA's implementation of a Work Takeover under ¶ 70.b. However, notwithstanding Settling Defendants' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 70.b until the earlier of (1) the date that Settling Defendants remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 50 (Record Review) requiring EPA to terminate such Work Takeover.

71.        Notwithstanding any other provision of this CD, the United States and the Navajo Nation retain all authority and reserve all rights to take any and all response actions authorized by law.

## XVI.   COVENANTS BY THE NAVAJO NATION

72.        **Covenants for Settling Defendants by the Navajo Nation.** Except as provided in ¶ 75 (Navajo Nation Reservations of Rights), the Navajo Nation covenants not to sue or to take administrative action against Settling Defendants pursuant to Section 107(a) of CERCLA and Sections 2403, 2501, and 2503 of NNCERCLA for the Work, NN Past Response Costs, and Future Response Costs owed to the Navajo Nation. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by Settling Defendants of their obligations under this

CD. These covenants extend only to Settling Defendants and do not extend to any other person.

73. **Covenants for SFAs by the Navajo Nation**. Except as provided in ¶ 75 (Navajo Nation Reservations of Rights), the Navajo Nation covenants not to sue or to take administrative action against SFAs pursuant to Section 107(a) of CERCLA and Sections 2403, 2501, and 2503 of NNCERCLA for the Work, NN Past Response Costs, and Future Response Costs owed to the Navajo Nation. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SFAs of their obligations under this CD. These covenants extend only to SFAs and do not extend to any other person.

74. **Navajo Nation Use of Residual Trust Assets.** Following Certification of Work Completion pursuant to ¶ 104, if any residual funds from the Trust Account are paid to NNEPA, NNEPA shall use the funds for the sole purpose of performing response actions under CERCLA, not inconsistent with the NCP, at abandoned uranium mines on Navajo Nation lands where no viable non-Federal potentially responsible party has been identified. Effective upon receipt by NNEPA of any such residual funds, the Navajo Nation forever releases, discharges, covenants, and agrees not to assert (by way of the commencement of an action or in any other fashion) any and all claims, causes of action, suits or demands of any kind whatsoever, in law or in equity, that the Navajo Nation may have had, or hereafter has, against the United States, including, but not limited to, claims under CERLCA Sections 107 and 113, 42 U.S.C. §§ 9607 and 9613, relating to any work performed as part of response actions at any abandoned uranium mines using residual funds from the Trust Assets pursuant to this Paragraph.

75. **Navajo Nation Reservation of Rights**. The Navajo Nation reserves, and this CD is without prejudice to, all rights against Settling Defendants and SFAs with respect to all matters not expressly included within the Navajo Nation's covenants. Notwithstanding any other provision of this CD, the Navajo Nation reserves, and this CD

is without prejudice to, all rights against Settling Defendants, and the Navajo Nation reserves, and this CD is without prejudice to, all rights against SFAs, with respect to:

a.      liability for failure by Settling Defendants or SFAs to meet a requirement of this CD;

b.      liability based on the ownership of any of the Mine Sites by Settling Defendants or SFAs when such ownership commences after signature of this CD by Settling Defendants or SFAs;

c.      liability based on the operation of any of the Mine Sites by Settling Defendants when such operation commences after signature of this CD by Settling Defendants and does not arise solely from Settling Defendants' performance of the Work and liability based on the operation of any of the Mine Sites by SFAs when such operation commences after signature of this CD by SFAs;

d.      liability based on Settling Defendants' or SFAs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with any of the Mine Sites, other than as provided in an action memorandum or record of decision issued for a Mine Site or Mine Sites, the Work, or otherwise ordered by EPA, after signature of this CD by Settling Defendants or SFAs;

e.      liability for costs not included within the definition of Future Response Costs owed to the Navajo Nation;

f.      liability for performance of response action other than the Work;

g.      liability for violations of federal or Navajo law that occur during or after implementation of the Work;

h.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments; and

i.      liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Mine Sites.

## XVII. COVENANTS BY SETTLING DEFENDANTS AND SFAS

76. **Covenants by Settling Defendants**. Subject to the reservations in ¶¶ 79 and 80, Settling Defendants covenant not to sue and agree not to assert any claims or causes of action against the United States or the Navajo Nation with respect to the Work, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, Future Settling Defendants Response Costs, and this CD, including, but not limited to:

a. any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or from the NNCERCLA Hazardous Substances Fund pursuant to NNCERCLA, 4 N.N.C. §§ 2403(E), 2501 (as modified by § 2502(B)), 2503, or 2701 (to the extent applicable), or any other provision of law;

b. any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), NNCERCLA, 4 N.N.C. § 2501 (as modified by § 2502(B)), or 2503, or state law regarding the Work, past response actions regarding the Mine Sites, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, Future Settling Defendants Response Costs, and this CD;

c. any claims arising out of response actions at or in connection with the Mine Sites, including any claim under the United States Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law; or

d. any direct or indirect claim for return of unused amounts from the NNCERCLA Cyprus Amax/Western Nuclear Sites Special Account , except for unused amounts that NNEPA determines shall be returned to Settling Defendants in accordance with ¶ 33.d (Unused Amount).

77. This CD shall not have any effect on claims or causes of action that Settling Defendants may have pursuant to CERCLA against the Navajo Nation or any of

its agencies or departments, other than NNEPA, based on the alleged status of the Navajo Nation or any of its agencies or departments, other than NNEPA, as a potentially responsible party pursuant to CERCLA, 42 U.S.C. § 9607(a), relating to the Work, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, and Future Settling Defendants Response Costs, nor shall it have any effect on claims or causes of action against the Navajo Nation or any of its agencies or departments, other than NNEPA, for contractual indemnification, or for other contractual remedies, that Settling Defendants may have relating to the Work, Past Response Costs, NN Past Response Costs, Past Settling Defendants Response Costs, Future Response Costs, and Future Settling Defendants Response Costs. Notwithstanding the foregoing sentence, the Navajo Nation, including its agencies and departments, has not waived its sovereign immunity, does not agree that it has any liability under CERCLA due to its status as a federally recognized Indian tribe, nor does it agree that it has any liability for claims or causes of action for contractual indemnification or other contractual remedies that Settling Defendants may have relating to the Work, Past Response Costs, NN Past Response Costs, Future Response Costs, and Future Settling Defendants Response Costs.

78. **Covenant by SFAs**. SFAs agree not to assert any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112, or 113, or any other provision of law with respect to the Work, past response actions regarding the Mine Sites, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, Future Settling Defendants Response Costs, and this CD. This covenant does not preclude demand for reimbursement from the Superfund of costs incurred by a SFA in the performance of its duties (other than pursuant to this CD) as lead or support agency under the NCP.

79. Except as provided in ¶¶ 82 (Waiver of Claims by Settling Defendants) and 88 (Res Judicata and Other Defenses), the covenants in this Section shall

not apply if the United States or the Navajo Nation brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by the United States) or Section XVI (Covenants by the Navajo Nation), other than in ¶¶ 69.a (claims by United States for failure to meet a requirement of the CD), 69.g (criminal liability prosecuted by the United States), 69.h (violations of federal law during or after implementation of the Work), 75.a (claims by Navajo Nation for a failure to meet a requirement of the CD) and 75.g (violations of federal or Navajo law during or after implementation of the Work), but only to the extent that Settling Defendants' claims arise from the same response action, response costs, or damages that the United States or the Navajo Nation is seeking pursuant to the applicable reservation.

80.     Settling Defendants reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of Settling Defendants' deliverables or activities. Settling Defendants also reserve, and this CD is without prejudice to, contribution claims against SFAs in the event any claim is asserted by the United States or the Navajo Nation against Settling Defendants pursuant to any of the reservations in Sections XV and XVI (Covenants by Plaintiffs) other than in ¶¶ 69.a (claims for failure to meet a requirement of the CD), 69.g (criminal liability), 69.h (violations of federal/state law during or after implementation of the Work), 75.a (claims by Navajo Nation for a failure to meet a requirement of the CD) and 75.g (violations of

federal or Navajo law during or after implementation of the Work), but only to the extent that Settling Defendants' claims arise from the same response action, response costs, or damages that the United States or the Navajo Nation is seeking pursuant to the applicable reservation.

81.　　　　Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

82.　　　　**Waiver of Claims by Settling Defendants**.

a.　　　　Settling Defendants agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA and NNCERCLA, 4 N.N.C. §§2501-2503) that they may have:

(1)　　**De Micromis Waiver**. For all matters relating to the Mine Sites against any person where the person's liability to Settling Defendants with respect to a Mine Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at a Mine Site, or having accepted for transport for disposal or treatment of hazardous substances at a Mine Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Mine Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

(2)　　*De Minimis*/**Ability to Pay Waiver**. For response costs relating to the Mine Sites against any person that has entered or in the future enters into a final CERCLA § 122(g) *de minimis* settlement, or a final settlement based on limited ability to pay, with EPA with respect to a Mine Site.

b.　　　　**Exceptions to Waivers**.

(1)　　The waivers under this ¶ 82 shall not apply with respect to any defense, claim, or cause of action that Settling Defendants may have against

64

any person otherwise covered by such waivers if such person asserts a claim or cause of action relating to the Mine Sites against Settling Defendants.

(2) The waiver under ¶ 82.a(1) (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to a Mine Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Mine Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Mine Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XVIII. EFFECT OF SETTLEMENT; CONTRIBUTION

83. Except as provided in ¶ 82 (Waiver of Claims by Settling Defendants), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVII (Covenants by Settling Defendants and SFAs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Mine Sites against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or

response actions and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

84.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially approved settlement pursuant to which Settling Defendants and each Settling Federal Agency has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work, Past Response Costs, NN Past Response Costs, Future Response Costs, Past Settling Defendants Response Costs, and Future Settling Defendants Response Costs.

85.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially approved settlement pursuant to which each Settling Defendant and each Settling Federal Agency has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

86.     Settling Defendants shall, with respect to any suit or claim brought by them for matters related to this CD, notify the United States and the Navajo Nation in writing no later than 45 days prior to the initiation of such suit or claim.

87.     Settling Defendants shall, with respect to any suit or claim brought against them for matters related to this CD, notify in writing the United States and the Navajo Nation within 10 days after service of the complaint on Settling Defendants. In addition, Settling Defendants shall notify the United States and the Navajo Nation within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

88.    **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the Navajo Nation for injunctive relief, recovery of response costs, or other appropriate relief relating to the Mine Sites, Settling Defendants (and, with respect to a Navajo Nation action, SFAs) shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the Navajo Nation in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Sections XV (Covenants by the United States) and XVI (Covenants by the Navajo Nation).

## XIX.   ACCESS TO INFORMATION

89.    Settling Defendants shall provide to EPA and NNEPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (referred to collectively in this Section and Section XX as "Records") within Settling Defendants' possession or control or that of their contractors or agents relating to activities at the Mine Sites or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Settling Defendants shall also make available to EPA and NNEPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

90.    **Privileged and Protected Claims**.

a.    Settling Defendants may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided Settling Defendants comply with ¶ 90.b, and except as provided in ¶ 90.c.

b.        If Settling Defendants assert a claim of privilege or protection, they shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Settling Defendants shall provide the Record to Plaintiffs in redacted form to mask the privileged or protected portion only. Settling Defendants shall retain all Records that they claim to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Settling Defendants' favor.

c.        Settling Defendants may make no claim of privilege or protection regarding: (1) any data regarding the Mine Sites, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Mine Sites; or (2) the portion of any Record that Settling Defendants are required to create or generate pursuant to this CD.

91.        **Business Confidential Claims**. Settling Defendants may assert that all or part of a Record provided to Plaintiffs under this Section or Section XX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), 40 C.F.R. § 2.203(b), and the Navajo Nation Privacy Act, 2 N.N.C. §§ 83(C) & 85(A)(19). Settling Defendants shall segregate and clearly identify all Records or parts thereof submitted under this CD for which Settling Defendants assert business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA and the Navajo Nation, or if EPA has notified Settling Defendants that the Records are not confidential under the standards of Section 104(e)(7)

of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Settling Defendants.

92. If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

93. Notwithstanding any provision of this CD, Plaintiffs retain all of their information-gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, NNCERCLA, and any other applicable statutes or regulations.

## XX. RETENTION OF RECORDS

94. Until 10 years after EPA's Notice of Completion of Work under Section XXV, Settling Defendants shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in their possession or control or that come into their possession or control that relate in any manner to their liability under CERCLA with respect to the Mine Sites, provided, however, that Settling Defendants must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Mine Sites. Settling Defendants must also retain, and instruct their contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in their possession or control or that come into their possession or control that relate in any manner to the performance of the Work, provided, however, that Settling Defendants (and their contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above Record retention requirements shall apply regardless of any corporate retention policy to the contrary.

95.     The United States acknowledges that each SFA: (a) is subject to all applicable federal record retention laws, regulations, and policies; and (b) has certified that it has fully complied with any and all EPA requests for information regarding the Mine Sites pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927.

96.     At the conclusion of this Record retention period, Settling Defendants shall notify the United States and the Navajo Nation at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the Navajo Nation, and except as provided in ¶ 90 (Privileged and Protected Claims), Settling Defendants shall deliver any such Records to EPA or NNEPA.

97.     Each Settling Defendant certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Mine Sites since notification of potential liability by the United States or the Navajo Nation and that it has fully complied with any and all EPA and NNEPA requests for information regarding the Mine Sites pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and NNCERCLA §§ 2301 and 2504(B)(3)(b).

98.     Until 10 years after EPA's Notice of Completion of Work under Section XXV, NNEPA and NNDOJ shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in their possession or control or that come into their possession or control that relate in any manner to the performance of the Work and, in addition, must retain copies of all data generated during the performance of the Work that are not already contained in those Records.  At the conclusion of this Record retention period, NNEPA and NNDOJ shall each notify the United States at least 90 days prior to the destruction of any such Records and, upon request by the United States and except as provided in ¶ 90 (Privileged and Protected Claims), shall deliver any such Records to EPA.

# XXI.  NOTICES AND SUBMISSIONS

99.        All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:        EES Case Management Unit

U.S. Department of Justice

Environment and Natural Resources Division

P.O. Box 7611

Washington, D.C. 20044-7611

eescdcopy.enrd@usdoj.gov

Re: DJ # 90-11-2-10823/1


Chief

U.S. Department of Justice

Environment and Natural Resources Division

Environmental Defense Section

Washington, D.C. 20044-7611

Re: DJ # 90-11-6-20322

**As to EPA**:                          Assistant Director, Superfund Division

U.S. Environmental Protection Agency, Region IX

75 Hawthorne Street

San Francisco, CA 94105

**and**:                               Linda Reeves

EPA Project Coordinator

U.S. Environmental Protection Agency, Region IX

75 Hawthorne Street

Mail Code: SFD-6-2

San Francisco, CA 94105

Reeves.linda@epa.gov

(415) 972-3445

Mark Ripperda

EPA Project Coordinator

U.S. Environmental Protection Agency, Region IX

75 Hawthorne Street

Mail Code: SFD-6-2

San Francisco, CA 94105

Ripperda.mark@epa.gov

(415) 972-3028

| | |
|---|---|
| **with a copy to**: | Director, Site Operations |
| | Office of Legacy Management, LM-1 |
| | U.S. Department of Energy |
| | 1000 Independence Avenue, SW |
| | Washington, D.C. 20585 |
| | |
| **As to the Regional Financial Management Officer**: | Linda Ma |
| | Cost Recovery Specialist |
| | U.S. Environmental Protection Agency, Region IX |
| | Mail Code: SFD-7-5 |
| | 75 Hawthorne Street |
| | San Francisco, CA 94105 |
| | Ma.linda@epa.gov |
| | (415) 972-3232 |
| | |
| **At to EPA Cincinnati Finance Center**: | EPA Cincinnati Finance Center |
| | 26 W. Martin Luther King Drive |
| | Cincinnati, Ohio 45268 |
| | cinwd_acctsreceivable@epa.gov |

| | |
|---|---|
| 1 | |
| 2 | **As to the Navajo Nation** Veronica Blackhat |
| 3 | Assistant Attorney General |
| 4 | Navajo Nation Dept. of Justice |
| 5 | P.O. Drawer 2010 |
| 6 | Window Rock, AZ 86515 |
| 7 | vblackhat@nndoj.org |
| 8 | 928-871-6347 |

**As to the Navajo Nation**   Veronica Blackhat
Assistant Attorney General
Navajo Nation Dept. of Justice
P.O. Drawer 2010
Window Rock, AZ 86515
vblackhat@nndoj.org
928-871-6347

**As to NNEPA**:   Donald Benn
Executive Director, NNEPA
P.O. Box 339
Window Rock, AZ 86515
donbenn@navajo-nsn.gov
926-871-7990

Diane Malone
Manager, Waste Regulatory and Compliance Dept.
Navajo Nation EPA
P.O. Box 339
Window Rock, AZ 86515
dmalone@navajo-nsn.gov
928-871-7993

| | |
|---|---|
| 1 | |
| 2 | **As to Settling Defendants**: Stuart Brown |
| 3 | Project Coordinator |
| 4 | Cyprus Amax Minerals Company |
| 5 | Western Nuclear, Inc. |
| 6 | 333 North Central Avenue |
| 7 | Phoenix, Arizona 85004 |

**As to Settling Defendants**:     Stuart Brown

Project Coordinator

Cyprus Amax Minerals Company

Western Nuclear, Inc.

333 North Central Avenue

Phoenix, Arizona 85004


Cyprus Amax Minerals Company

Western Nuclear, Inc.

Attn:  General Counsel

333 North Central Avenue

Phoenix, Arizona 85004

## XXII. RETENTION OF JURISDICTION

100.            This Court retains jurisdiction over both the subject matter of this CD and Settling Defendants for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXIII.            APPENDICES

101.            The following appendices are attached to and incorporated into this CD:

"Appendix A" is the list of 94 Mine Sites where response actions are required under this Consent Decree.

"Appendix B" is the list of 23 abandoned uranium mines on Navajo Nation lands

at which Vanadium Corporation of America was historically involved in mining activities and which are included in the Tronox Incorporated bankruptcy proceeding referenced in Paragraph F.  No work is required at those mines under this Consent Decree.

"Appendix C" is the SOW.

"Appendix D" is the Form of Financial Assurance.

"Appendix E" is the Navajo Informal Dispute Resolution Procedure.

"Appendix F" is the Trust Agreement.

## XXIV.    MODIFICATION

102.    Except as provided in ¶ 14 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and Settling Defendants and, in the case of the CD only, the Navajo Nation, and effective upon approval by the Court. Except as provided in ¶ 14, non-material modifications to this CD, including the SOW and changes to Appendices A and B, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and Settling Defendants, and in the case of the CD and Appendices A and B only, the Navajo Nation.  Before providing its approval to any modification to the SOW, the United States will provide the Navajo Nation with a reasonable opportunity to review and comment on the proposed modification.

103.    Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXV. NOTICE OF COMPLETION OF WORK

104.    When EPA determines, after consultation with NNEPA, and after EPA's review of the Final Report submitted pursuant to the SOW, that all Work has been fully performed in accordance with this CD, with the exception of any continuing obligations required by this CD, including payment of Future Response Costs and Record retention, EPA will provide written notice to Settling Defendants, as a Certification of Work Completion, pursuant to Paragraph 11.4 of the SOW. If EPA determines, after consultation with NNEPA, that any such Work has not been completed in accordance

with this CD, EPA will notify Settling Defendants, provide a list of deficiencies, and require that Settling Defendants correct such deficiencies. Settling Defendants shall correct the deficiencies and submit a modified Final Report in accordance with the EPA notice. Failure by Settling Defendants to correct the deficiencies as directed by EPA shall be a violation of this CD.

## XXVI.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

105.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. Settling Defendants consent to the entry of this CD without further notice.

106.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXVII.   SIGNATORIES/SERVICE

107.     The undersigned representative of Settling Defendants, the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, and the Attorney General for the Navajo Nation each certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

108.     Settling Defendants agree not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified Settling Defendants in writing that it no longer supports entry of the CD.

109.     Settling Defendants shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. Settling Defendants agree to accept service in that manner and to

waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. Settling Defendants need not file an answer to the complaints in this action unless or until the Court expressly declines to enter this CD.

## XXVIII.    FINAL JUDGMENT

110.    This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

111.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, the Navajo Nation, and Settling Defendants. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

Dated this 22nd day of May, 2017.

Douglas L. Rayes
United States District Judge

Signature Page for Consent Decree in *United States and Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*

**FOR THE UNITED STATES OF AMERICA:**

1/17/17
Dated

John C. Cruden
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

1/17/17
Dated

Katherine M. Kane
Erica H. Pencak
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
999 18th Street
Suite 370 – South Tower
Denver, CO 80202

1/17/17
Dated

Dustin J. Maghamfar
Sue Chen
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611

Signature Page for Consent Decree in *United States and Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

6 JAN 17
Dated

Enrique Manzanilla
Superfund Division Director, Region IX
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

January 6, 2017
Dated

Sarah E. Mueller
Assistant Regional Counsel, Region IX
U.S. Environmental Protection Agency
75 Hawthorne Street
San Francisco, California 94105

Signature Page for Consent Decree in *United States and Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*

**FOR THE NAVAJO NATION:**

1·6·2017
Dated

Ethel Billie Branch
Attorney General
Navajo Nation Department of Justice
P.O. Drawer 2010
Window Rock, AZ 86515-2010

Signature Page for Consent Decree in *United States and Navajo Nation v  Cyprus Amax Minerals Company and Western Nuclear, Inc*

**FOR CYPRUS AMAX MINERALS COMPANY:**

1/5/17

Dated

L. Richards McMillan, II
Senior Vice President
333 North Central Ave.
Phoenix, AZ 85004

**FOR WESTERN NUCLEAR, INC.:**

1/5/17

Dated

L. Richards McMillan, II
Senior Vice President
333 North Central Ave.
Phoenix, AZ 85004

# Appendix A

| | Mine Claim All Site IDs | Mine Name | Surface Area Acres (rounded) | Underground Area Acres (rounded) | AEC records of ore production (tons) | Group Name | Latitude (N) | Longitude (W) | Priority Mine | Proximate mines |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3 | Red Wash Point | 12.4 | 0.0 | 1,158 | Red Rock / Shadyside (King Tutt Mesa) | 36.7096741229 | -109.0183581790 | | |
| 2 | 4 | Junction | 2.7 | 0.0 | 18 | Red Rock / Shadyside (King Tutt Mesa) | 36.7140165274 | -109.0151600320 | | |
| 3 | 6 | Lookout Point Incline | 1.3 | 0.1 | 506 | Red Rock / Shadyside (King Tutt Mesa) | 36.7185226003 | -109.0373518480 | | |
| 4 | 9 | Lookout Point | 7.1 | 0.6 | 5,839 | Red Rock / Shadyside (King Tutt Mesa) | 36.7196605374 | -109.0360779100 | | |
| 5 | 10 | Begay No. 2 | 6.0 | 0.0 | 4,515 | Red Rock / Shadyside (King Tutt Mesa) | 36.7186736761 | -109.0262475870 | | |
| 6 | 11 | Shadyside No. 1 | 6.1 | 0.2 | 1,510 | Red Rock / Shadyside (King Tutt Mesa) | 36.7189364101 | -109.0319598080 | | |
| 7 | 12 | Williams Point | 6.3 | 0.0 | 127 | Red Rock / Shadyside (King Tutt Mesa) | 36.7260938656 | -109.0379772050 | | |
| 8 | 13 | Salt Canyon | 7.2 | 0.0 | 61 | Red Rock / Shadyside (King Tutt Mesa) | 36.7243502139 | -109.0220558960 | | |
| 9 | 14 | Salt Canyon | 1.5 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.7242126332 | -109.0176570660 | | |
| 10 | 15 | Frank's Point | 4.5 | 0.0 | 25 | Red Rock / Shadyside (King Tutt Mesa) | 36.7340267535 | -109.0396605010 | | |
| 11 | 16 | Upper Salt Rock | 1.4 | 0.0 | 96 | Red Rock / Shadyside (King Tutt Mesa) | 36.7342525428 | -109.0379628840 | | yes |
| 12 | 19 | Oak Springs Mine | 9.3 | 0.3 | 1,978 | Red Rock / Shadyside (King Tutt Mesa) | 36.7462941285 | -109.0512918380 | | |
| 13 | 20 | Oak Springs Mine (Gravel Cap) | 12.1 | 0.5 | 5,112 | Red Rock / Shadyside (King Tutt Mesa) | 36.7477338157 | -109.0504533910 | | |
| 14 | 26 | Hazel | 8.9 | 0.1 | 36 | Red Rock / Shadyside (King Tutt Mesa) | 36.7668208465 | -109.0514640730 | | yes |
| 15 | 27 | Lone Star | 7.2 | 0.0 | 200 | Red Rock / Shadyside (King Tutt Mesa) | 36.7685094906 | -109.0440597960 | | |
| 16 | 28 | Cottonwood Butte | 2.5 | 0.0 | 250 | Red Rock / Shadyside (King Tutt Mesa) | 36.7720560730 | -109.0402158320 | | |
| 17 | 50 | Carson | 15.8 | 0.0 | 93 | Rattlesnake (Tse Tah) | 36.8733124264 | -109.2884520340 | | yes |
| 18 | 51 | Martin Mine and George Simpson | 31.7 | 0.7 | 4,278 | Rattlesnake (Tse Tah) | 36.8780031133 | -109.2923296290 | | |
| 19 | 54 | Rattlesnake | 17.7 | 0.1 | 478 | Rattlesnake (Tse Tah) | 36.8770488527 | -109.2865764750 | | |
| 20 | 57 | North Martin | 8.2 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8846103259 | -109.2935038660 | yes | |
| 21 | 60 | Plot 1 | 11.7 | 0.1 | 775 | Red Rock / Shadyside (King Tutt Mesa) | 36.8999026375 | -109.2955065200 | | |
| 22 | 61 | McKenzie 3 | 18.6 | 0.0 | 504 | Rattlesnake (Tse Tah) | 36.9055595660 | -109.2941212340 | | yes |
| 23 | 65 | Plot 4 | 15.7 | 0.0 | 522 | Red Rock / Shadyside (King Tutt Mesa) | 36.9011753065 | -109.2877881380 | | |
| 24 | 69 | NA-0919B | 6.5 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8901151230 | -109.2732187350 | | yes |
| 25 | 70 | Plot 8 | 5.0 | 0.0 | 280 | Rattlesnake (Tse Tah) | 36.8951816771 | -109.2670863480 | | |
| 26 | 71 | Black Rock Point Mines | 23.5 | 0.0 | 2,025 | Rattlesnake (Tse Tah) | 36.8960334986 | -109.2649210150 | yes | |
| 27 | 96 | Mesa II 1/4 Mine | 2.2 | 0.3 | 725 | Lukachukai (Cove) | 36.5151713703 | -109.2343637110 | | |
| 28 | 104 | Cato No. 2 | 6.5 | 0.0 | 52 | Lukachukai (Cove) | 36.5480201387 | -109.2498938690 | | |
| 29 | 107 | NA-0316 | 1.6 | 0.0 | n/a | Lukachukai (Cove) | 36.5293472379 | -109.2571912820 | | yes |
| 30 | 116 | NA-0919A | 6.9 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8928117099 | -109.2714591170 | | yes |
| 31 | 219 | CBW-MC Mine | 3.0 | 0.0 | 388 | Rattlesnake (Tse Tah) | 36.8277039569 | -109.2628335060 | | |
| 32 | 223 | Rock Door No. 1 | 5.4 | 0.0 | 25 | Monument Valley | 37.0146880063 | -110.2149680890 | yes | |
| 33 | 226 | Monument No. 3 | 2.5 | 0.0 | 6 | Monument Valley | 37.0061724942 | -110.3537572920 | | |
| 34 | 246 | Monument No. 1 | 9.2 | 0.6 | 4,164 | Monument Valley | 36.9478156688 | -110.2311837890 | | |
| 35 | 275 | Kinusta Mesa | 10.0 | 0.0 | 788 | Cove Mesa | 36.6629305588 | -109.3029634580 | | |
| 36 | 282 | Rattlesnake No. 1 | 20.5 | 0.1 | 2,910 | Rattlesnake (Tse Tah) | 36.8738490465 | -109.1278711480 | | |

| | Mine Claim All Site IDs | Mine Name | Surface Area Acres (rounded) | Underground Area Acres (rounded) | AEC records of ore production (tons) | Group Name | Latitude (N) | Longitude (W) | Priority Mine | Proximate mines |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 283 | Captain Benally No. 4A | 2.4 | 0.1 | 114 | Rattlesnake (Tse Tah) | 36.9378887865 | -109.2625607730 | | |
| 38 | 321 | Ruby No. 1 and 2 | 6.4 | 49.6 | 495,360 | Eastern | 35.5194714259 | -108.2229776900 | | |
| 39 | 323 | Ruby No. 3 and 4 | 13.7 | 42.8 | 295,000 | Eastern | 35.5078555468 | -108.1623549840 | | |
| 40 | 415 | Mesa IV 1/4 Mine | 6.0 | 0.3 | 344 | Lukachukai (Cove) | 36.5282303341 | -109.2611541410 | | |
| 41 | 417 | Mesa III, West Mine | 6.6 | 0.0 | n/a | Lukachukai (Cove) | 36.5146359700 | -109.2507121510 | | |
| 42 | 422 | Billy Topaha Mine | 4.4 | 0.0 | 703 | Lukachukai (Cove) | 36.5005295341 | -109.2253065200 | | |
| 43 | 424 | Mesa III, Northwest Mine | 7.3 | 0.1 | 735 | Lukachukai (Cove) | 36.5195447407 | -109.2477979150 | yes | |
| 44 | 440 | Oak238 | 2.9 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.7408518946 | -109.0431157460 | | yes |
| 45 | 448 | John Lee Benally | 4.3 | 0.0 | 37 | Rattlesnake (Tse Tah) | 36.8921949904 | -109.4667302350 | | |
| 46 | 477 | Shadyside Incline | 1.5 | 0.2 | 2,401 | Red Rock / Shadyside (King Tutt Mesa) | 36.7172042821 | -109.0328527850 | | |
| 47 | 482 | Oak 143, Oak 146 | 5.6 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.7145679801 | -109.0338821020 | | yes |
| 48 | 483 | Tent No. 1 | 4.8 | 0.3 | 1,198 | Red Rock / Shadyside (King Tutt Mesa) | 36.7159672172 | -109.0333993270 | | |
| 49 | 487 | King Tutt Point | 13.5 | 0.4 | 1,384 | Red Rock / Shadyside (King Tutt Mesa) | 36.7091881856 | -109.0271894650 | yes | |
| 50 | 488 | Carrizo No. 1 | 0.7 | 0.2 | 828 | Red Rock / Shadyside (King Tutt Mesa) | 36.7102916949 | -109.0255230170 | | |
| 51 | 491 | Plot 7 | 8.9 | 0.0 | 500 | Rattlesnake (Tse Tah) | 36.8940570080 | -109.2699776990 | | |
| 52 | 492 | Tse079 | 3.9 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8953084318 | -109.2697459050 | | yes |
| 53 | 510 | Frank No. 2 | 3.9 | 0.3 | n/a | Lukachukai (Cove) | 36.5321226646 | -109.2529084440 | | |
| 54 | 513 | Firelight No. 6 | 10.5 | 0.2 | 2,141 | Monument Valley | 36.9136145294 | -110.2597767890 | yes | |
| 55 | 516 | C-3 | 6.1 | 0.8 | 5,410 | Monument Valley | 37.0448995831 | -110.3452034140 | | |
| 56 | 517 | Tom Holliday | 3.3 | 0.0 | 12 | Monument Valley | 37.0187777412 | -110.2537650250 | | |
| 57 | 621 | NA-0505B | 2.4 | 0.0 | n/a | Cove Mesa | 36.7949575508 | -109.2811728780 | | yes |
| 58 | 622 | Melvin Benally No. 1 | 0.6 | 0.0 | 81 | Rattlesnake (Tse Tah) | 36.8283075234 | -109.2667791150 | | |
| 59 | 623 | Plot 2 | 16.0 | 0.0 | 443 | Rattlesnake (Tse Tah) | 36.9051890787 | -109.2920576660 | | |
| 60 | 627 | Plot 13 | 13.6 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.8710128517 | -109.2909121370 | | |
| 61 | 628 | Plot 9 | 10.7 | 0.0 | 230 | Rattlesnake (Tse Tah) | 36.8878557510 | -109.2623965460 | | |
| 62 | 629 | Jimmie Bileen 1 | 17.7 | 0.0 | 67 | Rattlesnake (Tse Tah) | 36.8882040851 | -109.2602470280 | | yes |
| 63 | 630 | Sandy K | 15.0 | 0.0 | 7 | Rattlesnake (Tse Tah) | 36.8891276129 | -109.2576021150 | | yes |
| 64 | 631 | Plot 10 | 17.3 | 0.1 | 783 | Rattlesnake (Tse Tah) | 36.8846551084 | -109.2633007350 | | |
| 65 | 632 | Plot 11 | 23.2 | 0.1 | 500 | Rattlesnake (Tse Tah) | 36.8851581276 | -109.2607982270 | | |
| 66 | 633 | NA-0917A | 15.8 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8936387968 | -109.2627074580 | | yes |
| 67 | 634 | Plot 6 | 35.6 | 2.5 | 14,956 | Rattlesnake (Tse Tah) | 36.8992983968 | -109.2700102000 | yes | |
| 68 | 637 | Pope 1 | 1.6 | 0.1 | 423 | Rattlesnake (Tse Tah) | 36.8981095343 | -109.2720102000 | | yes |
| 69 | 640 | King Tutt 1 | 7.5 | 0.0 | 290 | Red Rock / Shadyside (King Tutt Mesa) | 36.7105655454 | -109.0197844490 | | |
| 70 | 642 | Shadyside No. 2 | 3.4 | 0.4 | 2,033 | n | 36.7199706567 | -109.0286792290 | | |
| 71 | 646 | Nelson Point | 5.1 | 0.9 | 15,213 | Red Rock / Shadyside (King Tutt Mesa) | 36.7157252792 | -109.0346215160 | | |
| 72 | 648 | NA-0410 | 7.4 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.7674467226 | -109.0484169380 | | yes |
| 73 | 649 | North Star | 5.6 | 0.1 | 625 | Red Rock / Shadyside (King Tutt Mesa) | 36.7679009316 | -109.0463652380 | | |
| 74 | 652 | Begay Incline | 4.4 | 0.0 | 655 | Red Rock / Shadyside (King Tutt Mesa) | 36.7169937562 | -109.0263494040 | | yes |
| 75 | 658 | White Cap | 2.8 | 0.0 | 155 | Red Rock / Shadyside (King Tutt Mesa) | 36.7649869953 | -109.0515744520 | | |
| 76 | 663 | AEC Plot 3 | 3.1 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8732280168 | -109.2861459150 | | |
| 77 | 664 | Plot 3 | 15.0 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.9032467957 | -109.2859978510 | yes | |
| 78 | 665 | Plot 5 | 21.3 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.9018028751 | -109.2841684320 | | |

| | Mine Claim All Site IDs | Mine Name | Surface Area Acres (rounded) | Underground Area Acres (rounded) | AEC records of ore production (tons) | Group Name | Latitude (N) | Longitude (W) | Priority Mine | Proximate mines |
|---|---|---|---|---|---|---|---|---|---|---|
| 79 | 667 | Climax Transfer Station | 2.1 | 0.0 | n/a | Lukachukai (Cove) | 36.7464944722 | -108.7021510220 | yes | |
| 80 | 106 | South Portal, Frank No. 1 Mine | 12.0 | 1.1 | 75,739 | Lukachukai (Cove) | 36.5304430903 | -109.2545655060 | | |
| | 505 | North Portal, Frank No. 1 Mine | 0.9 | 1.3 | | | 36.5369909246 | -109.2556406100 | | |
| | 509 | East Portal, Frank No. 1 Mine | 10.2 | 2.5 | | | 36.5331690026 | -109.2518936640 | | |
| 81 | 17 | VCA Plot 7 | 50.5 | 0.2 | 4,899 | Red Rock / Shadyside (King Tutt Mesa) | 36.7342224116 | -109.0329830760 | | |
| | 18 | | 5.4 | 1.0 | | | 36.7405300335 | -109.0414166810 | | |
| | 41 | | 0.9 | 0.0 | | | 36.7389594775 | -109.0396010940 | | |
| 82 | 184 | Eurida Mine | 4.1 | 0.2 | 800 | Rattlesnake (Tse Tah) | 36.7971736130 | -109.2847714070 | | |
| | 185 | East Workings | 4.0 | 0.0 | | | 36.7958653999 | -109.2802179740 | | |
| 83 | 186 | Plot 16 | 4.1 | 0.0 | 886 | Rattlesnake (Tse Tah) | 36.7933750486 | -109.2822125340 | | |
| | 619 | Plot 15 | 1.8 | 0.0 | | | 36.7940454168 | -109.2749319880 | | |
| | 620 | Plot 14 | 3.6 | 0.0 | | | 36.7988154268 | -109.2760282760 | | |
| 84 | 217 | Saytah Canyon | 0.7 | 0.0 | 112 | Rattlesnake (Tse Tah) | 36.8283323960 | -109.2662386980 | | |
| | 218 | | 0.7 | 0.0 | | | 36.8286294634 | -109.2607966160 | | |
| 85 | 241 | Monument No. 2 | 0.7 | 0.0 | 773,132 | Monument Valley | 36.9412038568 | -109.8886709960 | | |
| | 521 | | 177.0 | 0.5 | | | 36.9320710334 | -109.8848799080 | | |
| 86 | 261 | Taylor Reid No. 1 | 3.7 | 0.7 | 7,850 | Monument Valley | 37.0465662777 | -110.3486108590 | | |
| | 708 | | 3.9 | 0.0 | | | 37.0455257882 | -110.3467895330 | | |
| 87 | 31 | Upper Red Wash | 6.7 | 0.0 | 760 | Red Rock / Shadyside (King Tutt Mesa) | 36.6530986424 | -109.0494436810 | | |
| | 32 | | 2.0 | 0.0 | | | 36.6504486727 | -109.0454140090 | | |
| 88 | 34 | Cove Mesa Mines (Cato Sells) | 0.9 | 0.0 | 2,713 | Cove Mesa | 36.6496903779 | -109.2706973740 | | |
| | 35 | | 2.8 | 0.5 | | | 36.6517100962 | -109.2690035960 | | |
| | 36 | | 5.9 | 0.4 | | | 36.6522271361 | -109.2782442960 | | |
| 89 | 37 | Cove Mesa Mines (AEC Lease Plot 7) | 3.4 | 0.0 | 39,946 | Cove Mesa | 36.6486555054 | -109.2811485440 | | |
| | 38 | | 0.3 | 0.1 | | | 36.6478027234 | -109.2763852360 | | |
| | 39 | | 16.1 | 0.8 | | | 36.6375536912 | -109.2774905950 | | |
| | 430 | | 4.6 | 0.0 | | | 36.6393199949 | -109.2704848620 | | |
| | 431 | | 4.6 | 0.0 | | | 36.6432843066 | -109.2698782020 | | |
| | 434 | | 4.5 | 0.0 | | | 36.6371104611 | -109.2709258650 | | |
| | 497 | | 21.8 | 0.6 | | | 36.6320816673 | -109.2691153690 | | |
| | 498 | | 31.4 | 1.8 | | | 36.6315799260 | -109.2728366620 | | |
| | 501 | | 52.9 | 4.7 | | | 36.6409865343 | -109.2739185830 | | |
| 90 | 485 | Begay No. 1 | 15.6 | 0.9 | 3,921 | Red Rock / Shadyside (King Tutt Mesa) | 36.7088441355 | -109.0237185240 | | |
| | 659 | | 1.4 | 0.1 | | | 36.7099635747 | -109.0247665470 | | |
| 91 | 635 | Hoskie Henry | 5.4 | 0.0 | 978 | Rattlesnake (Tse Tah) | 36.9003612956 | -109.2677126980 | yes | |
| | 636 | | 6.0 | 0.1 | | | 36.9006159217 | -109.2724420060 | | |
| 92 | 7 | VCA Plot 3 | 18.6 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.7203371685 | -109.0376712070 | | |
| | 478 | | 43.4 | 0.0 | | | 36.7151579760 | -109.0370429500 | | |
| | 641 | | 7.4 | 0.0 | | | 36.7189454906 | -109.0301406620 | | |
| | 643 | | 9.9 | 0.0 | | | 36.7211785984 | -109.0272233350 | | |
| 93 | 75 | Tom Wilson | 2.9 | 0.0 | 59 | Central | 36.4624668786 | -109.9362086400 | | |
| | 76 | | 10.9 | 0.0 | | | 36.4631500061 | -109.9341997080 | | |
| | 400 | | 11.0 | 0.0 | | | 36.4640458210 | -109.9421355300 | | |
| | 402 | | 16.9 | 0.0 | | | 36.4655119278 | -109.9378450640 | | |
| 94 | n/a | Wilbur Sells Nos. 4A and 5A | | | n/a | Rattlesnake (Tse Tah) | 36.9100930000 | -109.2826560000 | | |

Appendix B

# APPENDIX B: MINES NOT INCLUDED IN CONSENT DECREE

| | Mine Claim All Site IDs | Mine Name | Surface Area Acres (rounded) | Underground Area Acres (rounded) | AEC records of ore production (tons) | Group Name | Latitude (N) | Longitude (W) | Priority Mine |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 64 | Block K | 6.7 | 0.0 | 2,016 | Rattlesnake (Tse Tah) | 36.9145657005 | -109.2833855210 | |
| 2 | 95 | Mesa I 3/4 Incline | 2.1 | 4.9 | 44,174 | Lukachukai (Cove) | 36.5060569028 | -109.2333648410 | |
| 3 | 101 | Mesa IV, West Mine | 4.8 | 0.6 | 3,365 | Lukachukai (Cove) | 36.5254382766 | -109.2505831300 | |
| 4 | 204 | Step Mesa Mine | 3.7 | 0.8 | 8,841 | Lukachukai (Cove) | 36.5054168059 | -109.2685290700 | |
| 5 | 205 | Black No. 2 Mine | 4.7 | 0.5 | 1,879 | Lukachukai (Cove) | 36.4991209205 | -109.2488102450 | |
| 6 | 287 | Mesa II Pit | 0.6 | 0.0 | 822 | Lukachukai (Cove) | 36.5303690307 | -109.2315899170 | |
| 7 | 288 | Mesa I 1/2, West Mine | 1.9 | 0.2 | n/a | Lukachukai (Cove) | 36.5115957623 | -109.2251049880 | |
| 8 | 419 | Mesa I 1/2 Mine | 5.9 | 0.7 | 7,555 | Lukachukai (Cove) | 36.5158324968 | -109.2197744960 | |
| 9 | 421 | Frank Jr. Mine | 5.7 | 0.0 | 10,519 | Lukachukai (Cove) | 36.5458114344 | -109.2471051040 | |
| 10 | 423 | Mesa I 1/4 Mine | 3.6 | 0.2 | 132 | Lukachukai (Cove) | 36.5111292786 | -109.2142881340 | |
| 11 | 428 | Knife Edge Mesa Mine | 5.5 | 0.1 | 1,032 | Lukachukai (Cove) | 36.4851261073 | -109.2465594870 | |
| 12 | 506 | Mesa IV 1/2 Mine and Simpson 181 | 2.9 | 2.5 | 8,977 | Lukachukai (Cove) | 36.5375622854 | -109.2562163360 | |
| 13 | 511 | Flag No. 1 Mine | 6.7 | 0.3 | 11,286 | Lukachukai (Cove) | 36.4998452180 | -109.2552586720 | |
| 14 | 600 | Mesa I 3/4 Mine No. 2, P150 | 2.3 | 0.4 | 6,423 | Lukachukai (Cove) | 36.5106409432 | -109.2337343070 | |
| 15 | 601 | Mesa II, Mine No. 1 & 2, P-21 | 12.4 | 32.3 | 274,128 | Lukachukai (Cove) | 36.5112353471 | -109.2348778320 | |
| 16 | 602 | Mesa II, Mine No. 1, P-150 | 3.9 | 0.9 | 3,825 | Lukachukai (Cove) | 36.5127277275 | -109.2327499040 | |
| 17 | 603 | Mesa II 1/2 Mine | 2.2 | 5.3 | 38,343 | Lukachukai (Cove) | 36.5149632882 | -109.2428501500 | |
| 18 | 605 | Mesa III Mine | 1.1 | 5.7 | 50,900 | Lukachukai (Cove) | 36.5152154124 | -109.2448960970 | yes |
| 19 | 606 | Mesa IV, Mine No. 1 | 9.7 | 1.1 | 7,648 | Lukachukai (Cove) | 36.5291881326 | -109.2411543410 | |
| 20 | 607 | Mesa IV, Mine No. 2 | 20.3 | 0.9 | 3,711 | Lukachukai (Cove) | 36.5325513018 | -109.2396517150 | |
| 21 | 611 | Mesa VI Mine | 3.9 | 0.9 | 8,994 | Lukachukai (Cove) | 36.5428608766 | -109.2582706050 | |
| 22 | 103 | Mesa V Mine | 4.3 | 3.1 | 55,599 | Lukachukai (Cove) | 36.5399148408 | -109.2490367380 | |
| | 508 | | 3.2 | 3.9 | | | 36.5380667228 | -109.2548895960 | |
| 23 | 93 | Mesa I, Mine No. 11 | 9.3 | 0.6 | 58,082 | Lukachukai (Cove) | 36.5246411899 | -109.2236001470 | yes |
| | 94 | Mesa I, Mine No. 13 | 5.4 | 7.6 | | | 36.5234840361 | -109.2177078940 | |
| | 654 | Mesa I, Mine No. 10 | 2.8 | 0.2 | | | 36.5236876881 | -109.2193060810 | |
| | 655 | Mesa I, Mine No. 12 | 25.4 | 2.8 | | | 36.5219957046 | -109.2225169400 | |
| | 656 | Mesa I, Mine No. 14 | 9.0 | 0.8 | | | 36.5195019444 | -109.2200127600 | |
| | 657 | Mesa I, Mine No. 15 | 7.4 | 0.8 | | | 36.5254231143 | -109.2217313930 | |

# Appendix C

**STATEMENT OF WORK**

**FOR RESPONSE ACTIONS AT 94 ABANDONED URANIUM MINE SITES ON**

**NAVAJO NATION LANDS IN ARIZONA, NEW MEXICO AND UTAH**

**EPA REGION 9**

**TABLE OF CONTENTS**

1.   INTRODUCTION ..................................................................................................1
2.   DEFINITIONS......................................................................................................3
3.   COMMUNITY INVOLVEMENT ......................................................................3
4.   GENERAL REQUIREMENTS ..........................................................................5
5.   REMOVAL SITE EVALUATION OR REMEDIAL INVESTIGATION ........8
6.   BASELINE HUMAN HEALTH RISK ASSESSMENT AND ECOLOGICAL RISK
     ASSESSMENT...................................................................................................10
7.   INTERIM ACTIONS.........................................................................................11
8.   ENGINEERING EVALUATION / COST ANALYSIS OR FEASIBILITY STUDY .....12
9.   REMOVAL DESIGN OR REMEDIAL DESIGN ...........................................13
10.  REMOVAL ACTION OR REMEDIAL ACTION ...........................................17
11.  OPERATION AND MAINTENANCE AND POST REMOVAL SITE CONTROL ......21
12.  REPORTING .....................................................................................................23
13.  DELIVERABLES...............................................................................................24
14.  SITE MANAGEMENT PLAN...........................................................................30
15.  COMPONENTS OF WORK ..............................................................................32
16.  NNEPA PARTICIPATION ................................................................................33
17.  REFERENCES ...................................................................................................33

# 1.   INTRODUCTION

1.1   **Purpose of the SOW**. This Statement of Work ("SOW") sets forth the procedures and requirements for implementing the Work as defined in Section IV (Definitions) of the Consent Decree ("CD") at 94 abandoned uranium Mine Sites, including one transfer station, in Arizona, New Mexico and Utah located on Navajo Nation lands, and listed in Appendix A to the CD ("Mine Sites").

1.2   **Description of the Mine Sites**. Appendix A to the CD includes the U.S. Environmental Protection Agency ("USEPA") mine site ID number, estimated ore production, surface area, and latitude and longitude for each Mine Site. Settling Defendants shall provide maps of the Mine Sites as part of the Site Management Plan ("SMP"), to be incorporated into this SOW as provided in Section 14. Areas of each Mine Site to be addressed pursuant to this SOW include:

(a)   All areas where hazardous substances associated with the Mine Sites have been deposited, stored, disposed of, placed, or otherwise come to be located;

(b)   Haul roads, along with their shoulders, from the Mine Site to the nearest intersection with a paved or significant gravel road or other location defined in the Removal Site Evaluation ("RSE") and/or Remedial Investigation ("RI") work plans for the Mine Site or group of Mine Sites;

(c)   Adits, vent holes and other mine openings related to the Mine Sites; and

(d)   Groundwater and surface water, where appropriate, in the vicinity of the Mine Sites.

(e)   **"Step Out" Areas**. In addition, Settling Defendants may be required to characterize additional "Step Out" areas in the field if USEPA determines that this is appropriate based on exceedances of the Investigation Level at the margins of the areas described above or if additional areas of mine waste associated with the Mine Site or Mine Sites are identified.

1.3   **The Work**. For the purposes of performing the Work, Settling Defendants may group Mine Sites together, with the approval of USEPA. The Work to be performed at each Mine Site or group of Mine Sites includes Community Involvement and Removal Site Evaluations ("RSEs") and/or Remedial Investigations ("RIs"), and the following if determined necessary by USEPA, after reasonable opportunity for review and comment by NNEPA, based on the RSE and/or RI results:

(a)   Interim Removal Action, as required by USEPA;

(b)   Baseline Human Health Risk Assessment and Ecological Risk Assessment, as required by USEPA;

(c)   Engineering Evaluation /Cost Analysis ("EE/CA") or Feasibility Study ("FS"), as required by USEPA;

(d)     Removal Design or Remedial Design, as required by USEPA;

(e)     Removal Action or Remedial Action, as required by USEPA; and,

(f)     Operation and Maintenance ("O&M") and Post Removal Site Controls ("PRSC"), as required by USEPA.

**1.4     Structure of the SOW**.

- Section 2 (Definitions) sets forth the definitions that apply to this SOW.
- Section 3 (Community Involvement) sets forth Settling Defendants' responsibilities for community involvement.
- Section 4 (General Requirements) sets forth general requirements that apply to the Work.
- Section 5 (Removal Site Evaluation or Remedial Investigation) sets forth the process and requirements for preparing the RSE or RI, which includes gamma scanning and background study, and characterization of the lateral and vertical extent of contamination.
- Section 6 (Interim Actions) sets forth requirements for Interim Removal Actions that may be required to protect human health and the environment, such as closing adits, vent holes or other mine openings, and installing fencing or warning signs around mine hazards.
- Section 7 (Baseline Human Health Risk Assessment and Ecological Risk Assessment) sets forth the criteria for characterizing the health risk to humans and ecological receptors.
- Section 8 (Engineering Evaluation / Cost Analysis ("EE/CA") or Feasibility Study) specifies the process and requirements for preparing the EE/CA or FS and development, screening and detailed analysis of alternatives.
- Section 9 (Removal or Remedial Design) sets forth the process for developing the RD, which includes the submission of specified primary deliverables.
- Section 10 (Removal or Remedial Action) sets forth requirements regarding the completion of the RA, including primary deliverables related to completion of the RA.
- Section 11 (O&M and PRSC) sets forth Settling Defendants' responsibilities for conducting O&M and PRSC.
- Section 12 (Reporting) sets forth Settling Defendants' reporting obligations.
- Section 13 (Deliverables) describes the content of the supporting deliverables and the general requirements regarding Settling Defendants' submission of, and USEPA's review of, approval of, comment on, and/or modification of, deliverables.
- Section 14 (Site Management Plan) sets forth the requirements for creating and implementing the SMP which includes a schedule of all Components of Work, interim tasks for each Component of Work, and a budget of estimated costs.
- Section 15 (Components of Work) sets forth the Deadlines subject to stipulated penalties.
- Section 16 (NNEPA Participation) describes NNEPA's participation in USEPA's approvals, disapprovals, and certifications under this SOW.
- Section 17 (References) provides a list of references, including URLs.

## 2.    DEFINITIONS

**2.1**    The terms used in this SOW that are defined in CERCLA, in regulations promulgated under CERCLA, or in the CD, have the meanings assigned to them in CERCLA, in such regulations, or in the CD, except that the term "Paragraph" or "¶" means a paragraph of the SOW, and the term "Section" means a section of the SOW, unless otherwise stated. In the event of any conflict between this SOW and the CD, the CD shall control.

**2.2**    "Components of Work" shall means the work products specified in Section 15.

**2.3**    "Deadlines" shall mean the dates for deliverables established under the operable version of the SMP (i.e., the most recent version) for the calendar year ("CY") in which that version of the SMP was approved by EPA and the ensuing two calendar years (CY+1, and CY+2). Deadlines are subject to stipulated penalties in accordance with Section XIV (Stipulated Penalties) of the CD.

**2.4**    "Parties" shall mean the United States, the Navajo Nation, and Settling Defendants. "Party" shall mean any one of these Parties, as the context requires.

**2.5**    "Performance Standards" or "PS" shall mean the cleanup levels and other measures of achievement of response action objectives, as set forth by EPA in one or more action memoranda or one or more records of decision issued in accordance with the SOW, the NCP, and CERCLA.

**2.6**    "Schedule" shall mean a timetable or plan that indicates the time and sequence of events.

**2.7**    "Settling Defendants" shall mean Cyprus Amax Minerals Company and Western Nuclear, Inc.

**2.8**    "Site Management Plan" or "SMP" shall mean a planning document prepared under Section 14 that contains a Schedule. The SMP will be used as a management tool in planning, reviewing, and setting priorities for all response activities at the Mine Sites. Deadlines for deliverables developed under the terms of this SOW will be listed in the SMP and are subject to Stipulated Penalties.

## 3.    COMMUNITY INVOLVEMENT

**3.1    Community Involvement ("CI") Responsibilities**

(a)    **USEPA CI Responsibilities.** USEPA, after reasonable opportunity for review and comment by NNEPA, may develop geographic Community Involvement Plans (CIPs) for the Mine Sites. As directed by USEPA, Settling Defendants shall provide information supporting USEPA's CIPs and shall participate in the preparation of such information for dissemination to the public and in public meetings which may be held or sponsored by USEPA to explain activities at or concerning the Mine Sites. USEPA shall update any CIPs as necessary.

(b) **Settling Defendants CI Participation.** If requested by USEPA, Settling Defendants shall participate in community involvement activities, including (1) the preparation of information regarding the Work for dissemination to the public, with consideration given to including mass media and/or Internet notification, and (2) public meetings that may be held or sponsored by USEPA to explain activities at or relating to the Mine Sites. Settling Defendants' support of USEPA's community involvement activities may include providing online access to initial submissions and updates of deliverables to (1) any Community Advisory Groups, (2) any Technical Assistance Grant recipients and their advisors, and (3) other entities to provide them with a reasonable opportunity for review and comment. USEPA may describe in its CIPs Settling Defendants' responsibilities for community involvement activities. All community involvement activities conducted by Settling Defendants at USEPA's request are subject to USEPA's and NNEPA's oversight. Upon USEPA's request, Settling Defendants shall establish a community information repository at or near the Mine Sites to house one copy of the administrative record.

(c) **Settling Defendants' CI Coordinator**. If requested by USEPA, Settling Defendants shall, within 15 days of the Effective Date of the CD, designate and notify USEPA of Settling Defendants' Community Involvement Coordinator ("Settling Defendants' CI Coordinator"). Settling Defendants may hire a contractor for this purpose. Settling Defendants' notice must include the name, title, and qualifications of the Settling Defendants' CI Coordinator. Settling Defendants' CI Coordinator is responsible for providing support regarding USEPA's community involvement activities, including coordinating with USEPA's CI Coordinator regarding responses to the public's inquiries about the Mine Sites.

(d) **Settling Defendants' Responsibilities for Technical Assistance**. If USEPA requests, Settling Defendants shall arrange for a qualified community group(s) to receive the services of a technical advisor(s) who can: (i) help group members understand Mine Site cleanup issues (specifically, to interpret and comment on Site-related documents developed under this SOW); and (ii) share this information with others in the community. The technical advisor(s) will be independent from the Settling Defendants. Settling Defendants' Technical Assistance Plan (TAP) assistance will end when USEPA issues a Notification of Completion of RA Construction under ¶ 10.6. Settling Defendants shall implement this requirement under a TAP.

(e) S**ettling Defendants' Outreach**. Settling Defendants may conduct outreach activities at Navajo Chapters and applicable Navajo Nation departments for the following purposes: to obtain access to perform the Work; to provide notification of planned field work; to coordinate cultural resource and biological surveys; and to respond to inquiries from the Navajo Nation. Settling Defendants will inform USEPA and NNEPA of planned outreach activities and coordinate as needed.

# 4. GENERAL REQUIREMENTS

4.1     **Grouping of Mine Sites**. Many of the Mine Sites are relatively small and located adjacent to or in close proximity to each other. Further, waste rock and other materials from nearby mines may have been consolidated as part of earlier reclamation work. Settling Defendants may group Mine Sites together for purposes of performing the Work, with the approval of USEPA. USEPA may also group Mine Sites together when selecting response actions, after reasonable opportunity for review and comment by NNEPA.

4.2     **Priority Media**. Priority media to be addressed at each Mine Site include, where appropriate, soils, sediments, dust, groundwater and surface water, which present the greatest potential risk to human health and the environment.

4.3     **Contaminants of Potential Concern ("COPC")**. COPCs include, but are not limited to, the following:

      (a)     Soil and Sediment. COPCs for soil and sediment include all or some of the following analytes related to historic mining, depending upon site conditions: radium 226, total uranium, thorium, and the stable metals arsenic, molybdenum, selenium, mercury, vanadium, PCBs, total petroleum hydrocarbons and explosives, including perchlorate.

      (b)     Well Water and Surface Water. COPCs for well water and surface water include all or some of the following analytes, depending upon site conditions: Radium 226, Radium 228, gross alpha, and the following metals: antimony, arsenic, barium, beryllium, cadmium, chromium, cobalt, copper, lead, mercury, molybdenum, nickel, nitrate, selenium, silver, thallium, isotopic uranium, vanadium and zinc.

4.4     **Notice of Fieldwork and Sampling**. Settling Defendants shall provide a 2-week notice to USEPA and NNEPA of all field work and sampling activities, including soil, sediment and groundwater sampling and scanning.

4.5     **Mine Site Access**. In addition to the requirements in Section VIII (Property Requirements) of the CD, Settling Defendants shall obtain access before Work commences at any of the Mine Sites. Unless otherwise directed by USEPA, Settling Defendants shall obtain access in accordance with the following requirements. If access cannot be reasonably attained pursuant to Paragraph 19 of the CD, Settling Defendants shall so notify USEPA and NNEPA.

      (a)     Trust or Fee Land.

            (1)     Homesite Lease Holders. Settling Defendants shall obtain a signed access agreement from any homesite lease holder for work within their homesite lease.

            (2)     Resident Without Homesite Lease. If there is a home without a homesite lease, Settling Defendants shall notify USEPA and NNEPA and proceed

as instructed by USEPA, after reasonable opportunity for review and comment by NNEPA.

  (3) Grazing Permit Holders. Settling Defendants shall obtain a signed access agreement from any grazing permit holders for work within their grazing permit area.

  (4) Commercial, Institutional or Other Entities. Settling Defendants shall obtain a signed access agreement from commercial or institutional entities (e.g., schools, businesses, chapter houses, churches) with rights to the land, based on instructions from USEPA and NNEPA, as appropriate.

 (b) Allotted land

  (1) Allottees. Settling Defendants shall obtain signed access agreements from allottees on allotted land for investigative work, consistent with the process agreed to by USEPA, NNEPA, NNDOJ, and BIA, and described in a March 2, 2016 letter from USEPA Region 9 to the Regional BIA Director. Settling Defendants shall await instructions from USEPA, after reasonable opportunity for review and comment by NNEPA about the process for obtaining access from allottees for all other work.

  (2) Residents Who Are Not Allottees. If there is a home without a homesite lease, Settling Defendants shall notify USEPA and NNEPA and proceed as instructed by USEPA, after reasonable opportunity for review and comment by NNEPA.

  (3) Grazing Permit Holders. Settling Defendants shall obtain a signed access agreement from any grazing permit holders for work within their grazing permit area.

  (4) Commercial, Institutional or Other Entities. Settling Defendants shall obtain a signed access agreement from commercial or institutional entities (e.g., schools, businesses, chapter houses, churches) with rights to the land, based on instructions from USEPA and NNEPA, as appropriate.

**4.6** **Split Samples**. Upon request from USEPA or NNEPA, Settling Defendants shall provide 10% split samples to be analyzed by USEPA's or NNEPA's laboratory for corroboration analysis.

**4.7** **Cultural Resources Surveys**.

 (a) As part of the RSEs and RIs, Settling Defendants shall conduct a Cultural Resources Survey at each Mine Site or group of Mine Sites according to the guidelines of the Navajo Nation Historic Preservation Department (NNHPD) and Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. The Cultural Resources Survey Report may address Mine Sites individually or in

groups. Unless required for completion of the Cultural Resources Survey, no intrusive work shall be performed at a Mine Site until so directed by USEPA.

(b)     Each Cultural Resources Survey shall include (1) a Cultural Resources Inventory, (2) consultation with Chapter Houses, landowners, residents, and other applicable stakeholders, and (3) a pedestrian survey resulting in full coverage of the areas surveyed (to the extent practicable). Cultural sites (prehistoric or historic and newly discovered or previously recorded) will be recorded in their entirety, including the coordinates of the boundaries (i.e., GPS). Boundaries of applicable findings will be marked in the field with wooden stakes and flagging around the boundaries. A scaled Mine Site map shall be created showing features, artifact concentrations, diagnostic artifacts, and topographic features. In-field artifact analysis will be conducted and photographs will be taken.

(c)     Upon the completion of Cultural Resources Surveys, USEPA will determine whether cultural resources are present and will be affected, and will provide NNHPD with 30 days to respond to USEPA's determination. If NNHPD disagrees with EPA's finding, or if USEPA determines that the work may adversely impact cultural resources, then Settling Defendants shall not proceed with invasive work until notice-to-proceed is received from USEPA.

**4.8    Biological Surveys**.

(a)     The approach for the biological survey at each site or group of sites will depend on the potential species present and layout of the Mine Site or group of Mine Sites. Settling Defendants shall obtain information from the Navajo Nation Department of Fish and Wildlife (NNDFW) and United States Fish and Wildlife Service (USFWS) about potential species present at the Mine Sites, and the need for and scope of the biological (vegetation and wildlife) survey. Data requests for species of concern shall be submitted to the NNFWS and for federal threatened and endangered (T&E) species and critical habitat to the USFWS.

(b)     If directed by EPA, Settling Defendants shall conduct the biological survey for vegetation or wildlife species-of-concern according to the NNDFW guidelines and the Endangered Species Act (ESA), including the procedures set forth in the Biological Resource Land Use Clearance Policies and Procedures (RCP), RCS-44-08 (NNDFW, 2008), the Species Accounts document (NNHP, 2008a, 2008b), and the USFWS survey protocols and recommendations. These documents present guidelines for approval and submittal processes as well as species-specific information regarding distribution, life histories, habitat, and survey methods to assist with survey and project planning. The biological survey shall be performed by experienced professionals, with guidance from the RCP, Species Accounts document, and NNDFW and USFWS personnel.

(c)     Settling Defendants shall not proceed with any intrusive work at a Mine Site until USEPA so directs.

## 5. REMOVAL SITE EVALUATION OR REMEDIAL INVESTIGATION

5.1   **RSE or RI.** USEPA will determine, after reasonable opportunity for review and comment by NNEPA, whether Settling Defendants shall conduct an RSE, RI, or RSE and RI at each Mine Site or group of Mine Sites.

5.2   **RSE or RI Work Plan.** For every Mine Site or group of Mine Sites selected by USEPA for an RSE and/or RI, Settling Defendants shall develop and submit to USEPA for review and approval or approval with modification RSE and RI Work Plans. The RSE or RI Work Plan shall be in substantially the form of the Ruby Mines Removal Site Evaluation Work Plan (2015). Settling Defendants may subdivide the RSE and RI Work Plans into separate Work Plans for each phase of the RSE or RI. The RSE and RI Work Plans shall include the following, as defined in Section 13.6:

    (a)   Data Management Plan

    (b)   Quality Assurance Plan

    (c)   Field Sampling Plan

    (d)   Emergency Report Plan

    (e)   Health and Safety Plan

5.3   **RSE or RI Content**.  Settling Defendants shall include the following in the RSE and RI:

    (a)   **Site Mapping.** Settling Defendants shall perform, digitize and georeference for import into GIS Mine Site features and physical attributes based on field surveys and desktop studies at each Mine Site or group of Mine Sites, to include the following:

        (1)   Location and description of buildings or structures, fences, roads, and other important information;

        (2)   Topography, soil cover (rock, soil, sediment), and drainage patterns. Settling Defendants shall supplement physical Mine Site surveys with desktop studies, consisting of review of available historical information, aerial photographs, previous studies, and other readily available information;

        (3)   Historical aerial photographs with a Land Use/Land Cover analysis;

        (4)   Mapping of the location and physical condition of wells and surface water identified within a one-mile radius of each Mine Site or group of Mine Sites, and additional data that are readily available concerning wells and surface water in the vicinity of each Mine Site or group of Mine Sites (e.g., Agency databases and permit records); and,

(5)     Any other available information relevant to the assessment of the Mine Site.

(b)     **Gamma scanning.**  Settling Defendants shall conduct a gamma scan of the potentially impacted areas described in ¶ 1.2 at each Mine Site or group of Mine Sites. The gamma scanning shall be conducted consistent with MARSSIM or as otherwise approved by USEPA. The gamma scanning shall include: a gamma transect scan designed with an appropriate step out to determine the lateral limits of contamination, a background study, and statistical summaries of the field and analytical results.

(c)     **Characterization of Surface Soils, Subsurface Soils and Sediments.**

(1)     Settling Defendants shall characterize the lateral and vertical extent of contamination in soils and sediments based on Ra-226 concentrations and shall include surface and subsurface sampling at appropriate locations and intervals. The depth shall be sufficient to confirm the absence of contamination or until bedrock is reached, as determined by a field gamma meter and confirmatory soil sampling. Additional gamma scanning shall be conducted as necessary to address any gamma scanning data gaps.

(2)     Settling Defendants shall sample and analyze soils and sediment at each Mine Site or group of Mine Sites, for the COPCs listed in Section 4.3 (COPCs), or as otherwise directed by USEPA. Unless otherwise directed by USEPA, Settling Defendants shall sample for the following COPCs in a subset of samples from locations where there is indication of a possible release of these compounds: PCBs, total petroleum hydrocarbons and explosives, including perchlorate.

(d)     **Characterization of Groundwater and Surface Water.**  Settling Defendants shall perform the following sampling activities:

(1)     Groundwater. Settling Defendants shall sample and analyze groundwater from wells identified for each Mine Site or group of Mine Sites, except for the Proximate Mines, or report the sampling results from another agency if they exist, for the COPCs listed in ¶ 4.3, or as otherwise directed by USEPA after reasonable opportunity for review and comment by NNEPA. In addition, Settling Defendants shall analyze well water and surface water from selected locations for total dissolved solids (TDS), anions (carbonate, bicarbonate, chloride, and sulfate), cations (sodium and calcium), pH, conductivity, turbidity, temperature, salinity, and oxidation potential.  This task does not include sampling any wells that cannot be opened or are obstructed.

(2)     Settling Defendants shall also sample and analyze surface water for each Mine Site or group of Mine Sites, except for the Proximate Mines, or report the sampling results from another agency if they exist, for the

COPCs listed in ¶ 4.3, or as otherwise directed by USEPA after reasonable opportunity for review and comment by NNEPA. Settling Defendants shall describe in field notes the type of surface water feature sampled (e.g., ponds, washes, and springs).

(3)    For work performed under a RSE Work Plan, if USEPA determines that further characterization of groundwater or surface water at the Mine Site or group of Mine Sites, except for the Proximate Mines, is necessary, USEPA may instruct Settling Defendants to submit and implement a RI Work Plan.

(e)    **Laboratory Testing.** Settling Defendants shall use a USEPA-approved laboratory for chemical analyses. Settling Defendants shall ensure that the selected laboratory provides a laboratory quality assurance plan (LQAP) that meets the requirements of this SOW and is consistent with the Quality Assurance Project Plan (QAPP) required under ¶ 13.6(e). Settling Defendants shall include the LQAP as an attachment to the QAPP.

5.4    **RSE and RI Reports**. Settling Defendants shall submit RSE and RI Reports to USEPA for review and approval or approval with modification as described in ¶ 13.5 of this SOW.  The RSE and RI Report shall include the following:

(a)    A summary of the results of the RSE and RI activities for each Mine Site or group of Mine Sites.

(b)    Field and validated laboratory data collected, including gamma scan results, laboratory reports, data validation results, summary tables, graphs and maps showing the results.

(c)    An identification of the vertical and lateral extent of soil contamination, as defined by USEPA.

(d)    Conclusions as to whether a mine site is impacting surface water and groundwater, except for the Proximate Mines, and conclusions as to whether there are other exposure pathways that might require further investigation (e.g., crop uptake).

6.    **BASELINE HUMAN HEALTH RISK ASSESSMENT AND ECOLOGICAL RISK ASSESSMENT**

6.1    **Baseline Human Health Risk Assessment and Ecological Risk Assessment**.

(a)    Settling Defendants shall submit for USEPA review and approval or approval with modification a Baseline Human Health Risk Assessment and Ecological Risk Assessment report ("Risk Assessments").  If approved by USEPA, the Risk Assessment can be incorporated into the RSE, RI, EE/CA or FS for a Mine Site or group of Mine Sites.

(b)      USEPA, after reasonable opportunity for review and comment by NNEPA, will determine the scope of the Risk Assessments for each Mine Site or group of Mine Sites. Unless otherwise directed by USEPA, the Risk Assessment will be conducted in accordance with applicable USEPA guidance, including but not limited to: "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation Manual (Part A)," (RAGS, EPA-540-1-89-002, OSWER Directive 9285.7-01A, December 1989); "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments)," (RAGS, EPA 540-R-97-033, OSWER Directive 9285.7-01D, January 1998); "Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments" (ERAGS, EPA-540-R-97-006, OSWER Directive 9285.7-25, June 1997) or subsequently issued guidance.

(c)      The Risk Assessments shall consider exposure scenarios representative of Navajo traditional uses of the land, including consumption of locally grazed livestock, and shall identify the Performance Standards as defined in Section IV (Definitions) of the CD.

## 7.      INTERIM ACTIONS

**7.1**      **Interim Actions**. At the direction of USEPA, after reasonable opportunity for review and comment by NNEPA, Settling Defendants shall conduct Interim Work or Interim Removal Actions.

**7.2**      **Interim Work Examples**

(a)      Signage. USEPA will provide instruction to Settling Defendants about the location of signs to be installed at the Mine Sites. This instruction will be based on specific Mine Site characteristics and coordination with NNEPA, Navajo chapter(s) and local residents. This instruction may require that Settling Defendants install bilingual (English and Navajo) signs on each cardinal direction at each Mine Site. Signs may be placed around a group of Mine Sites that are relatively small in size and adjacent to each other. The need for and placement of signs may be modified after the Removal Site Evaluations or Remedial Investigations are completed. Signs need USEPA written approval in the form of an email communication.

(b)      Fencing. Settling Defendants shall assess whether fencing needs to be placed around adits, vent holes and other mine openings at each Mine Site. If required by USEPA, after reasonable opportunity for review and comment by NNEPA, Settling Defendants shall install fencing.  Fencing needs USEPA written approval in the form of an email communication.

(c)      Closure of Adits, Vent Holes and Other Mine Openings. If required by USEPA, Settling Defendants shall properly close adits, vent holes and other mine openings that could pose a physical safety hazard as soon as reasonably possible.

(d)     Other Interim Removal Actions. At the direction of USEPA, Settling Defendants shall conduct any other Interim Removal Actions necessary to protect public health and the environment, including addressing mine waste that poses a risk to residents near the Mine Site.

**7.3     Interim Removal Action Work Plan**. Settling Defendants shall develop and submit to USEPA for review and approval or approval with modification Interim Removal Action Work Plans pursuant to the Schedule in the SMP.

**7.4     Interim Removal Action Completion Report**. Settling Defendants shall submit an Interim Removal Action Completion Report for USEPA review and approval or approval with modification, that contains the following:

(1)     Descriptions of the work conducted, maps of the areas affected, and drawings that provide as-built details; and,

(2)     Description of any ongoing maintenance or management required for the Interim Removal Actions, and proposed post-removal site controls consistent with Section 300.415(1) of the NCP and OSWER Directive No. 9360.2- 02.

## 8.     ENGINEERING EVALUATION / COST ANALYSIS OR FEASIBILITY STUDY

**8.1     EE/CA or Feasibility Study ("FS").** USEPA will determine, after reasonable opportunity for review and comment by NNEPA, whether Settling Defendants shall conduct an EE/CA or a Feasibility Study at each Mine Site or group of Mine Sites.

**8.2     EE/CA or FS Work Plan.** Settling Defendants shall submit an EE/CA and FS Work Plans for USEPA approval or approval with modification, pursuant to the Schedules in the SMP. The Work Plan must include a proposed outline of the EE/CA or FS, including the Performance Standards, and a description of proposed alternatives for analysis.

**8.3     Development and Screening of Alternatives**. Settling Defendants shall develop an appropriate range of waste management options and shall evaluate these options during the development and screening of alternatives. The alternatives shall include options for managing waste both on and off Navajo Nation lands. Settling Defendants shall provide USEPA, with a copy to NNEPA, with a proposed description of Removal Action Objectives or Remedial Action Objectives and a proposed description of alternatives in the EE/CA or FS Work Plan. Settling Defendants shall include proposals for Engineering Controls as well as for Institutional Controls. Settling Defendants shall screen the comprehensive list of possible alternatives in the Work Plan and provide a list of alternatives for a detailed analysis in the EE/CA or FS.

(a)     **Detailed Analysis of Alternatives**. Settling Defendants shall conduct the EE/CA or FS in accordance with the provisions in CERCLA, the NCP, and USEPA guidance, including but not limited to the Guidance on Conducting Non-Time-Critical Removal Actions under CERCLA, OSWER (Aug. 1993), EPA 540-R-93-057, Guidance for Conducting Remedial Investigations and Feasibility Studies,

OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988), and guidance referenced therein, and guidance referenced in this SOW, as may be amended or modified by USEPA. The EE/CA or FS shall identify the objectives of the planned removal action, propose alternatives that may be used to achieve these objectives, and analyze those alternatives for cost, effectiveness, and ability to be implemented.

(b) **Alternatives Analysis for Engineering and Institutional Controls and Screening**. The Alternatives Analysis for Engineering and Institutional Controls and Screening shall (i) state the objectives (i.e., what will be accomplished) for the Engineering and Institutional Controls; (ii) determine the specific types of Engineering and Institutional Controls that can be used to meet the removal action objectives; (iii) investigate when the Engineering and Institutional Controls need to be implemented and/or secured and how long they must be in place; and, (iv) research, discuss, and document any agreement with the proper entities (e.g., the Navajo Nation, Navajo Chapters, Navajo individuals who have an interest in the Mine Site as described in Section 4.5, state, conservation organizations, Settling Defendants) on exactly who will be responsible for securing, maintaining, and enforcing the Engineering and Institutional Controls. Settling Defendants shall be responsible for monitoring and ensuring implementation of all Institutional Controls.

8.4 **EE/CA or FS Report**. Settling Defendants shall prepare an EE/CA or FS report for USEPA review and approval or approval with modification.

8.5 **Action Memo or ROD**. After an EE/CA or RI/FS is complete, USEPA may issue an Action Memo or proposed plan and ROD following public comment. The Action Memo or ROD will contain Performance Standards and identify response actions required to be performed under the CD.

## 9. REMOVAL DESIGN OR REMEDIAL DESIGN

9.1 **Removal or Remedial Design.** USEPA will determine, after reasonable opportunity for review and comment by NNEPA, whether Settling Defendants shall conduct a Removal Design or Remedial Design for each Mine Site or group of Mine Sites. USEPA's determination will be documented in an Action Memo or ROD.

9.2 **Removal Design or Remedial Design Work Plan**. After USEPA executes the ROD or Action Memo, Settling Defendants shall submit a Removal Design or a Remedial Design (RD) Work Plan (RDWP) for USEPA approval or approval with modification pursuant to the Schedule in the SMP. The RDWP must include:

(a) Plans for implementing all RD activities identified in this SOW, in the RDWP, or required by USEPA to be conducted to develop the RD;

(b) A description of the overall management strategy for performing the RD, including a proposal for phasing of design and construction, if applicable;

(c)     A description of the proposed general approach to contracting, construction, operation, maintenance, and monitoring of the Remedial Action or Removal Action (RA) as necessary to implement the Work;

(d)     A description of the responsibility and authority of all organizations and key personnel involved with the development of the RD;

(e)     Descriptions of any areas requiring clarification and/or anticipated problems (e.g., data gaps);

(f)     Description of any proposed pre-design investigation;

(g)     Description of any proposed treatability study;

(h)     Descriptions of any applicable permitting requirements and other regulatory requirements;

(i)     Description of plans for obtaining Access in connection with the Work, such as property acquisition, property leases, and/or easements pursuant to the obligation under Section VIII (Property Requirements) of the CD; and,

(j)     The following supporting deliverables described in ¶ 13.6 (Supporting Deliverables): Health and Safety Plan; Emergency Response Plan; and, if a Pre-Design Investigation is included in the work, a Field Sampling Plan and Quality Assurance Project Plan.

**9.3**    **Design Meetings.** Settling Defendants shall meet regularly with USEPA to discuss design issues as necessary, directed or determined by USEPA. These meetings will include NNEPA whenever feasible.

**9.4**    **Pre-Design Investigation**. If required by USEPA, after reasonable opportunity for review and comment by NNEPA, Settling Defendants shall conduct a Pre-Design Investigation for any of the Mine Sites or group of Mine Sites. The purpose of the Pre-Design Investigation (PDI) is to address data gaps by conducting additional field investigations.

(a)     **PDI Work Plan**. Settling Defendants shall submit a PDI Work Plan (PDIWP) for USEPA approval or approval with modification. The PDIWP must include:

(1)     An evaluation and summary of existing data and description of data gaps;

(2)     A sampling plan including media to be sampled, contaminants or parameters for which sampling will be conducted, location (areal extent and depths), and number of samples; and

(3)     Cross references to quality assurance/quality control (QA/QC) requirements set forth in the Quality Assurance Project Plan (QAPP) as described in ¶ 13.6(e).

(b) **PDI Evaluation Report**. Following the PDI, Settling Defendants shall submit a PDI Evaluation Report. This report must include:

    (1) Summary of the investigations performed;

    (2) Summary of investigation results;

    (3) Summary of validated data (i.e., tables and graphics);

    (4) Data validation reports and laboratory data reports;

    (5) Narrative interpretation of data and results;

    (6) Results of statistical and modeling analyses;

    (7) Photographs documenting the work conducted; and,

    (8) Conclusions and recommendations for RD, including design parameters and criteria.

(c) USEPA, after reasonable opportunity for review and comment by NNEPA, may require Settling Defendants to supplement the PDI Evaluation Report and/or to perform additional pre-design studies.

**9.5** **Treatability Study.** If required by USEPA, after reasonable opportunity for review and comment by NNEPA, Settling Defendants shall conduct a Treatability Study for any of the Mine Sites or group of Mine Sites.

(a) **Treatability Study Work Plan**. Settling Defendants shall submit a TS Work Plan (TSWP) for USEPA review and approval or approval with modification. Settling Defendants shall prepare the TSWP in accordance with USEPA's *Guide for Conducting Treatability Studies under CERCLA, Final* (Oct. 1992), as supplemented for RD by the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995).

(b) **Treatability Study Evaluation Report**. Settling Defendants shall submit a TS Evaluation Report for USEPA review and approval or approval with modification. USEPA may require Settling Defendants to supplement the TS Evaluation Report and/or to perform additional treatability studies.

**9.6** **Preliminary (30%) RD**. Settling Defendants shall submit a Preliminary (30%) RD for USEPA's and NNEPA's comment. The Preliminary RD must include:

(a) A design criteria report, as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995);

(b) Preliminary drawings and specifications;

(c) Descriptions of permit requirements, if applicable;

(d)     Preliminary Operation and Maintenance (O&M) Plan or Post Removal Site Control ("PRSC") Plan and O&M Manual;

(e)     A description of how the RA will be implemented in a manner that minimizes environmental impacts in accordance with USEPA's *Principles for Greener Cleanups* (Aug. 2009);

(f)     A description of monitoring and control measures to protect human health and the environment, such as air monitoring and dust suppression, during the RA;

(g)     Any proposed revisions to the RA Schedule that is set forth in the SMP; and,

(h)     Updates of all supporting deliverables required to accompany the RDWP and the following additional supporting deliverables described in ¶ 13.6 (Supporting Deliverables): Field Sampling Plan; Quality Assurance Project Plan; Site Wide Monitoring Plan; Construction Quality Assurance/Quality Control Plan; Transportation and Off-Site Disposal Plan; O&M Plan or PRSC Plan; O&M Manual; and, Institutional Controls Implementation and Assurance Plan.

**9.7     Intermediate (60%) RD**. Settling Defendants shall submit for USEPA's and NNEPA's comment an Intermediate (60%) RD at a Mine Site or group of Mine Sites, unless otherwise indicated by USEPA. The Intermediate RD must: (a) be a continuation and expansion of the Preliminary RD; (b) address USEPA's and NNEPA's comments regarding the Preliminary RD; and (c) include the same elements as are required for the Preliminary (30%) RD.

**9.8     Pre-Final (95%) RD**. Settling Defendants shall submit the Pre-final (95%) RD for USEPA's and NNEPA's comment. The Pre-final RD must be a continuation and expansion of the previous design submittal and must address USEPA's and NNEPA's comments regarding the Intermediate RD. The Pre-final RD will serve as the approved Final (100%) RD if USEPA approves the Pre-final RD without comments. The Pre-final RD must include:

(a)     A complete set of construction drawings and specifications that are: (1) certified by a registered professional engineer; (2) suitable for procurement; and (3) follow the Construction Specifications Institute's MasterFormat 2012;

(b)     A survey and engineering drawings showing existing Mine Site features, such as elements, property borders, easements, and Mine Site conditions;

(c)     Pre-Final versions of the same elements and deliverables as are required for the Preliminary and Intermediate RD;

(d)     A specification for photographic documentation of the RA; and,

(e)     Updates of all supporting deliverables required to accompany the Preliminary (30%) RD.

**9.9**   **Final (100%) RD**. Settling Defendants shall submit the Final (100%) RD for USEPA approval or approval with modification. The Final RD must address USEPA's and NNEPA's comments on the Pre-final RD and must include final versions of all Pre-final RD deliverables.

## 10.   REMOVAL ACTION OR REMEDIAL ACTION

**10.1**   **Removal Action or Remedial Action**. USEPA, after reasonable opportunity for review and comment by NNEPA, will determine whether Settling Defendants shall conduct a Removal Action or a Remedial Action for each Mine Site or group of Mine Sites.

**10.2**   **Removal Action or Remedial Action Work Plan.** For each Mine Site or group of Mine Sites for which USEPA has selected one or more response actions in an Action Memo or ROD, Settling Defendants shall submit a RA Work Plan (RAWP) for USEPA approval or approval with modification that includes:

(a)   A proposed RA Construction Schedule such as critical path method, Gantt chart, or PERT;

(b)   An updated health and safety plan that covers activities during the RA; and,

(c)   If applicable, plans for satisfying permitting requirements, including obtaining permits for off-site activity and for satisfying substantive requirements of permits for on-site activity.

**10.3**   **Independent Quality Assurance Team**. If required by USEPA, Settling Defendants shall designate an Independent Quality Assurance Team (IQAT). The IQAT will be independent of the Supervising Contractor. Settling Defendants may hire a third party for this purpose. Settling Defendants' notice must include the names, titles, contact information, and qualifications of the members of the IQAT. The IQAT will have the responsibility to determine whether Work is of expected quality and conforms to applicable plans and specifications. The IQAT will have the responsibilities as described in Chapter 2.1.3 of the *Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties*, EPA/540/G-90/001 (April 1990).

**10.4**   **Meetings and Inspections**

(a)   **Preconstruction Conference**. Settling Defendants shall hold a preconstruction conference with USEPA, NNEPA and others as directed or approved by USEPA and as described in the *Remedial Design/Remedial Action Handbook*, EPA 540/R-95/059 (June 1995). Settling Defendants shall prepare minutes of the conference and shall distribute the minutes to all Parties.

(b)   **Periodic Meetings**. During the construction portion of the RA, Settling Defendants shall meet regularly with USEPA, NNEPA and others as directed or determined by USEPA, to discuss construction issues. Settling Defendants shall distribute an agenda and list of attendees to all Parties prior to each meeting.

Settling Defendants shall prepare minutes of the meetings and shall distribute the minutes to all Parties.

(c) **Inspections**

(1) USEPA or its representative will conduct periodic inspections of, or have an on-site presence, during the Work. At USEPA's request, the Supervising Contractor or other designee shall accompany USEPA or its representative during inspections.

(2) If needed by USEPA or NNEPA**,** Settling Defendants shall provide on-site office space for USEPA or NNEPA personnel to perform their oversight duties. The minimum office requirements are a private office with at least 150 square feet of floor space, an office desk with chair, a telephone with a private line if cell service is unreliable, access to facsimile and reproduction machines, wireless internet access, and sanitation facilities.

(3) If needed by USEPA, Settling Defendants shall provide personal protective equipment such as hard hats and reflective vests needed for USEPA personnel and any oversight officials to perform their oversight duties.

**10.5 Off-Site Shipments**

(a) **Hazardous substances, pollutants and contaminants**. Settling Defendants may ship hazardous substances, pollutants, and contaminants from one or more Mine Sites to an off-site facility only if Settling Defendants comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Settling Defendants will be deemed to be in compliance with CERCLA § 121(d)(3) and 40 C.F.R. § 300.440 regarding a shipment if Settling Defendants obtain a prior determination from USEPA that the proposed receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

(b) **Waste Material**. Settling Defendants may ship Waste Material from the Mine Sites to an out-of-state waste management facility only if, prior to any shipment, they provide notice to the appropriate state environmental official in the receiving facility's state and to the USEPA Project Coordinator. This notice requirement will not apply to any off-site shipments when the total quantity of all such shipments does not exceed 10 cubic yards. The notice must include the following information, if available: (1) the name and location of the receiving facility; (2) the type and quantity of Waste Material to be shipped; (3) the schedule for the shipment; and (4) the method of transportation. Settling Defendants also shall notify the state environmental official referenced above and the USEPA Project Coordinator of any major changes in the shipment plan, such as a decision to ship the Waste Material to a different out-of-state facility. Settling Defendants shall provide the notice after the award of the contract for RA construction and before the Waste Material is shipped. If Waste Material will be transported across

Navajo Nation lands, Settling Defendants also shall provide at least four days advance notice to NNEPA and the Navajo Director of Public Safety of the information listed in (1)-(4) and the route of the shipment.

(c) **Investigation Derived Waste**. Settling Defendants may ship Investigation Derived Waste ("IDW") from the Mine Sites to an off-site facility only if they comply with Section 121(d)(3) of CERCLA, 42 U.S.C. § 9621(d)(3), 40 C.F.R. § 300.440, *EPA's Guide to Management of Investigation Derived Waste*, OSWER 9345.3-03FS (Jan. 1992), and any IDW-specific requirements contained in the Action Memo or ROD. Wastes shipped off-site to a laboratory for characterization, and RCRA hazardous wastes that meet the requirements for an exemption from RCRA under 40 CFR § 261.4(e) shipped off-site for treatability studies, are not subject to 40 C.F.R. § 300.440.

**10.6 RA Construction Completion**

(a) **RA Construction**. For purposes of this ¶ 10.6(a), "RA Construction" comprises, for any RA that involves the construction and operation of a system to achieve Performance Standards (for example, groundwater or surface water restoration remedies), the construction of such system and the performance of all activities necessary for the system to function properly and as designed.

(b) **Inspection of Constructed Remedy**. Settling Defendants shall schedule an inspection to review the construction and operation of the system and to review whether the system is functioning properly and as designed. The inspection must be attended by Settling Defendants, USEPA and/or their representatives, and NNEPA if NNEPA requests to be present. A re-inspection must be conducted if requested by USEPA.

(c) **Shakedown Period**. There shall be a shakedown period of up to one year for USEPA to review whether the remedy is functioning properly and performing as designed. Settling Defendants shall provide such information as USEPA requests for such review, with copies to NNEPA.

(d) **RA Construction Deficiencies.** Upon notification by USEPA of any deficiencies in the RA Construction, Settling Defendants shall take all necessary steps to correct the deficiencies and/or bring the RA Construction into compliance with the approved RD, any approved design changes, and/or the approved RAWP. If applicable, Settling Defendants shall comply with any schedule provided by USEPA in its notice of deficiency.

(e) **RA Construction Report**. Following the shakedown period, Settling Defendants shall submit an "RA Report" for each Mine Site or group of Mine Sites requesting USEPA's determination that RA Construction has been completed. The RA Report must: (1) include statements by a registered professional engineer and by Settling Defendants' Project Coordinator that construction of the system is complete and that the system is functioning properly and as designed; (2) include

a demonstration, and supporting documentation, that construction of the system is complete and that the system is functioning properly and as designed; (3) include as-built drawings signed and stamped by a registered professional engineer; (4) be prepared in accordance with Chapter 2 (Remedial Action Completion) of USEPA's *Close Out Procedures for NPL Sites* guidance (May 2011); and (5) be certified in accordance with ¶ 13.4 (Certification).

(f) **USEPA Concludes RA Construction Not Complete**. If USEPA determines that RA Construction is not complete, USEPA shall so notify Settling Defendants. USEPA's notice will include a description of, and schedule for, the activities that Settling Defendants must perform to complete RA Construction. USEPA's notice may include a schedule for completion of such activities or may require Settling Defendants to submit a proposed schedule for USEPA approval or approval with modification. Settling Defendants shall perform all activities described in the USEPA notice in accordance with the schedule.

(g) **USEPA Concludes RA Construction Complete**. If USEPA determines, based on the initial or any subsequent RA Report, that RA Construction is complete, USEPA shall so notify Settling Defendants.

10.7 **Periodic Review Support Plan (PRSP)**. Settling Defendants shall submit the PRSP for USEPA approval or approval with modification. The PRSP addresses the studies and investigations that Settling Defendants shall conduct to support USEPA's reviews of whether the RA is protective of human health and the environment in accordance with Section 121(c) of CERCLA, 42 U.S.C. § 9621(c) (also known as "Five-year Reviews"). Settling Defendants shall develop the plan in accordance with *Comprehensive Five-year Review Guidance*, OSWER 9355.7-03B-P (June 2001), and any other relevant five-year review guidance.

10.8 **Notification of Completion of Decision Document Response Action**

(a) **Decision Document Response Action Inspection**. Settling Defendants shall schedule an inspection for the purpose of obtaining USEPA's Notification of Completion of each Decision Document Response Action. The inspection must be attended by Settling Defendants, USEPA and/or their representatives, and NNEPA if NNEPA requests to be present.

(b) **Decision Document Response Action Completion Report**. Following the inspection, Settling Defendants shall submit a report to USEPA, with a copy to NNEPA, documenting the completion of response actions required under the Decision Document, with the exception of O&M and/or post-removal site control, and requesting USEPA's Notification of Completion of such Decision Document Response Action. The report must: (1) include certifications by a registered professional engineer and by Settling Defendants' Project Coordinator that the response actions required under the Decision Document, with the exception of O&M and/or post-removal site control activities, is complete; and (2) be certified in accordance with ¶ 13.4 (Certification). If the RA Report or PSRP submitted

under ¶ 10.7 includes all elements required under this ¶ 10.8(b), then the RA Report or PSRP suffices to satisfy all requirements under this ¶ 10.8(b).

(c) **USEPA Concludes Response Action Not Complete**. If USEPA concludes that the Response Action is not complete, USEPA shall so notify Settling Defendants. USEPA's notice must include a description of the activities that Settling Defendants must perform to complete the Response Action. USEPA's notice must include specifications and a schedule for such activities or must require Settling Defendants to submit specifications and a schedule for USEPA approval or approval with modification. Settling Defendants shall perform all activities described in the notice or in the USEPA-approved specifications and schedule.

(d) **USEPA Concludes Response Action Complete**. If USEPA concludes, based on the initial or any subsequent report requesting Notification of Completion of Response Action, that the Response Action is complete, except for any continuing obligations under the CD, USEPA shall so certify in writing to Settling Defendants. Issuance of the Notification of Completion of each Decision Document Response Action does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections VIII (Property Requirements), XX (Retention of Records), and XIX (Access to Information) of the CD; (3) Institutional Controls obligations as provided in the ICIAP; (4) any other relevant obligations; and (5) reimbursement of USEPA's Future Response Costs under Section IX (Payments for Response Costs) of the CD.

## 11. OPERATION AND MAINTENANCE AND POST REMOVAL SITE CONTROL

11.1 **O&M and PRSC.** Settling Defendants shall conduct O&M or PRSC for each Mine Site or group of Mine Sites, unless otherwise specified by USEPA, after reasonable opportunity for review and comment by NNEPA. O&M and PRSC may include: operation of treatment remedies; periodic inspection of the Mine Sites and any remedies, including waste repositories; and, monitoring and repair of erosion control measures at Mine Sites and any waste repositories, and monitoring any ICs implemented as part of a removal or remedial action under the CD. Settling Defendants shall also conduct remedy review at each Mine Site or Group of Sites, unless otherwise specified by USEPA pursuant to the obligation under Section VII (Remedy Review) of the CD.

11.2 **O&M Plan or PRSC Plan**. Settling Defendants shall submit to USPEA, with a copy to NNEPA, for review and approval or approval with modification an O&M Plan or PRSC Plan that describes the requirements for inspecting, operating, and maintaining the RA. Settling Defendants shall develop the O&M Plan or PRSC Plan in accordance with Operation and Maintenance in the Superfund Program, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001). The O&M Plan or PRSC Plan must include the following additional requirements:

(a) Description of performance standards ("PS") required to be met to implement the Action Memo or ROD;

(b)     Frequency and description of activities to be performed: (i) to provide confidence that PS will be met; and (ii) to determine whether PS have been met;

(c)     O&M or PRSC Reporting. Description of records and reports that will be generated during O&M or PRSC, such as daily operating logs, laboratory records, records of operating costs, reports regarding emergencies, personnel and maintenance records, monitoring reports, and monthly and annual reports to USEPA and NNEPA;

(d)     Description of corrective action in case of systems failure, including: (i) alternative procedures to prevent the release or threatened release of Waste Material which may endanger public health and the environment or may cause a failure to achieve PS; (ii) analysis of vulnerability and additional resource requirements should a failure occur; (iii) notification and reporting requirements should O&M or PRSC systems fail or be in danger of imminent failure; and, (iv) community notification requirements; and,

(e)     Description of corrective action to be implemented in the event that PS are not achieved; and a schedule for implementing these corrective actions.

**11.3     O&M or PRSC Manual.** Settling Defendants shall submit to USEPA and NNEPA an O&M or PRSC Manual that serves as a guide to the purpose and function of the equipment and systems that make up the remedy. Settling Defendants shall develop the O&M or PRSC Manual in accordance with Operation and Maintenance in the Superfund Program, OSWER 9200.1 37FS, EPA/540/F-01/004 (May 2001).

**11.4     Certification of Work Completion**

(a)     **Work Completion Inspection**. Settling Defendants shall schedule an inspection for the purpose of obtaining USEPA's Certification of Work Completion for all of the Mine Sites. The inspection must be attended by Settling Defendants, USEPA and/or their representatives, and NNEPA if NNEPA requests to be present.

(b)     **Work Completion Report**. Following the inspection, Settling Defendants shall submit a report to USEPA, with a copy to NNEPA, requesting USEPA's Certification of Work Completion. The report must: (1) include certifications by a registered professional engineer and by Settling Defendants' Project Coordinator that the Work, including all O&M and/or post-removal site control activities, is complete; and (2) be certified in accordance with ¶ 13.4 (Certification). If the RA Report or Monitoring Report submitted under ¶ 10.8(b) includes all elements required under this ¶ 11.4(b), then the RA Report or Monitoring Report suffices to satisfy all requirements under this ¶ 11.4(b).

(c)     **USEPA Concludes Work Not Complete**. If USEPA concludes that the Work is not complete, USEPA shall so notify Settling Defendants. USEPA's notice must include a description of the activities that Settling Defendants must perform to complete the Work. USEPA's notice must include specifications and a schedule for such activities or must require Settling Defendants to submit specifications

and a schedule for USEPA approval or approval with modification. Settling Defendants shall perform all activities described in the notice or in the USEPA-approved specifications and schedule.

(d)     **USEPA Concludes Work Complete**. If USEPA concludes, based on the initial or any subsequent report requesting Certification of Work Completion, that the Work is complete, except for any continuing obligations under the CD, USEPA shall so certify in writing to Settling Defendants. Issuance of the Certification of Work Completion does not affect the following continuing obligations: (1) activities under the Periodic Review Support Plan; (2) obligations under Sections VIII (Property Requirements), XX (Retention of Records), and XIX (Access to Information) of the CD; (3) Institutional Controls obligations as provided in the ICIAP; (4) any other relevant obligations; and (5) reimbursement of USEPA's Future Response Costs under Section IX (Payments for Response Costs) of the CD.

## 12.     REPORTING

**12.1    Weekly Technical Calls**. Settling Defendants shall, as needed, participate in weekly technical conference calls with USEPA's project manager, USEPA's consultants and NNEPA representatives. On the weekly call, Settling Defendants' representatives shall provide updates on all tasks and raise issues that may need to be resolved in order to expedite completion of the Work.

**12.2    Quarterly Progress Reports**. Commencing with the quarter following lodging of the CD and until USEPA approves the RA Completion or RA Construction Completion, Settling Defendants shall submit quarterly progress reports to USEPA with a copy to NNEPA. These reports must be submitted within 30 days after the end of each quarter. The reports must cover all activities that took place during the prior reporting period, including:

(a)     The actions taken to achieve compliance with the SMP;

(b)     A summary of all results of sampling, tests, and all other data received or generated by Settling Defendants;

(c)     A description of all deliverables that Settling Defendants submitted to USEPA;

(d)     A description of all activities that are scheduled for the next quarter;

(e)     A description of any problems, delays, or adverse conditions which materially impair the ability to meet the Deadlines in the SMP, and a description of efforts made to mitigate those delays or anticipated delays;

(f)     A description of any modifications to the SMP, work plans or other schedules that Settling Defendants have proposed or that have been approved by USEPA;

(g)     A summary of expenditures and costs incurred for the reporting period and the SMP calendar year, with an explanation of any significant discrepancies in the

SMP cost estimates, including actual costs that deviate from the estimate costs by 10%; and,

(h)     A description of all activities undertaken in support of the CIP during the reporting period and those to be undertaken in the next quarter.

**12.3    Laboratory Results.** A copy of all validated laboratory results shall be provided to USEPA, with a copy to NNEPA, within 5 days of Settling Defendants' or Settling Defendants' consultant's receipt of such results.

## 13.     DELIVERABLES

**13.1    Applicability**. Settling Defendants shall submit deliverables for USEPA approval or for USEPA and NNEPA comment as specified in the SOW and the SMP. If neither is specified, the deliverable does not require USEPA's approval or comment. Paragraphs 13.2 (General Requirements for Deliverables) through Paragraphs 13.3 (Technical Specifications) apply to all deliverables. Paragraph 13.4 (Certification) applies to any deliverable that is required to be certified. Paragraph 13.5 (Approval of Deliverables) applies to any deliverable that is required to be submitted for USEPA approval.

**13.2    General Requirements for Deliverables.** All deliverables must be submitted by the deadlines in the SMP. Settling Defendants shall submit all deliverables to USEPA and NNEPA in electronic form pursuant to Section XXI (Notices and Submissions) of the CD. Technical specifications for sampling and monitoring data and spatial data are addressed in ¶ 13.3 (Technical Specifications). If requested by USEPA, Settling Defendants shall submit paper copies of deliverables including maps, drawings or other exhibits that are larger than 8.5" by 11".

**13.3    Technical Specifications.** Sampling and monitoring data should be submitted in standard regional Electronic Data Deliverable (EDD) format. Unless otherwise specified by USEPA, Settling Defendants shall provide project data in electronic formats that can be imported into Scribe, a software tool developed by USEPA. Site-specific data will be maintained and managed using a geographic information system (GIS). Unless otherwise specified by USEPA, Settling Defendants shall provide data in the following formats:

(a)     Photographs and videos will be provided in native format (e.g., jpeg or MP3).

(b)     Hardcopies of relevant non-digital data will be provided (e.g., maps and historical aerial photographs); applicable hard copy maps may be scanned into Geotiff format.

(c)     Tabular data not included in the GIS, including laboratory analytical results, will be provided as Microsoft Access or Excel files in a consistent electronic data deliverable (EDD) format.

(d)     Global position system (GPS) point coordinates not included in the GIS will be provided.

(e)     Spatial data, including spatially-referenced data and geospatial data, should be submitted: (1) in the ESRI File Geodatabase format; and, (2) as unprojected geographic coordinates in decimal degree format using North American Datum 1983 (NAD83) or World Geodetic System 1984 (WGS84) as the datum. If applicable, submissions should include the collection method(s). Projected coordinates may optionally be included but must be documented. Spatial data should be accompanied by metadata, and such metadata should be compliant with the Federal Geographic Data Committee (FGDC) Content Standard for Digital Geospatial Metadata and its USEPA profile, the USEPA Geospatial Metadata Technical Specification. An add-on metadata editor for ESRI software, the USEPA Metadata Editor (EME), complies with these FGDC and USEPA metadata requirements and is available at https://edg.epa.gov/EME/.

(f)     Each file must include an attribute name for each site unit or sub-unit submitted. Consult https://www.epa.gov/geospatial/geospatial-policies-and-standards for any further available guidance on attribute identification and naming.

(g)     Spatial data submitted by Settling Defendants does not, and is not intended to, define the boundaries of the Mine Sites.

**13.4    Certification**. All deliverables that require compliance with this ¶ 13.4 must be signed by the Settling Defendants' Project Coordinator, or other responsible official of Settling Defendants, and must contain the following statement:

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

**13.5    Approval of Deliverables**.

(a)     **Initial Submissions**.

(1)     After review of any deliverable that is required to be submitted for USEPA approval under the CD or the SOW, USEPA shall: (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

(2)     USEPA also may modify the initial submission to cure deficiencies in the submission if: (i) USEPA determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the

Work; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

(b) **Resubmissions**. Upon receipt of a notice of disapproval under ¶ 13.5(a) (Initial Submissions), or if required by a notice of approval upon specified conditions under ¶ 13.5(a), Settling Defendants shall, within 14 days or such longer time as specified by USEPA in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, USEPA may: (1) approve, in whole or in part, the resubmission; (2) approve the resubmission upon specified conditions; (3) modify the resubmission; (4) disapprove, in whole or in part, the resubmission, requiring Settling Defendants to correct the deficiencies; or (5) any combination of the foregoing.

(c) **Implementation**. Upon approval, approval upon conditions, or modification by USEPA under ¶ 13.5(a) (Initial Submissions) or ¶ 13.5(b) (Resubmissions), of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, will be incorporated into and enforceable under the CD; and (2) Settling Defendants shall take any action required by such deliverable, or portion thereof. The implementation of any non-deficient portion of a deliverable submitted or resubmitted under ¶ 13.5(a) or ¶ 13.5(b) does not relieve Settling Defendants of any liability for stipulated penalties under Section XIV (Stipulated Penalties) of the CD.

13.6 **Supporting Deliverables**. Settling Defendants shall submit each of the following supporting deliverables for USEPA approval or approval with modifications, except as specifically provided. Settling Defendants shall develop the deliverables in accordance with all applicable regulations, guidance, and policies (see Section 17 (References)). Settling Defendants shall update each of these supporting deliverables as necessary or appropriate during the course of the Work, and/or as requested by USEPA.

(a) **Health and Safety Plan**. The Health and Safety Plan (HASP) describes all activities to be performed to protect on site personnel and area residents from physical, chemical, and all other hazards posed by the Work. Settling Defendants shall develop the HASP in accordance with USEPA's Emergency Responder Health and Safety and Occupational Safety and Health Administration (OSHA) requirements under 29 C.F.R. §§ 1910 and 1926. The HASP should cover RD activities and should be, as appropriate, updated to cover activities during the RA and updated to cover activities after RA completion. USEPA does not approve the HASP, but will review it to ensure that all necessary elements are included and that the plan provides for the protection of human health and the environment.

(b) **Emergency Response Plan**. The Emergency Response Plan (ERP) must describe procedures to be used in the event of an accident or emergency at the Mine Sites (for example, power outages, mine waste transport accidents, water impoundment failure, treatment plant failure, slope failure, etc.). The ERP must include:

(1)     Name of the person or entity responsible for responding in the event of an emergency incident;

(2)     Plan and date(s) for meeting(s) with the Navajo Nation, NNEPA, Navajo chapters, local community, including local, State, and federal agencies involved in the cleanup, as well as local emergency squads and hospitals;

(3)     Spill Prevention, Control, and Countermeasures (SPCC) Plan (if applicable), consistent with the regulations under 40 C.F.R. Part 112, describing measures to prevent, and contingency plans for, spills and discharges;

(4)     Notification activities in accordance with Section 12.b (Release Reporting) of the CD in the event of a release of hazardous substances requiring reporting under Section 103 of CERCLA, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-to-know Act (EPCRA), 42 U.S.C. § 11004; and

(5)     A description of all necessary actions to ensure compliance with Section 12 (Emergencies and Releases) of the CD in the event of an occurrence during the performance of the Work that causes or threatens a release of Waste Material from the Mine Sites that constitutes an emergency or may present an immediate threat to public health or welfare or the environment.

(c)     **Data Management Plan**. Settling Defendants shall prepare a Data Management Plan for USEPA review and approval or approval with modification that describes the plan for the generation, validation, and distribution of project data deliverables. At a minimum, the Data Management Plan shall address the following topics:

(1)     Data management processes, including the data management team and management of Mine Site data;

(2)     The data management system, including databases, software and specification of EDD;

(3)     Management and administration of the data management system, including access, security and data backup; and,

(4)     This plan will include a discussion of the management of both tabular and spatial (GIS) data.

(d)     **Field Sampling Plan**. The Field Sampling Plan (FSP) addresses all sample collection activities. The FSP must be written so that a field sampling team unfamiliar with the project would be able to gather the samples and field information required. The FSP shall include vertical and lateral characterization and verification sampling utilizing an appropriate statistical approach and a sufficient radiological scanning approach. An approach consistent with

MARRSIM should be used. Visual Sampling Plan software can be used to properly document that soil sampling approach is statistically representative. Settling Defendants shall develop the FSP in accordance with *Guidance for Conducting Remedial Investigations and Feasibility Studies*, EPA/540/G 89/004 (Oct. 1988).

(e)     **Quality Assurance Project Plan**. The Quality Assurance Project Plan (QAPP) augments the FSP and addresses sample analysis and data handling regarding the Work. The QAPP must include a detailed explanation of Settling Defendants' quality assurance, quality control, and chain of custody procedures for all assessment, treatability, design, compliance, and monitoring samples. Settling Defendants shall develop the QAPP in accordance with *EPA Requirements for Quality Assurance Project Plans*, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006); *Guidance for Quality Assurance Project Plans*., QA/G-5, EPA/240/R 02/009 (Dec. 2002); and *Uniform Federal Policy for Quality Assurance Project Plans*, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005). The QAPP also must include procedures:

(1)     To ensure that USEPA and NNEPA and their authorized representative have reasonable access to laboratories used by Settling Defendants in implementing the CD (Settling Defendants' Labs);

(2)     To ensure that Settling Defendants' Labs analyze all samples submitted by USEPA pursuant to the QAPP for quality assurance monitoring;

(3)     To ensure that Settling Defendants' Labs perform all analyses using USEPA-accepted methods (i.e., the methods documented in *USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis*, ILM05.4 (Dec. 2006); *USEPA Contract Laboratory Program Statement of Work for Organic Analysis*, SOM01.2 (amended Apr. 2007); and *USEPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration)*, ISM01.2 (Jan. 2010)) or other methods acceptable to USEPA;

(4)     To ensure that Settling Defendants' Labs participate in an USEPA-accepted QA/QC program or other program QA/QC acceptable to USEPA;

(5)     For Settling Defendants to provide USEPA and the NNEPA with 2-week notice prior to any sample collection activity;

(6)     For Settling Defendants to provide split samples and/or duplicate samples to USEPA and the NNEPA upon request;

(7)     For USEPA and the NNEPA to take any additional samples that they deem necessary;

(8)      For USEPA and the NNEPA to provide to Settling Defendants, upon request, split samples and/or duplicate samples in connection with USEPA's and the NNEPA's oversight sampling; and,

(9)      For Settling Defendants to submit to USEPA and the NNEPA all sampling and tests results and other data in connection with the implementation of the CD.

(f)      **Construction Quality Assurance/Quality Control Plan (CQA/QCP)**. The purpose of the Construction Quality Assurance Plan (CQAP) is to describe planned and systemic activities that provide confidence that the RA construction will satisfy all plans, specifications, and related requirements, including quality objectives. The purpose of the Construction Quality Control Plan (CQCP) is to describe the activities to verify that RA construction has satisfied all plans, specifications, and related requirements, including quality objectives. The CQA/QCP must:

(1)      Identify, and describe the responsibilities of, the organizations and personnel implementing the CQA/QCP;

(2)      Describe the PS required to be met to achieve Completion of the RA;

(3)      Describe the activities to be performed: (i) to provide confidence that PS will be met; and, (ii) to determine whether PS have been met;

(4)      Describe verification activities, such as inspections, sampling, testing, monitoring, and production controls, under the CQA/QCP;

(5)      Describe industry standards and technical specifications used in implementing the CQA/QCP;

(6)      Describe procedures for tracking construction deficiencies from identification through corrective action;

(7)      Describe procedures for documenting all CQA/QCP activities; and

(8)      Describe procedures for retention of documents and for final storage of documents.

(g)      **Transportation and Off-Site Disposal Plan**. Settling Defendants shall submit to USEPA for review and approval or approval with modification a Transportation and Off-Site Disposal Plan (TODP) that describes plans to ensure compliance with ¶ 10.5 (Off-Site Shipments). The TODP must include:

(1)      Proposed routes for off-site shipment of Waste Material;

(2)      Identification of communities affected by shipment of Waste Material; and,

(3)     Description of plans to minimize impacts on affected communities.

(h)     **Institutional Controls Implementation and Assurance Plan**. The Institutional Controls Implementation and Assurance Plan (ICIAP) describes plans to implement, maintain, and enforce the Institutional Controls (ICs) at the Mine Site. Settling Defendants shall develop the ICIAP in accordance with *Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites*, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012), and *Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites*, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012). The ICIAP must include the following additional requirements:

(1)     Locations of recorded real property interests (e.g., easements, liens) and resource interests in the property that may affect ICs (e.g., surface, mineral, and water rights) including accurate mapping and geographic information system (GIS) coordinates of such interests; and

(2)     Legal descriptions and survey maps that are prepared according to current American Land Title Association (ALTA) Survey guidelines and certified by a licensed surveyor.

## 14.     SITE MANAGEMENT PLAN

**14.1**     **SMP**. Settling Defendants shall develop and submit an SMP to USEPA, with a copy to NNEPA, for review and approval or approval with modification. The SMP shall be used as a management tool in planning, reviewing, and setting priorities for all response activities at the Mine Sites. The SMP is a dynamic document and will be revised annually to accommodate new information, including changes to the schedules, costs, and other variables.

**14.2**     **SMP Content**. The SMP shall include the following:

(a)     An overview of all Mine Sites covered by the CD and proposed groupings of Mine Sites for purposes of completing the Work, including a figure or figures showing mine site locations.

(b)     The list of mines where one or more Components of Work will be performed during the relevant 3-year planning period;

(c)     A schedule of all Components of Work specified in Section 15 of this SOW and interim tasks for each Component of Work that will be performed during the 3-year planning period, except that the first period will begin upon the Effective Date of the CD and end on December 31, 2020. The SMP may include a combination of Components of Work to improve efficiency of the Work; and,

(d)     A budget of estimated costs for the relevant 3-year planning period for the Components of Work in the SMP, with estimated costs separated by calendar year.

**14.3    Priority Setting Meeting**. Each year, Settling Defendants, USEPA and NNEPA shall meet to discuss priorities for Components of Work to be included in the SMP. Priorities may include risks to public health and the environment. Other priorities may include efficiencies such as performing the same task in multiple geographic areas, or performing multiple tasks in a geographic area. Priority setting will also take into consideration the actual and estimated cost of work performed in the SMP for the current calendar year, and the estimated cost of future work. Based on this meeting, USEPA, after reasonable opportunity for review and comment by NNEPA, will decide the priorities for the next SMP.

**14.4    SMP Considerations**.

(a)     When formulating the annual SMP, Settling Defendants may consider the actual costs incurred for work performed and the estimate of costs for the remainder of the calendar year to evaluate whether the previously approved Components of Work should change. Any proposed extensions or other changes to the schedule for the Components of Work must be explained in a cover letter to the Draft Amendment to the SMP.

(b)     If Settling Defendants propose, in the Amendment to the SMP, modifications to the schedule for the Components of Work to which USEPA has not agreed, those proposed modifications shall be treated as a request by Settling Defendants for an extension. Schedules for Components of Work may be extended during the annual SMP development process pursuant to this Section. If USEPA, after reasonable opportunity for review and comment by NNEPA, denies the request for extension or otherwise disapproves the Amendment, then Settling Defendants shall amend the SMP in conformance with the USEPA comments.

**14.5    SMP Timeline.**

(a)     **Priority Setting Meeting**. The Initial SMP Priority Setting meeting shall occur 30 days after the Effective Date of the CD, and all future Priority Setting meetings shall occur by September 30 of each year.

(b)     **Draft SMP**. Settling Defendants shall submit to USEPA, with a copy to NNEPA, the Initial Draft SMP no later than 30 days after the Priority Setting meeting, and shall submit all future Draft SMPs no later than 30 days after the Priority Setting meeting in that year.

(c)     **Final SMP**. Settling Defendants shall submit to USEPA, with a copy to NNEPA, the Final SMP by 30 days after receipt of any USEPA comments on the SMP. All future Annual SMPs shall be developed by the latest of either December 31, or 30 days after receipt of any USEPA comments on the SMP.

**14.6** **Notice of SMP Schedule Changes**. Settling Defendants shall notify USEPA and NNEPA of any changes that will delay the SMP schedule. Settling Defendants shall notify USEPA and NNEPA about delays of Components of Work as soon as possible and at least 7 days prior to the SMP schedule for the Deadline. Settling Defendants shall notify USEPA and NNEPA about delays to interim tasks, other than Components of Work, in the next Quarterly Report.

## 15.    COMPONENTS OF WORK

**15.1** **Components of Work**. Settling Defendants shall include the following Components of Work in the SMP, as applicable. These Components of Work are subject to Section XIV (Stipulated Penalties) of the CD. Components of Work may be combined to improve efficiency of the Work as described in the SMP. The initial component of work shall include, at a minimum, RSEs for the Mine Sites in Attachment A.

|    | **Components of Work**                                        | **¶ Ref.** |
|----|---------------------------------------------------------------|------------|
| 1  | Quarterly Reports                                             | 12.2       |
| 2  | Cultural Resource Surveys                                     | 4.7        |
| 3  | Biological Resource Surveys                                   | 4.8        |
| 4  | RSE or Remedial Investigation Work Plan                       | 5.2        |
| 5  | RSE or RI Report                                              | 5.4        |
| 6  | Baseline Health and Ecological Risk Assessment Report         | 6.1(a)     |
| 7  | Interim Removal Action Work Plan                              | 7.3        |
| 8  | Interim Removal Action Completion Report                      | 7.4        |
| 9  | EE/CA or FS Work Plan                                         | 8.2        |
| 10 | EE/CA or FS Report                                            | 8.4        |
| 11 | Pre-Design Investigation Work Plan                            | 9.4(a)     |
| 12 | Pre-Design Investigation Evaluation Report                    | 9.4(b)     |
| 13 | Treatability Study Work Plan                                  | 9.5(a)     |
| 14 | Treatability Study Report                                     | 9.5(b)     |
| 15 | Removal or Remedial Design Work Plan                          | 9.2        |
| 16 | Pre-final Design (95%)                                        | 9.8        |
| 17 | Final Design (100%)                                           | 9.9        |
| 18 | Removal or Remedial Action Work Plan                          | 10.2       |
| 19 | Construction CQA/QCP                                          | 13.6(f)    |
| 20 | RA Construction Report                                        | 10.6(e)    |
| 21 | Decision Document Response Action Completion Report           | 10.8(b)    |
| 22 | O&M Plan or PRSC Plan                                         | 11.2       |
| 23 | O&M Manual or PRSC Manual                                     | 11.3       |
| 24 | Periodic Review Support Plan                                  | 10.7       |
| 25 | Work Completion Report                                        | 11.4(b)    |

# 16.    NNEPA PARTICIPATION

**16.1    Copies**. Settling Defendants shall, at any time they send a deliverable to USEPA, send a copy of such deliverable to NNEPA. USEPA shall, at any time it sends a notice, authorization, approval, disapproval, or certification to Settling Defendants, send a copy of such document to NNEPA.

**16.2    Review and Comment**. NNEPA shall have a reasonable opportunity for review and comment prior to:

(a)    Any USEPA approval or disapproval under ¶ 13.5 (Approval of Deliverables) of any deliverables that are required to be submitted for USEPA approval;

(b)    Any approval or disapproval of the Construction Phase under ¶ 10.6 (RA Construction Completion), any disapproval of, or Notification of Response Action Completion under ¶ 10.8 (Notification of Response Action Completion), and any disapproval of, or  Certification of Work Completion under ¶ 11.4 (Certification of Work Completion); and

(c)    Any other actions taken under this SOW for which reasonable opportunity for NNEPA to review and comment is specified.

# 17.    REFERENCES

**17.1**    The following regulations and guidance documents, among others, apply to the Work. Any item for which a specific URL is not provided below is available on one of the two USEPA Web pages listed in ¶ 17.2.

(a)    "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation Manual (Part A)," (RAGS, EPA-540-1-89-002, OSWER Directive 9285.7-01A, December 1989).

(b)    "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments)," (RAGS, EPA 540-R-97-033, OSWER Directive 9285.7-01D, January 1998).

(c)    "Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments" (ERAGS, EPA-540-R-97-006, OSWER Directive 9285.7-25, June 1997).

(d)    Guidance on Conducting Non-Time-Critical Removal Actions under CERCLA, OSWER (Aug. 1993), EPA 540-R-93-057.

(e)    A Compendium of Superfund Field Operations Methods, OSWER 9355.0-14, EPA/540/P-87/001a (Aug. 1987).

(f)     CERCLA Compliance with Other Laws Manual, Part I: Interim Final, OSWER 9234.1-01, EPA/540/G-89/006 (Aug. 1988).

(g)     Guidance for Conducting Remedial Investigations and Feasibility Studies, OSWER 9355.3-01, EPA/540/G-89/004 (Oct. 1988).

(h)     CERCLA Compliance with Other Laws Manual, Part II, OSWER 9234.1-02, EPA/540/G-89/009 (Aug. 1989).

(i)     Guidance on EPA Oversight of Remedial Designs and Remedial Actions Performed by Potentially Responsible Parties, OSWER 9355.5-01, EPA/540/G-90/001 (Apr.1990).

(j)     Guidance on Expediting Remedial Design and Remedial Actions, OSWER 9355.5-02, EPA/540/G-90/006 (Aug. 1990).

(k)     Guide to Management of Investigation-Derived Wastes, OSWER 9345.3-03FS (Jan. 1992).

(l)     Permits and Permit Equivalency Processes for CERCLA On-Site Response Actions, OSWER 9355.7-03 (Feb. 1992).

(m)     Guidance for Conducting Treatability Studies under CERCLA, OSWER 9380.3-10, EPA/540/R-92/071A (Nov. 1992).

(n)     National Oil and Hazardous Substances Pollution Contingency Plan; Final Rule, 40 C.F.R. Part 300 (Oct. 1994).

(o)     Guidance for Scoping the Remedial Design, OSWER 9355.0-43, EPA/540/R-95/025 (Mar. 1995).

(p)     Remedial Design/Remedial Action Handbook, OSWER 9355.0-04B, EPA/540/R-95/059 (June 1995).

(q)     EPA Guidance for Data Quality Assessment, Practical Methods for Data Analysis, QA/G-9, EPA/600/R-96/084 (July 2000).

(r)     Operation and Maintenance in the Superfund Program, OSWER 9200.1-37FS, EPA/540/F-01/004 (May 2001).

(s)     Comprehensive Five-year Review Guidance, OSWER 9355.7-03B-P, 540-R-01-007 (June 2001).

(t)     Guidance for Quality Assurance Project Plans, QA/G-5, EPA/240/R-02/009 (Dec. 2002).

(u)     Institutional Controls: Third Party Beneficiary Rights in Proprietary Controls (Apr. 2004).

(v)     Quality management systems for environmental information and technology programs -- Requirements with guidance for use, ASQ/ANSI E4:2014 (American Society for Quality, February 2014).

(w)     Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, EPA/505/B-04/900A though 900C (Mar. 2005).

(x)     Superfund Community Involvement Handbook, SEMS 100000070 (January 2016) available at https://www.epa.gov/superfund/community-involvement-tools-and-resources.

(y)     EPA Guidance on Systematic Planning Using the Data Quality Objectives Process, QA/G-4, EPA/240/B-06/001 (Feb. 2006).

(z)     EPA Requirements for Quality Assurance Project Plans, QA/R-5, EPA/240/B-01/003 (Mar. 2001, reissued May 2006).

(aa)    EPA Requirements for Quality Management Plans, QA/R-2, EPA/240/B-01/002 (Mar. 2001, reissued May 2006).

(bb)    USEPA Contract Laboratory Program Statement of Work for Inorganic Analysis, ILM05.4 (Dec. 2006).

(cc)    USEPA Contract Laboratory Program Statement of Work for Organic Analysis, SOM01.2 (amended Apr. 2007).

(dd)    EPA National Geospatial Data Policy, CIO Policy Transmittal 05-002 (Aug. 2008), available at https://www.epa.gov/geospatial/geospatial-policies-and-standards and https://www.epa.gov/geospatial/epa-national-geospatial-data-policy.

(ee)    Summary of Key Existing EPA CERCLA Policies for Groundwater Restoration, OSWER 9283.1-33 (June 2009).

(ff)    Principles for Greener Cleanups (Aug. 2009), available at https://www.epa.gov/greenercleanups/epa-principles-greener-cleanups.

(gg)    Providing Communities with Opportunities for Independent Technical Assistance in Superfund Settlements, Interim (Sep. 2009).]

(hh)    EPA Contract Laboratory Program Statement of Work for Inorganic Superfund Methods (Multi-Media, Multi-Concentration), ISM01.2 (Jan. 2010).

(ii)    Close Out Procedures for National Priorities List Sites, OSWER 9320.2-22 (May 2011).

(jj)    Groundwater Road Map: Recommended Process for Restoring Contaminated Groundwater at Superfund Sites, OSWER 9283.1-34 (July 2011).

(kk)  Recommended Evaluation of Institutional Controls: Supplement to the "Comprehensive Five-Year Review Guidance," OSWER 9355.7-18 (Sep. 2011).

(ll)  Construction Specifications Institute's MasterFormat 2012, available from the Construction Specifications Institute, http://www.csinet.org/masterformat.

(mm)  Updated Superfund Response and Settlement Approach for Sites Using the Superfund Alternative Approach, OSWER 9200.2-125 (Sep. 2012)

(nn)  Institutional Controls: A Guide to Planning, Implementing, Maintaining, and Enforcing Institutional Controls at Contaminated Sites, OSWER 9355.0-89, EPA/540/R-09/001 (Dec. 2012).

(oo)  Institutional Controls: A Guide to Preparing Institutional Controls Implementation and Assurance Plans at Contaminated Sites, OSWER 9200.0-77, EPA/540/R-09/02 (Dec. 2012).

(pp)  EPA's Emergency Responder Health and Safety Manual, OSWER 9285.3-12 (July 2005 and updates), https://www.epaosc.org/_HealthSafetyManual/manual-index.htm.

(qq)  Broader Application of Remedial Design and Remedial Action Pilot Project Lessons Learned, OSWER 9200.2-129 (Feb. 2013).

(rr)  Guidance for Evaluating Completion of Groundwater Restoration Remedial Actions, OSWER 9355.0-129 (Nov. 2013).

(ss)  Groundwater Remedy Completion Strategy: Moving Forward with the End in Mind, OSWER 9200.2-144 (May 2014).

**17.2**  A more complete list may be found on the following USEPA Web pages:

Laws, Policy, and Guidance: https://www.epa.gov/superfund/superfund-policy-guidance-and-laws

Test Methods Collections: https://www.epa.gov/measurements/collection-methods

**17.3**  For any regulation or guidance referenced in the CD or SOW, the reference will be read to include any subsequent modification, amendment, or replacement of such regulation or guidance. Such modifications, amendments, or replacements apply to the Work only after Settling Defendants receive notification from USEPA of the modification, amendment, or replacement.

Attachment A:  List of 31 Mine Sites included in the initial component of Work.

| | Mine Claim All Site IDs | Mine Name | Surface Area Acres (rounded) | Underground Area Acres (rounded) | AEC records of ore production (tons) | Group Name | Latitude (N) | Longitude (W) | Priority Mine |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 51 | Martin Mine and George Simpson No. 1 | 31.7 | 0.7 | 4,278 | Rattlesnake (Tse Tah) | 36.8780031133 | -109.2923296290 | |
| 2 | 54 | Rattlesnake | 17.7 | 0.1 | 478 | Rattlesnake (Tse Tah) | 36.8770488527 | -109.2865764750 | |
| 3 | 57 | North Martin | 8.2 | 0.0 | n/a | Rattlesnake (Tse Tah) | 36.8846103259 | -109.2935038660 | yes |
| 4 | 60 | Plot 1 | 11.7 | 0.1 | 775 | Rattlesnake (Tse Tah) | 36.8999026375 | -109.2955065200 | |
| 5 | 65 | Plot 4 | 15.7 | 0.0 | 522 | Rattlesnake (Tse Tah) | 36.9011753065 | -109.2877881380 | |
| 6 | 70 | Plot 8 | 5.0 | 0.0 | 280 | Rattlesnake (Tse Tah) | 36.8951816771 | -109.2670863480 | |
| 7 | 71 | Black Rock Point Mines | 23.5 | 0.0 | 2,025 | Red Rock / Shadyside (King Tutt Mesa) | 36.8960334986 | -109.2649210150 | yes |
| 8 | 96 | Mesa II 1/4 Mine | 2.2 | 0.3 | 725 | Lukachukai (Cove) | 36.5151713703 | -109.2343637110 | |
| 9 | 104 | Cato No. 2 | 6.5 | 0.0 | 52 | Lukachukai (Cove) | 36.5480201387 | -109.2498938690 | |
| 10 | 223 | Rock Door No. 1 | 5.4 | 0.0 | 25 | Monument Valley | 37.0146880063 | -110.2149680890 | yes |
| 11 | 415 | Mesa IV 1/4 Mine | 6.0 | 0.3 | 344 | Lukachukai (Cove) | 36.5282303341 | -109.2611541410 | |
| 12 | 417 | Mesa III, West Mine | 6.6 | 0.0 | n/a | Lukachukai (Cove) | 36.5146359700 | -109.2507121510 | |
| 13 | 422 | Billy Topaha Mine | 4.4 | 0.0 | 703 | Lukachukai (Cove) | 36.5005295341 | -109.2253065200 | |
| 14 | 424 | Mesa III, Northwest Mine | 7.3 | 0.1 | 735 | Lukachukai (Cove) | 36.5195447407 | -109.2477979150 | yes |
| 15 | 487 | King Tutt Point | 13.5 | 0.4 | 1,384 | Red Rock / Shadyside (King Tutt Mesa) | 36.7091814650 | -109.0271894650 | yes |
| 16 | 491 | Plot 7 | 8.9 | 0.0 | 500 | Rattlesnake (Tse Tah) | 36.8940570080 | -109.2699776990 | |
| 17 | 510 | Frank No. 2 | 3.9 | 0.3 | n/a | Lukachukai (Cove) | 36.5321226646 | -109.2529084440 | |
| 18 | 513 | Firelight No. 6 | 10.5 | 0.2 | 2,141 | Monument Valley | 36.9136145294 | -110.2597767890 | yes |
| 19 | 623 | Plot 2 | 16.0 | 0.0 | 443 | Rattlesnake (Tse Tah) | 36.9051890787 | -109.2920576660 | |
| 20 | 627 | Plot 13 | 13.6 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.8710128517 | -109.2909121370 | |
| 21 | 628 | Plot 9 | 10.7 | 0.0 | 230 | Rattlesnake (Tse Tah) | 36.8878557510 | -109.2623965460 | |
| 22 | 631 | Plot 10 | 17.3 | 0.1 | 783 | Rattlesnake (Tse Tah) | 36.8846551084 | -109.2633007350 | |
| 23 | 632 | Plot 11 | 23.2 | 0.1 | 500 | Rattlesnake (Tse Tah) | 36.8851581276 | -109.2607982270 | |
| 24 | 634 | Plot 6 | 35.6 | 2.5 | 14,956 | Rattlesnake (Tse Tah) | 36.8992983968 | -109.2700102000 | yes |
| 25 | 663 | AEC Plot 3 | 3.1 | 0.0 | n/a | Red Rock / Shadyside (King Tutt Mesa) | 36.8732280168 | -109.2861459150 | |
| 26 | 664 | Plot 3 | 15.0 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.9032467957 | -109.2859978510 | yes |
| 27 | 665 | Plot 5 | 21.3 | 0.0 | 180 | Rattlesnake (Tse Tah) | 36.9018028751 | -109.2841684320 | |
| 28 | 667 | Climax Transfer Station | 2.1 | 0.0 | n/a | Lukachukai (Cove) | 36.7464944722 | -108.7021510220 | yes |
| 29 | 106 | South Portal, Frank No. 1 Mine | 12.0 | 1.1 | | | 36.5304430903 | -109.2545655060 | |
| | 505 | North Portal, Frank No. 1 Mine | 0.9 | 1.3 | 75,739 | Lukachukai (Cove) | 36.5366909246 | -109.2556406100 | |
| | 509 | East Portal, Frank No. 1 Mine | 10.2 | 2.5 | | | 36.5331690026 | -109.2518936640 | |
| 30 | 241 | Monument No. 2 | 0.7 | 0.0 | 773,132 | Monument Valley | 36.9412038568 | -109.8886709960 | |
| | 521 | | 177.0 | 0.5 | | | 36.9320710334 | -109.8848799680 | |
| 31 | 635 | Hoskie Henry | 5.4 | 0.0 | 978 | Rattlesnake (Tse Tah) | 36.9003612956 | -109.2677126980 | yes |
| | 636 | | 6.0 | 0.1 | | | 36.9006159217 | -109.2724420060 | |

Appendix D

**CERCLA Financial Assurance Sample Performance Bond for Use in Connection with Settlements**

**[Letterhead of Bond Issuer]**

**PERFORMANCE BOND**

| | |
|---|---|
| Surety's Performance Bond Number: | **[insert number]** |
| Date of Execution of Performance Bond: | **[insert date]** |
| Effective Date of Performance Bond: | **[insert date]** |
| Total Dollar Amount of Performance Bond: | $**[insert dollar amount]** |

PRINCIPAL:
| | |
|---|---|
| Legal Name: | **[insert name of PRP/Settling Defendant]** |
| Address: | **[insert address]** |
| Contact Person(s)/Information: | **[insert name and contact information (phone, email)]** |

SURETY:
| | |
|---|---|
| Legal Name: | **[insert name of surety providing the bond]** |
| Address: | **[insert address]** |
| Contact Person(s)/Information: | **[insert name and contact information (phone, email)]** |

BENEFICIARY:
| | |
|---|---|
| Legal Name: | U.S. Environmental Protection Agency Region **[insert #]** c/o **[insert appropriate Regional official such as "Superfund Division Director"]** |
| Address/Contact Information: | **[insert address and contact information (phone, email)]** |

SITE INFORMATION:
| | |
|---|---|
| Name and Location of Site: | **[insert site name [operable unit] and location]** ("Site") |
| EPA Identification Number: | **[insert Site/Spill Identification Number]** |
| Agreement Governing Site Work: | [That certain [**insert as appropriate:** "Consent Decree," "Administrative Settlement Agreement and Order on Consent," or "Settlement Agreement"] dated **[insert date]**, [**insert as appropriate:** civil action number for consent decrees or EPA docket number for administrative agreements], between the United States of America and **[insert settling parties]** (the "Agreement")] |

**KNOW ALL PERSONS BY THESE PRESENTS, THAT:**

1

**WHEREAS**, said Principal is required, under the Agreement entered pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675, to perform the "Work" as defined in such Agreement (hereinafter, the "Work") and to fulfill its other obligations as set forth therein; and

**WHEREAS**, said Principal is required by the Agreement to provide financial assurance to ensure completion of the Work.

**NOW, THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.       The Principal and Surety hereto are firmly bound to the United States Environmental Protection Agency (EPA or Beneficiary), in the above Total Dollar Amount of this Performance Bond, for the performance or payment of the Work, which we, the Principal and Surety, bind ourselves, our heirs, executors, administrators, successors, and assigns, jointly and severally, subject to and in accordance with the terms and conditions hereof.

2.       The conditions of the Surety's obligation hereunder are such that if the Principal shall promptly, faithfully, fully, and finally complete the Work in accordance with the terms of the Agreement, the Surety's obligation hereunder shall be null and void; otherwise it is to remain in full force and effect.

3.       Pursuant to and in accordance with the terms of the Agreement, and except as specifically provided in Paragraph 5 below, the Surety shall become liable on the obligation evidenced hereby only upon the Principal's failure to perform all or any portion(s) of the Work, EPA's subsequent notice of a Work Takeover, and the Principal's failure to remedy to EPA's satisfaction the circumstances giving rise to EPA's issuance of such notice. At any time and from time to time upon notification by EPA (as specified in the Agreement) that a Work Takeover has commenced, the Surety shall, up to the Total Dollar Amount of the Performance Bond, promptly (and in any event within 15 days after receiving such notification):

        (a)       Commence to complete the Work to be done under the Agreement in accordance with its terms and conditions; or

        (b)       Pay to EPA funds in such amounts and to such person(s), account(s), or otherwise as EPA may direct.

If the Surety does not render such performance or payment set forth above within the specified 15-day period, the Surety shall be deemed to be in default of this Performance Bond and EPA shall be entitled to enforce any remedy available to it at law, in equity, or otherwise; provided, however, that if such default is susceptible of cure but cannot reasonably be cured within such 15-day period and provided further that Surety shall have commenced to cure such default within such 15-day period and thereafter diligently proceeds to perform the same, such

15-day period shall be extended for such time as is reasonably necessary for Surety in the exercise of due diligence to cure such default, such additional period not to exceed 90 days.

4.      The liability of the Surety shall not be discharged by any performance, payment, or succession of payments hereunder, unless and until such performance, payment, or payments shall amount in the aggregate to the Total Dollar Amount of this Performance Bond, but in no event shall the aggregate obligation of the Surety hereunder exceed the amount of said sum.

5.      The Surety may cancel this Performance Bond only by sending notice of cancellation to the Principal and to the Beneficiary, provided, however, that no such cancellation shall be effective during the 120-day period beginning on the date of receipt of the notice of cancellation by both the Principal and the Beneficiary, as evidenced by return receipts. If after 90 days of such 120-day period, the Principal has failed to provide alternative financial assurance to EPA in accordance with the terms of the Agreement, EPA shall have the right to (up to the Total Dollar Amount of this Performance Bond) demand performance of the Work or draw on the guaranteed funds.

6.      The Principal may terminate this Performance Bond only by sending written notice of termination to the Surety and to the Beneficiary, provided, however, that no such termination shall become effective unless and until the Surety receives written authorization for termination of this Performance Bond by the Beneficiary.

7.      Any modification, revision, or amendment that may be made to the terms of the Agreement or to the Work to be done thereunder, or any extension of the Agreement, or other forbearance on the part of either the Principal or Beneficiary to the other, shall not in any way release the Principal and the Surety, or either of them, or their heirs, executors, administrators, successors, or assigns from liability hereunder. The Surety hereby expressly waives notice of any change, revision, or amendment to the Agreement or to any related obligations between the Principal and the Beneficiary.

8.      The Surety will immediately notify the Beneficiary of any of the following events: (a) the filing by the Surety of a petition seeking to take advantage of any laws relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts; (b) the Surety's consent to (or failure to contest in a timely manner) any petition filed against it in an involuntary case under such bankruptcy or other laws; (c) the Surety's application for (or consent to or failure to contest in a timely manner) the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator, or the like of itself or of all or a substantial part of its assets; (d) the Surety's making a general assignment for the benefit of creditors; or (e) the Surety's taking any corporate action for the purpose of effecting any of the foregoing.

9.      Any provision in this Performance Bond that conflicts with CERCLA or any other applicable statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or legal requirement shall be deemed incorporated herein.

10.     All notices, elections, consents, approvals, demands, and requests required or permitted hereunder shall be given in writing to (unless updated from time to time) the addressees shown on the first page of this Performance Bond, identify the Site, and provide a contact person (and contact information). All such correspondence shall be: (a) effective for all purposes if hand delivered or sent by (i) certified or registered United States mail, postage prepaid, return receipt requested or (ii) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, to the relevant address shown on the first page of this Performance Bond; and (b) effective and deemed received upon the earliest of (i) the actual receipt of the same by personal delivery or otherwise, (ii) one business day after being deposited with a nationally recognized overnight courier service as required above, or (iii) three business days after being deposited in the United States mail as required above. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given as herein required shall be deemed to be receipt of the notice, election, consent, approval, demand, or request sent.

11.     The Surety hereby agrees that the obligations of the Surety under this Performance Bond shall be in no way impaired or affected by any winding up, insolvency, bankruptcy, or reorganization of the Principal or by any other arrangement or rearrangement of the Principal for the benefit of creditors.

12.     No right of action shall accrue on this Performance Bond to or for the use of any person other than the Beneficiary or the executors, administrators, successors, or assigns of the Beneficiary.

**[SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the Principal and Surety have executed this Performance Bond and have affixed their seals on the date set forth above.

The persons whose signatures appear below hereby represent, warrant, and certify that they are authorized to execute this Performance Bond on behalf of the Principal and Surety, respectively.

### FOR THE PRINCIPAL:

Date: _____      By [signature]: _____
                                Printed name: _____
                                Title: _____

State of [**insert state**]
County of [**insert county**]

On this [**insert date**], before me personally came [**insert name of PRP/Settling Defendant's signatory**] to me known, who, being by me duly sworn, did depose and say that she/he is [**insert title**] of [**insert name of PRP/Settling Defendant**], the entity described in and which executed the above instrument; and that she/he signed her/his name thereto.

_____
[Signature of Notary Public]

### FOR THE SURETY:

Date: _____      By [signature]: _____
                                Printed name: _____
                                Title: _____

State of [**insert state**]
County of [**insert county**]

On this [**insert date**], before me personally came [**insert name of Surety's signatory**] to me known, who, being by me duly sworn, did depose and say that she/he is [**insert title**] of [**insert name of Surety**], the entity described in and which executed the above instrument; and that she/he signed her/his name thereto.

_____
[Signature of Notary Public]

# Appendix E

**APPENDIX E: NAVAJO INFORMAL DISPUTE RESOLUTION PROCEDURE**

The Parties are hopeful that there will be very limited areas of disagreement between them. Nevertheless, disputes can always arise and it is therefore important to establish a dispute resolution process as part of this CD. The purpose of this paragraph is to establish a process to talk through any dispute before resorting to other methods. In that regard the Navajo Nation, with the invaluable assistance of former Navajo Nation Supreme Court Chief Justice Robert Yazzie and former Director of the Navajo Abandoned Mines Program Perry Charley, has provided the following discussion of Navajo Fundamental Law which it believes should inform any such discussions:

a.       If one conceives of the notion of problem-solving as a circle, or sun with four stages, the process begins on the eastern side of the circle and might be labeled in Navajo as "nitsahakees" or "thinking." Thinking is key and it takes a long time. It goes on and on. Perhaps it has no beginning and no end. In this process of thinking about remediating the uranium contamination left over from past uranium mining on Navajo lands it is almost impossible to identify a beginning. The Navajo paradigm and the four stages within it are imbedded with one another. No one stage can exist without the other. Regardless, Navajo problem-solving begins with thinking. This CD has required a great deal of thinking. Thinking is examining root causes of a problem and its nature and consequences. Before we can decide on a solution ("nahat'a" or "planning") we must understand the problem. If we have done our job well, there will be few disagreements.

b.       After "thinking" comes "nahat'a" or "planning." Planning may be visualized as the southernmost point of the circle. Inside the circle is the milieu of life. For the Navajo this means many things including the sacred elements (air, water, fire and earth/pollen), the sacred mountains, and "Nayee" (things that get in the way of a good life).

c.       After "planning" comes "Iina" or the life that "implements" the planning. "Implementation" may be seen as the westernmost point of the circle. Again, this takes time and interacts with the forces visualized as being inside the circle. Obstacles emerge and interfere with

the implementation. Insights arise and help the implementation. But, if the thinking continues and the planning continues, this leads to hopeful and positive results.

        d.      After "implementation" comes "sihasin" which means many things including "results." Results appear at the northernmost point of the circle. Results follow thinking, planning and implementation. For all the Parties here the desired results mean the expeditious implementation of this CD, although each Party likely has its own reasons for wanting this result. For the Navajo Nation, this result is desired because it represents a step toward the complete remediation of all uranium contamination left over from past uranium mining on Navajo lands. The Navajo Nation understands the difficulties and challenges faced in achieving that goal. Still, the goal is worth the effort.

        It is often difficult to keep focus on the nested nature of the four aspects discussed here. Each aspect is re-evaluated by discussion of what has worked and what has failed.

Appendix F

## U.S. Four Corners Uranium Mine Sites Trust Agreement

This Trust Agreement is entered into by and among Cyprus Amax Minerals Company, Western Nuclear, Inc., (collectively, "Settling Defendants"); the United States of America ("United States"); and Le Petomane XXX, Inc., not individually but solely as trustee of the Trust established herein ("Trustee").

RECITALS

A.     The United States and Settling Defendants entered into a Consent Decree that was signed by them and the Navajo Nation (a federally recognized Indian tribe) and lodged in the U.S. District Court for the District of Arizona on January 17, 2017.

B.     The Consent Decree provides for the creation of the Trust and for the transfer of funding to the Trust, to be administered by the Trustee pursuant to this Agreement and the Consent Decree.

C.     Under the Consent Decree, Settling Defendants agree to perform Work and pay Future Response Costs, as those terms are defined therein, and to receive certain reimbursement for the costs of such performance in accordance with Paragraph 34 of the Consent Decree.

D.     The Trust is established solely for the purpose of holding, for the benefit of the United States and Settling Defendants, the Trust Assets, which shall be used solely for payment of the United States' share of the costs of Work performed pursuant to the Consent Decree.

E.     The Trust Assets shall be held in trust solely for payment of the United States' share of the costs of Work performed pursuant to the Consent Decree as provided herein and may not be used for any other purpose.

F.     The Trust is to be funded in the amount set forth in the Consent Decree.

G.     This Agreement and the Consent Decree govern the Trust.

H.     The Trust is created to comply with section 1.468B-1 *et seq* of the Treasury Regulations (the "Treasury Regulations") promulgated under Section 468B of the Internal Revenue Code (the "Code").

I.     The Trust Assets shall be invested in accordance with a conservative strategy that emphasizes capital preservation while generating a reasonable level of income, as determined by the Trustee after consultation with the United States, and as set forth in more detail in Paragraph 5.

J.     It is intended that no contractor, consultant, supplier, or other third party shall be considered to be a third party beneficiary, either incidentally or directly, of this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and in the Consent Decree, the United States, the Settling Defendants, and the Trustee hereby agree as follows:

# AGREEMENT

1. Definitions

   Unless otherwise defined, all capitalized terms in this Agreement shall have the same meaning as that in the Consent Decree.

   1.1. "Agreement" shall mean this Trust Agreement.

   1.2. "Beneficiaries" shall mean the United States and Settling Defendants.

   1.3. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

   1.4. "Consent Decree" shall mean the Consent Decree that was signed by the United States, Settling Defendants, and the Navajo Nation and lodged in the U.S. District Court for the District of Arizona on January 17, 2017.

   1.5. "Effective Date" shall mean the date upon which the approval of the Consent Decree is recorded on the docket of the U.S. District Court for the District of Arizona.

   1.6. "EPA" shall mean the U.S. Environmental Protection Agency.

   1.7. "Grantor" shall mean the United States.

   1.8. "Party" or "Parties" shall refer to Cyprus Amax Minerals Company, Western Nuclear, Inc., and the United States individually or collectively, as appropriate.

   1.9. "Trust Assets" shall mean the funding described in Paragraph 2.1.3 and such other assets as may be acquired, earned, or held by the Trust before its termination.

   1.10. "Trust Parties" shall mean, collectively, the Trust, the Trustee and its affiliates and their shareholders, officers, directors, employees, members, managers, partners, and affiliated entities.

   1.11. "Trustee" shall mean the trustee selected pursuant to Paragraph 3.1 of this Agreement or its successor.

2. The Trust

   2.1. <u>Creation and Transfer of Funding to the Trust</u>.

      2.1.1.  Pursuant to the Consent Decree, the United States hereby establishes the Trust on behalf of the Beneficiaries.  The Trustee hereby accepts and agrees to hold the Trust Assets for the benefit of the Beneficiaries solely for the purposes described in Section 2.2 below, subject to the terms of this Agreement and the Consent Decree.

2

2.1.2. Within 10 business days of the Effective Date of the Consent Decree, the Trustee shall establish and administer the U.S. Four Corners Uranium Mine Sites Trust Account ("Trust Account"), which shall receive the Trust Assets. Subject to the provisions below, the Trustee shall hold in trust and invest the Trust Assets solely in Qualified Investments as provided in Section 5 of this Agreement. All earnings on the funds held in the Trust shall be considered part of Trust Assets and reinvested with other Trust Assets.

2.1.3. As soon as reasonably practicable after the establishment of the Trust Account and receipt by the United States of payment instructions from the Trustee, the United States shall transfer $335 million into the Trust Account pursuant to Paragraph 34.a of the Consent Decree.

2.1.4. This Agreement shall not take effect, and Trustee shall not establish the Trust Account, before the Effective Date of the Consent Decree.

2.2. <u>Objectives and Purpose</u>. The exclusive purposes and functions of the Trust are to hold, for the benefit of the Beneficiaries, the Trust Assets, and to use those assets solely to pay the United States' share of the costs of Work performed pursuant to the Consent Decree. The Trust Assets shall be held in trust solely for payment of the United States' share of the costs of Work performed pursuant to the Consent Decree as provided herein and may not be used for any other purpose. The Trust Assets shall not be construed as property of Settling Defendants or any of their subsidiaries, parents, affiliates, successors, or assigns, or of its bankruptcy estate should any of those entities enter bankruptcy proceedings.

2.3. <u>Beneficiaries</u>. Beneficial interest in the Trust shall be held by the United States and Settling Defendants. Settling Defendants' interest is held subject to a spendthrift trust. Settling Defendants' interest is limited to submitting claims for reimbursement as provided herein and shall not be subject to voluntary or involuntary transfer; nor shall such interest be subject to assignment or to attachment by or to the interference or control of any creditor or assignee of Settling Defendants, or be taken or reached by any legal or equitable process in satisfaction of any debt or liability of Settling Defendants, and any attempted transfer or encumbrance of such interest prior to distribution shall be void.

2.4. <u>Safekeeping of Trust Assets</u>. The Trust Assets shall be held in trust and segregated. The Trustee is expressly prohibited from holding any or all of the Trust Assets in a common, commingled or collective trust fund with the assets of any other entity.

2.5. <u>Accounting</u>. The Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Trust, and the assets and liabilities of the Trust, in such detail and for such period of time as may be necessary to enable the Trustee to make full

and proper accounting in accordance with Paragraphs 2.6 and 6.1 below and to comply with applicable provisions of law and good accounting practices.

2.6. <u>Irrevocability, Termination, and Final Disposition of Trust Assets</u>. Subject to the right of the Parties to modify this Agreement as provided in Paragraph 7.1, this Trust shall be irrevocable and shall continue until terminated upon the earlier of (i) receipt by the United States of the Trustee's written notice of complete exhaustion of the Trust Assets, or (ii) the issuance of the Certification of Work Completion pursuant to Paragraph 104 of the Consent Decree. Before the occurrence of either event, the Trustee shall set aside sufficient funds from the Trust to facilitate the Trust's orderly termination.

2.6.1. Termination upon exhaustion of Trust Assets. In the event that the Trust Account's balance reaches a level equal to the amount set aside to facilitate the Trust's orderly termination, the Trustee shall pay any remaining taxes, assessments, and charges incident to the Trust's management. Within 30 days of making such payments, the Trustee shall deliver to the United States a final statement of account. Upon making this final accounting, the Trust shall be deemed terminated and the Trustee shall immediately close the account.

2.6.2. Termination upon issuance of Certification of Work Completion. In the event that Settling Defendants notify Trustee of their receipt of a Certification of Work Completion, the Trustee shall make any remaining payments required by the terms of this Agreement and the Consent Decree, and pay any remaining taxes, assessments, and charges incident to the Trust's management. After making such payments, the Trustee shall expeditiously liquidate and distribute any remaining Trust Assets, including any current and accumulated income, to the Navajo Nation Environmental Protection Agency for the sole purpose of performing response actions under CERCLA, not inconsistent with the National Contingency Plan, at abandoned uranium mines on Navajo Nation lands where no viable non-Federal potentially responsible party has been identified. The Trustee must deliver a final statement of account to the United States within 30 days of this final distribution or, if no such distribution can be made, within 30 days of the last payment of any taxes, assessments, and charges incident to the Trust's management. Upon making this final accounting, the Trust shall be deemed terminated and the Trustee shall immediately close the account.

2.7. <u>Document Retention and Disposition</u>. The Trustee shall preserve and retain all material non-identical copies of records or documents (including records or documents in electronic form) now in its possession or control or which comes into its possession or control that relate in any manner to the implementation of this Agreement or management of the Trust. The United States and Settling Defendants shall have the right upon 14 days prior written notice to the Trustee to inspect any such records or documents. In the event of termination of the Trust, the Trustee shall give the United States at least 180 days written notice before the destruction of any records or documents

of whatever kind, nature or description in any way relating to the Trust, in order to enable the United States to prepare and implement a protocol for their preservation.

3. The Trustee

3.1. <u>Generally</u>. The United States has selected Le Petomane XXX, Inc., not individually but solely in its representative capacity, as Trustee for an initial term of ten years to administer the Trust and the Trust Account in accordance with this Agreement and the Consent Decree. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the objectives and purposes of the Trust, this Agreement, and the Consent Decree. The Trustee shall have the authority to bind the Trust, and any successor Trustee or successor or assign of the Trust, but shall for all purposes hereunder be acting in its representative capacity as Trustee and not individually. The Trustee shall not be required to take any action or omit to take any action if, after the advice of counsel, the Trustee believes in good faith that such action or omission is inconsistent with the Trustee's fiduciary duties. The Trustee shall not be considered a successor to the United States.

3.2. <u>Powers of the Trustee</u>. In administering the Trust, except as otherwise set forth in this Agreement and the Consent Decree, the Trustee is authorized to perform any and all acts necessary to accomplish the Trust's objectives and purposes. Except as otherwise set forth in this Agreement and the Consent Decree, the powers of the Trustee shall include, without limitation, each of the following: (a) to receive, manage, invest, supervise, and protect the Trust Assets and to pay obligations owed by the Trust from the Trust Assets in accordance with this Agreement and the Consent Decree; (b) to engage the Investment Manager and, as the Trustee deems necessary or appropriate, other persons to assist the Trustee as to the responsibilities described herein; (c) to make disbursements of the Trust Assets for the purposes contemplated in and in accordance with the terms of this Agreement and the Consent Decree; and (d) to effect all actions and execute all agreements, instruments, and other documents necessary to implement this Agreement and the Consent Decree. The Trustee is authorized to execute and deliver all documents on behalf of the Trust to accomplish the purposes of this Agreement and the Consent Decree.

3.3. <u>Retaining Other Professionals</u>. In addition to the Investment Manager retained pursuant to Section 5, the Trustee is authorized, following consultation with the United States, to retain on behalf of the Trust and to pay such additional third parties as the Trustee may deem necessary or appropriate to assist the Trustee in carrying out its powers and duties under this Agreement and the Consent Decree, including, without limitation: (a) counsel to the Trustee; (b) a public accounting firm to perform such reviews or audits of the financial books and records of the Trust as may be appropriate in the Trustee's reasonable discretion, and to prepare and file any tax returns or informational returns for the Trust as may be required; and (c) environmental consultants, brokers, contractors, administrative assistants, and clerks. The Trustee shall pay all such persons from the

Trust Assets for services rendered and expenses incurred in accordance with a budget or fee schedule approved by the United States. The budget or fee schedule may be revised from time to time in the Trustee's discretion, subject to the approval of the United States.

3.4. <u>Limitation of the Trustee's Authority</u>.  The Trustee is not, and shall not be, authorized to engage in any trade or business as to the Trust Assets.  The performance by the Trustee of its duties under this Agreement shall not be considered to constitute engagement in a trade or business.

3.5. <u>Notice to the Parties Regarding Account Balances</u>.  The Trustee shall provide notice to the United States and Settling Defendants within 30 days of the Trust Account's balance falling below $15 million, and shall include in that notice a projection of when the Trust Account will be exhausted based on information provided to the Trustee under Paragraphs 5.2.2 and 7.9.  The Trustee shall provide notice to the United States and Settling Defendants within 15 days of the Trust Account's balance reaching the amount that Trustee set aside to facilitate the Trust's orderly termination under Paragraph 2.6.

3.6. <u>Compensation</u>.  The Trustee shall be compensated from the Trust Assets for its services rendered on behalf of the Trust and shall be reimbursed for its reasonable and necessary costs and expenses in connection with the Trustee's duties hereunder (including costs and expenses incurred to convert the Trust into an environmental response trust pursuant to Paragraphs 70.c and 70.d of the Consent Decree and Paragraph 4.2.2 of this Agreement), upon submission of periodic billings.  The Trustee's compensation and reimbursement shall be in accordance with a budget or fee schedule approved by the United States. This budget or fee schedule may be revised from time to time, subject to the approval of the United States.

3.7. <u>Instructions and Requests from the United States</u>.  All instructions, directions, notices, requests for information, and other communications from the United States to the Trustee pursuant to this Agreement shall be made exclusively by the U.S. Department of Justice.

3.8. <u>Exculpation and Indemnification</u>.

3.8.1.   None of the Trust Parties shall be personally liable as to any claims, causes of action, and other assertions of liability arising out of its actions or omissions of action under this Agreement, the Consent Decree, or any order of court.  The foregoing shall not apply should the U.S. District Court for the District of Arizona, by a final order, not reversed on appeal, find that the Trust Party committed fraud or willful misconduct in relation to its duties or actions that are asserted as the basis for liability.

3.8.2.   The Trust shall indemnify, defend, and hold harmless the Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs,

judgments, damages or expenses (including attorneys' fees and expenses) and any other assertion of liability arising out of the Trust Parties' negligent action or omissions of action under this Agreement, to the fullest extent permitted by applicable law, provided that such indemnification shall be limited to the Trust Assets. Any judgment against any Trust Party and any costs of defense for a Trust Party relating to its actions or omissions of action under this Agreement shall be paid from and limited to funds from the Trust Assets without the Trust Party having to first pay from its own funds for any personal liability or costs of defense, unless the U.S. District Court for the District of Arizona, by a final order, not reversed on appeal, finds that the Trust Party committed fraud or willful misconduct in relation to its duties or actions that are asserted as the basis for liability. The Trustee shall provide written notice to the United States and Settling Defendants at least 30 days before charging against the Trust Assets pursuant to this Paragraph. The indemnification provided in this Paragraph shall not take precedence over any insurance coverage obtained by the Trust. This Paragraph is intended for the benefit of the indemnified parties and not any insurer; nor is it intended to relieve any insurer of its coverage obligations.

3.8.3.  There shall be an irrebuttable presumption that any action taken or not taken with the approval of the Court does not constitute a breach of the Trust Parties' fiduciary duties or an act of fraud or willful misconduct. For the avoidance of doubt, the term "approval of the Court" shall not be construed to mean the Consent Decree or any order approving the Consent Decree.

3.8.4.  Nothing in this Paragraph 3.8, the Agreement, or the Consent Decree shall preclude the United States or Settling Defendants from enforcing the terms of this Agreement against the Trust Parties. The Trustee shall not be liable to the Navajo Nation (including the Navajo Nation Environmental Protection Agency) for actions or omissions of actions under this Agreement.

3.9. Conflicts.  If conflicting demands are made upon Trustee, Trustee may hold any money or documents subject to such conflicting demands until the rights of the Parties making such conflicting demands are resolved by the Parties or determined by court action pursuant to the Consent Decree.

3.10. Resignation and Removal of the Trustee.

3.10.1. Resignation.  The Trustee shall have the right to resign at any time upon giving 120 days written notice of such resignation to the United States and Settling Defendants, provided that if a suitable replacement is not found and approved by the United States within 120 days after such written notice is provided, the Trustee's resignation shall not become effective and the Trustee shall continue to function in its capacity as Trustee until a suitable replacement is found and approved by the United States.

3.10.2. Removal.  The United States shall have the right to remove the Trustee for cause upon 120 days written notice to the Trustee and Settling Defendants.

3.10.3. Transfer of Trust Assets and Trust Documents.  A Trustee that resigns or is removed shall transfer and deliver to its successor the then-existing entire Trust Assets in its possession, along with all Trust documents and records in its possession. Upon such transfer, the Trustee shall be discharged as Trustee of the Trust and shall have no further powers, discretion, rights, obligations, or duties with reference to the Trust Assets, and all such powers, discretion, rights, obligations, and duties of the resigning Trustee shall inure to and be binding upon such successor Trustee.  Notwithstanding the foregoing, nothing in this Paragraph shall be deemed to discharge or release any Trustee that resigns or is removed from liability for its acts or omissions.

3.11. Successor Trustee.

3.11.1. In the event the Trustee resigns or is removed, the United States shall select, in writing, a successor within 120 days of receiving written notice of resignation or within 120 days of removal.

3.11.2. Upon expiration of the Trustee's initial term, the United States may extend that Trustee's term or select, in writing, a successor.

3.11.3. A successor Trustee shall have all the duties, rights, responsibilities, and powers provided by the Trust.

3.11.4. A successor Trustee shall not be liable or responsible in any way for the acts or omissions of any predecessor Trustee or for any loss or expense occasioned by any act or omission of any such predecessor.  A successor Trustee shall be liable for its own acts or omissions in respect to property actually received or duties, responsibilities, and powers assumed by it as the successor.  Notwithstanding the foregoing, nothing contained in this Paragraph shall be deemed to discharge or release any predecessor Trustee from liability for its acts or omissions.

3.12. No Bond.  Notwithstanding any state law to the contrary, the Trustee shall be exempt from giving any bond or other security in any jurisdiction.  The Trustee shall investigate the possible purchase of an insurance policy to cover professional liability related to this Agreement, and shall make recommendations to the United States regarding such insurance.  If authorized in writing by the United States to purchase insurance, the Trustee shall promptly do so using Trust Assets.

4. Disbursements from the Trust

4.1. <u>Requests for Disbursement</u>.

    4.1.1.   From time to time, but no more than once every 30 calendar days, Settling Defendants may submit to the Trustee a request for disbursement (a "Draw Request") of reimbursement for the United States' share of Future Settling Defendants Response Costs incurred in connection with Settling Defendants' performance of the Work as required by the Consent Decree. Each Draw Request must be accompanied by sufficient documentation to allow verification of the accuracy of the costs claimed, proof of payment of all costs included in the Draw Request, and a signed certification under penalty of law that such costs were properly incurred and consistent with the National Contingency Plan, the Consent Decree, and any Decision Documents as that term is defined in Paragraph 4 of the Consent Decree (collectively, "Supporting Cost Documentation").

    4.1.2.   Draw Requests shall be submitted using forms supplied by the Trustee and shall include all information reasonably required to facilitate disbursement in accordance with the Consent Decree and this Agreement, including the Inflation Start Date and the occurrence of the Trigger.

    4.1.3.   Settling Defendants shall not submit Draw Requests, and the Trustee shall not disburse funds, exceeding the maximum claims for reimbursement permitted by Paragraph 34 of the Consent Decree.

4.2. <u>Disbursement of Funds</u>.

    4.2.1.   Within 15 business days of receiving a Draw Request and its Supporting Cost Documentation, Trustee shall, after determining that such documents comply with the requirements of Paragraph 4.1 of this Agreement and Paragraph 34 of the Consent Decree, disburse the amount sought by the Draw Request to Settling Defendants. Unless directed by the United States, the Trustee shall not conduct a substantive review, including an assessment of consistency with the National Contingency Plan. If the Trustee determines that such documents do not comply with these requirements or identifies any error in the documents, the Trustee shall notify Settling Defendants of the deficiency or error. If the Trustee and Settling Defendants cannot rectify the deficiency or error within the 15 business-day period, the Trustee shall disburse only an amount equal to the undisputed portion of the Draw Request, and the Parties shall seek to resolve the dispute over the remaining portion pursuant to the procedures set forth in Paragraph 34.d of the Consent Decree.

    4.2.2.   In the event of a Work Takeover by EPA pursuant to Paragraph 70 of the Consent Decree, Trustee shall follow any instructions from the U.S. Department of Justice

regarding (a) disbursement of Trust Assets, and (b) necessary steps to convert the Trust into an environmental response trust capable of performing the Work pursuant to the Consent Decree. In the event that Work Takeover terminates and Settling Defendants resume performance of the Work, the Trustee shall, subject to Paragraph 4.5 of this Agreement, resume disbursement of funds pursuant to Paragraphs 4.1 and 4.2.1 of this Agreement.

4.3. <u>Disputed Costs</u>. Upon the receipt of any Settling Defendants Costs Statement required by Paragraph 34.b(4) of the Consent Decree, the United States shall have 60 days to review and approve that statement. Within 60 days of receipt of the Settling Defendants Costs Statement, the United States may object in writing, and that objection shall be sent to Settling Defendants and the Trustee pursuant to Paragraph 7.8. If, upon resolution of the objection pursuant to Paragraph 34.e of the Consent Decree, the United States prevails in whole or in part upon any objection to any costs described in the Settling Defendants Costs Statement, the Trustee shall reduce future disbursement(s) pursuant to Paragraph 4.5.

4.4. <u>Duty to Assist in Dispute Resolution</u>. Paragraph 34.d of the Consent Decree identifies procedures to be followed in the event of a dispute regarding Settling Defendants Response Costs. In the event of a dispute, the Trustee shall provide assistance to the United States and Settling Defendants in the dispute-resolution process as requested, including production of information, documents, and testimony relating to the Trustee's activities under this Agreement.

4.5. <u>Notice to Trustee and Reduction in Disbursements</u>. The Parties shall promptly notify the Trustee of any reduction in disbursement determined pursuant to Paragraphs 34.b(9) or 34.e of the Consent Decree. The Trustee shall reduce one or more subsequent disbursements, as necessary, by that amount.

4.6. <u>Liens</u>. Notwithstanding anything to the contrary in this Agreement, the Trustee and the United States shall have a first-priority lien on and security interest in the Trust Assets, to secure the payment of all amounts owed to or accrued or reserved on account of the Trust or to be retained by the Trustee hereunder or otherwise due hereunder. The Trustee agrees to take appropriate actions and execute appropriate documents so that the Trustee's and the United States' liens and security are perfected as of the Effective Date.

5. Investment of Trust Assets

5.1. <u>Generally</u>. The Trust Assets shall be invested in accordance with a conservative strategy that emphasizes capital preservation while generating a reasonable level of income, as determined by the Trustee after consultation with the United States. To implement this strategy, and subject to those constraints, the initial objective shall be to attain at least a 3% average annual return. Notwithstanding this initial objective, the Parties recognize and agree that the Trustee shall have discretion to adapt this target to changing market conditions (after consultation with the United States), that the Trustee does not guarantee

investment performance, and that the Trustee shall not be subject to liability solely as a result of the average annual returns not achieving the 3% target.

5.2. <u>Retaining the Investment Manager</u>. The Trustee shall retain a professional investment manager ("Investment Manager") to manage all investments of the Trust Assets in Qualified Investments. The Investment Manager shall be selected by the Trustee after consultation with the United States and shall be compensated from the Trust Assets.

   5.2.1. The Investment Manager shall be responsible for all investment decisions regarding the Trust Assets, including (a) selection of individual investments; (b) timing of the purchase and sale of individual investments; (c) selection of any brokerage firms and other institutions to be used in carrying out the investment activities affecting Trust Assets; and (d) selection of the manner and form in which investments are to be purchased, held, and transferred.

   5.2.2. The Investment Manager shall recommend, for the Trustee's approval, the initial allocation of Trust Assets among Qualified Investments. Any material changes to the allocation shall also be approved by the Trustee.

   5.2.3. Within 30 days of notifying the Parties of the selection of the Investment Manager, the Trustee shall enter into a contract with the designated Investment Manager ("Investment Management Agreement"). The Investment Management Agreement shall identify the duties of the Investment Manager and provide that the Investment Manager will be compensated from the Trust Assets at the rate identified in that agreement, and shall require the Investment Manager to adhere to the parameters identified in this Section 5 in managing investment of the Trust Assets. The Investment Management Agreement shall require the Investment Manager to submit to the Trustee quarterly reports identifying, among other things, the balance of the Trust Assets and those assets' performance in comparison to appropriate investment benchmarks. The Investment Management Agreement shall also require the Investment Manager to review the Trust Assets each quarter and give written notice to the Trustee and the United States if it appears that the Trust Assets will be insufficient to satisfy anticipated payment obligations of the United States under the Consent Decree during the next 12 months based on projected cost estimates submitted by Settling Defendants under Paragraph 7.9.

   5.2.4. The Investment Management Agreement shall provide that it may be terminated by the Trustee at any time upon 30 days written notice. The Trustee shall exercise this termination provision only after consultation with the United States.

5.3. <u>Qualified Investments</u>. Qualified Investments shall mean any of the following investments: (a) cash and cash equivalent investments defined as dollar-denominated demand deposits, time deposits, certificates of deposit, or other obligations (including acceptances) of any bank whose deposits are federally insured and having (1) capital and surplus in excess of $250 million and (2) a short-term commercial paper rating from

Standard & Poor's that is at least A-1 or the equivalent thereof or a short-term commercial paper rating from Moody's that is at least P-1 or the equivalent; (b) U.S. Treasury bills and notes; (c) A, AA, or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); (d) U.S. Treasury futures contracts; (e) AA or AAA municipal bonds; (f) open-ended mutual funds, short-term investment funds, or commingled funds owning only assets described in (a) through (e); and (g) such other categories of investments as may be approved by the United States in writing; *provided*, however, that investment in in U.S. Treasury futures contracts may not exceed 10% of the portfolio. U.S. Treasury futures investment will be measured as U.S. Treasury futures notional divided by total portfolio market value. Any such investments shall be made consistently with the Uniform Prudent Investor Act. Should any ambiguities arise as to whether an instrument is or continues to be a Qualified Instrument, the Trustee shall, after consultation with the Investment Manager, resolve that ambiguity consistent with the terms and purposes of this Agreement and the Consent Decree.

5.4. Investment Company Act. Nothing in this Section 5 shall be construed as authorizing the Trustee to cause the Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended. The sole purpose of this Section is to authorize the investment of the funds in the Trust or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Trust.

6. Financial Reports and Taxes

6.1. Financial Reports. As soon as practicable after the end of each calendar quarter beginning with the quarter ended after the Trust's receipt of the payment required of the United States pursuant to Paragraph 34.a of the Consent Decree, and ending as soon as practicable upon termination of the Trust, the Trustee shall submit to the United States and Settling Defendants a written report that includes (a) financial statements of the Trust at the end of such calendar quarter or period and the receipts and disbursements of the Trust for such calendar quarter or period; and (b) a description of any action taken by the Trustee in the performance of its duties which, as determined by outside counsel, accountants, or other professional advisors, materially and adversely affects the Trust and of which notice has not previously been given to the United States and Settling Defendants. Further, by February 28, 2018, and each subsequent calendar year the Trustee shall submit to the United States and Settling Defendants an annual report that provides the above-described information for the preceding calendar year or, if the report is a final report after termination, for the period from the most recent annual report until the termination of the Trust.

6.2. Qualified Settlement Fund. For federal income tax purposes, the Trust is intended to be a qualified settlement fund and the Grantor will elect to treat the Trust as a grantor trust

pursuant to section 468B of the Code and related Treasury Regulations. The Parties and the Trustee agree to take all legally available steps necessary to assure such treatment.

6.2.1. <u>Tax Reporting</u>. The Trustee is intended to be the "administrator" of the Trust within the meaning of Treasury Regulation sections 1.468B-1(k)(2)(i) and 1.468B-2(k)(3). The Trustee shall be responsible for preparing and filing all applicable income tax returns or other income tax reporting requirements to comply with the requirements of Code sections 468B and 671 and related Treasury Regulations.

6.2.2. <u>Grantor Trust Election</u>. As the sole transferor to the Trust, the Grantor agrees to make the election (grantor trust election) under Treasury Regulation section 1.468B-1(k) to treat the Trust as a trust all of which is owned by the Grantor (solely for tax purposes) under Code section 671 and related Treasury Regulations. To effect such election, the Grantor agrees to timely provide the Trustee with the required transferor election statement pursuant to Treasury Regulation section 1.468B-1(k)(2). The Trustee shall timely file a Form 1041 on behalf of the Trust with the Grantor's election statement attached. The Form 1041 will be filed for the taxable year in which the Trust satisfies the requirements of Treasury Regulation section 1.468B-1(c).

6.2.3. <u>Environmental Remediation Trust</u>. In the event the Trust does not meet the requirements under Treasury Regulation section 1.468B-1 to be a qualified settlement fund, the Trust is intended to qualify as an environmental remediation trust under Treasury Regulation section 301.7701-4(e).

7. Miscellaneous Provisions

7.1. <u>Modifications</u>. Material modifications of this Agreement shall be in writing, signed by the Parties and the Trustee, and effective upon approval by the U.S. District Court for the District of Arizona. Non-material modifications shall be in writing and effective when signed by duly authorized representatives of the Parties and the Trustee.

7.2. <u>Modification and Termination in Work Takeover</u>. Paragraphs 70.c and 70.d of the Consent Decree and Paragraph 4.2.2 of this Agreement, which authorize conversion of the Trust into an environmental response trust and may entail modification of this Agreement or termination of the Trust and this Agreement and creation of a successor Trust, shall supersede any contrary provisions in this Agreement regarding modification or termination. Any modifications to this Agreement or any new trust agreement created pursuant to Paragraphs 70.c and 70.d of the Consent Decree and Paragraph 4.2.2 of this Agreement shall not require the agreement or signature of the Trustee or Settling Defendants. In making such modification or creating such new agreement, the United States shall consult with the Trustee. Notwithstanding Paragraph 3.10.2 of this Agreement, the United States shall have absolute discretion to remove the Trustee in the event of a Work Takeover pursuant to Paragraph 70 of the Consent Decree.

7.3. <u>Relationship to Trust</u>.  None of Settling Defendants or the Navajo Nation shall be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Trust solely on account of this Agreement or the Consent Decree.  No title or interest in the Trust Assets, its funds or any income accruing therefrom or thereon, or its other property shall vest in Settling Defendants or the Navajo Nation during the continuance of the Trust.  Settling Defendants and the Navajo Nation shall have no right, power, or authority to anticipate any income from the Trust Assets, payments into the Trust Assets, or any payments from the Trust Assets; or to alienate, convey, transfer, or dispose of the same or any interest therein or any part thereof in advance of payment.  None of the principal or income of the Trust Assets, payments into the Trust Assets, nor any payments from the Trust Assets shall be involuntarily alienated by Settling Defendants or the Navajo Nation or be subject to attachment, execution, or levy, or taken upon any process for any debts that Settling Defendants or the Navajo Nation may have contracted, or in satisfaction of any demands or obligations that Settling Defendants or Navajo Nation may have incurred.  The Trust Assets shall not be construed as property of Settling Defendants or the Navajo Nation, or of any entity's bankruptcy estate should that entity enter bankruptcy proceedings.

7.3.1.   The Navajo Nation, including the Navajo Nation Environmental Protection Agency, shall have no right to approve or consult on any Trustee actions or decisions relating to the Trust; nor shall the Navajo Nation have the right to review or access any documents relating to the implementation of this Agreement, or management or operation of the Trust.

7.3.2.   Except as provided in Paragraph 6.2.2 and solely for purposes of tax law, the United States shall not be deemed to be an owner, operator, trustee, partner, agent, shareholder, officer, or director of the Trust solely on account of this Agreement or the Consent Decree.

7.4. <u>Consent Decree Controls</u>.  To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Consent Decree.  In the event of an irreconcilable conflict between this Agreement and the Consent Decree, the Consent Decree shall control.

7.5. <u>Compliance with Laws</u>.  Any and all distributions of Trust Assets shall be in compliance with all applicable laws.

7.6. <u>Choice of Law</u>.  The situs of the Trust shall be in Arizona.  The rights, duties, and obligations arising under this Agreement shall be governed by, and construed and enforced in accordance with, applicable federal law.  Where federal law is not applicable, the rights, duties, and obligations arising under this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Arizona, without regard to its choice of law rules.

7.7. <u>Forum for Disputes</u>. If a dispute arises over the terms or administration of the Trust, the Parties and the Trustee shall attempt to resolve the dispute among themselves or with the assistance of non-binding mediation. If the dispute cannot be resolved informally, the United States, Settling Defendants, or the Trustee may seek to have the dispute resolved by the U.S. District Court for the District of Arizona. This provision does not confer upon any court the right to alter or amend this Agreement's terms or conditions.

7.8. <u>Notices</u>. All notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly received 5 days after being mailed by registered or certified mail, return receipt requested, or 1 business day after being sent overnight by a nationally recognized courier with established tracking capability, addressed to each Party and the Trustee as follows:


If to Settling Defendants:

Cyprus Amax Minerals Company and Western Nuclear, Inc.
333 North Central Avenue
Phoenix, Arizona 85004
Attention: William E. Cobb

and:

Cyprus Amax Minerals Company and Western Nuclear, Inc.
333 North Central Avenue
Phoenix, Arizona 85004
Attention: Treasurer

with copy to:

Vinson & Elkins, LLP
2200 Pennsylvania Ave. NW, Suite 500 West
Washington, DC 20037
Attention: Kevin A. Gaynor, Esq.

If to the United States:

Chief
Environmental Defense Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Re: DJ # 90-11-6-20322

If to Trustee:

Le Petomane XXX, Inc., not individually but solely as Trustee of the
U.S. Four Corners Uranium Mine Sites Trust
35 East Wacker Drive - Suite 1550
Chicago, Illinois 60601

with copy to:
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin  53202
Attn:  Tanya C. O'Neill

Each Party and the Trustee shall have the right to designate new recipients of any notice required to be given under this Agreement by providing notice of such change to the other Parties using the process set forth in this Paragraph.

7.9. <u>Submission of Annual Projected Cost Estimates</u>.  Within 15 days of the conclusion of the annual planning process set forth in Paragraph 11.d of the Consent Decree, Settling Defendants shall submit to the Trustee the projected cost estimates for the following year's Work.  Further, Settling Defendants shall cooperate with and respond to the Trustee's reasonable requests for information, including projections of future reimbursement requests, that would assist the Trustee in managing the Trust's liquidity.

7.10. <u>Notice of Receipt of Certification of Work Completion</u>.  Within 15 days of receiving a Certification of Work Completion pursuant to Paragraph 104 of the Consent Decree, Settling Defendants shall notify Trustee and the United States of their receipt of the certification.

7.11. <u>No Recourse to Beneficiary</u>.  In no event shall the Beneficiaries have any responsibility to pay any expenses, fees, or other obligations of the Trust, and in no event shall the Trustee, the Investment Manager, or any other person employed or contracted to perform services on behalf of the Trust have recourse to the Beneficiaries therefor.

7.12. <u>Uniform Custodial Trust Act Not Applicable</u>.  This Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any state, now or in the future.

7.13. <u>Headings</u>.  The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any of its terms or provisions.

7.14. <u>Binding Effect</u>.  This Agreement shall be binding upon and shall inure to the benefit of the heirs, representatives, successors and assigns of each of the Parties and Trustee.

7.15. <u>Multiple Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be an original and all of which combined shall constitute one and the same instrument.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

THE UNDERSIGNED ENTER INTO THIS AGREEMENT:

**FOR CYPRUS AMAX MINERALS COMPANY:**

By: _Scott Statnam_

Name: SCOTT STATNAM

Its: DEPUTY GENERAL COUNSEL - PCX

Date: 3/3/17

**FOR WESTERN NUCLEAR, INC.:**

By: _Scott Statnam_

Name: SCOTT STATNAM

Its: DEPUTY GENERAL COUNSEL - PCX

Date: 3/3/17

Signature page for Trust Agreement (Appendix F of the Consent Decree in *United States and the Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*, No. 2:17-cv-00140-MHB (D. Ariz.))

**FOR THE UNITED STATES OF AMERICA:**

By: _____

Name: __Bruce S. Gelber_____

Its: ____Deputy Assistant Attorney General____

Date: __3-5-17_____


Signature page for Trust Agreement (Appendix F of the Consent Decree in *United States and the Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*, No. 2:17-cv-00140-MHB (D. Ariz.))

**FOR THE TRUSTEE:**

By: _Jay A. Steinberg_ _not individually, but solely as Pres. of_

Name: Jay A. Steinberg, not individually, but
solely in his representative capacity as President of
the Trustee

Date: _2/28/17_

Signature page for Trust Agreement (Appendix F of the Consent Decree in *United States and the
Navajo Nation v. Cyprus Amax Minerals Company and Western Nuclear, Inc.*, No. 2:17-cv-
00140-MHB (D. Ariz.))

Signature Page 3